## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; WOMEN'S HELP SERVICES D/B/A 1ST WAY LIFE CENTER & FOCUS WOMEN'S CENTER; ROCKFORD FAMILY INITIATIVE; RELEVANT PREGNANCY OPTIONS CENTER; and PRO-LIFE ACTION LEAGUE, on behalf of themselves and their clients, | ) ) ) ) ) ) ) ) ) | |
| | ) | Case No.: 23-cv-50279 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) | |
| Defendant. | ) ) ) | |

### VERIFIED COMPLAINT FOR TEMPORARY AND PERMANENT INJUNCTION AND OTHER RELIEF

NOW COME Plaintiffs National Institute of Family and Life Advocates ("NIFLA"), Women's Help Services d/b/a 1st Way Life Center & Focus Women's Center, Rockford Family Initiative, Relevant Pregnancy Options Center, and Pro-Life Action League (collectively, "Plaintiffs"), by their undersigned counsel, and Complain of Defendant Kwame Raoul, Attorney General of Illinois, as follows:

### INTRODUCTION

1.      Just as it is core to our Constitution that government may not establish religion, thereby coercing citizens to believe what is allegedly "orthodox" in matters of faith, it no less core

1

to our Constitution, and our American way of life, that government may not prescribe political, moral, or even scientific orthodoxies from which no one is permitted to depart; or worse, that certain disfavored citizens are required to speak, no matter how vehemently they disagree. As the Supreme Court recently put it: "Whenever . . . a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines" the ends of the First Amendment in preserving "our democratic form of government" and "further[ing] the search for truth." *Janus v. Am. Fed'n of State Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018).

2.      Today, Illinois does violence to those quasi-sacred ends. Governor Pritzker has signed into law Senate Bill 1909 (103d Ill. Gen. Assem., 2023 Sess.) ("SB1909") (Attached as Exhibit 1.), which openly targets pro-life pregnancy ministries—while exempting abortion facilities—by specifically prohibiting them from engaging in undefined "deception" or "omissions of any material fact" under the Illinois Consumer Fraud and Deceptive Businesses Practices Act ("Deceptive Business Practices Act"). But SB1909 goes far beyond traditional restrictions on deceptive business practices, in part by stating in its express legislative intent (Section 1 of the law) that it unapologetically targets alleged pro-life "*misinformation*"—that is, controverted facts about abortion that the Illinois General Assembly majority believes are not among the "orthodox" views on the subject.

3.      The Illinois Attorney General's Office, which authored and will enforce SB1909, confirmed during legislative hearings on SB1909 that the law could prohibit pro-life pregnancy centers from stating that "Life begins at conception" or require them to speak the State's viewpoint that childbirth is allegedly associated with a 14-times-greater risk of death than abortion, despite

studies contradicting that view and in the teeth of the pro-life position that abortion poses a 100% risk of death for the unborn child.

4. But now, speaking common pro-life views as part of a pregnancy help ministry, or failing to speak the State's pro-abortion views on hotly disputed issues, is illegal under state law, on pain of crippling fines, injunctions, and attorney fees. Meanwhile, abortion facilities (as well as expressly exempted licensed healthcare providers and hospitals) remain free to engage in their own controversial speech about abortion, as they wish.

5. It is for days like today—perhaps more than any other—that the First and Fourteenth Amendment were ratified, to stop such affronts to core premises and promises of our national life.

6. This lawsuit seeks to protect the right of life-affirming pregnancy help ministries to continue their meaningful and important work of providing compassionate and competent advice, care, and support to the thousands of women facing difficult or untimely pregnancies across the State of Illinois each year.

7. Plaintiffs are faith-based organizations that seek to make every woman feel loved and supported in her pregnancy, especially those facing a difficult or untimely pregnancy. They believe that all women deserve compassionate, competent, and life-affirming medical care and support through their pregnancies. To this end, they provide resources, support, counseling, and care to their clients.

8. Plaintiffs each hold as articles of their religious mission that life begins from the moment of conception and that abortion is the unjustified killing of an innocent human being: a sin and a violation of the Ten Commandments' decree that "Thou Shalt Not Kill." Plaintiffs are driven by their religious mission to counsel pregnant women to better inform them about all of

their options with the goal of helping them choose life for their unborn child. Plaintiffs thus also provide material support and assistance to pregnant women and their children so that they need not feel coerced or compelled to choose abortion.

9. Because of these views, Plaintiffs also oppose contraception that they understand to be abortifacients because they can operate after the point of fertilization. This includes "emergency contraception" such as the "morning after pill" and "ella."

10. Plaintiffs have assisted thousands of women in navigating the uncertainty of a difficult or untimely pregnancy with love and compassion, treating each woman with dignity and respect no matter what decision she makes regarding her pregnancy. Moreover, Plaintiffs provide all of their services and support for free as part of their religious ministries.

11. Plaintiffs require all of their staff and volunteers to be truthful at all times with their clients or potential clients. Indeed, Plaintiffs believe it is essential that their clients be given all the facts regarding their pregnancy and abortion to make an informed decision about their futures. Deception of any kind is strictly forbidden.

12. Despite the obvious benefit that life-affirming organizations like Plaintiffs provide to their community, SB1909 threatens to silence all religious and pro-life speech on the issues of pregnancy, motherhood, and abortion with which the State disagrees.

13. SB1909 prohibits life-affirming organizations from spreading so-called "misinformation" about abortion, pregnancy, and reproductive healthcare. (SB1909, Sec. 1 at 2:6.)

14. SB1909 targets the speech of only "limited services pregnancy centers," i.e., any organization or facility that provides "counseling service[s]" relating to pregnancy or abortion, but does not provide abortions or emergency contraception or otherwise provide referrals to or affiliate

with organizations that provide abortions and emergency contraception. (*Id.*, Sec. 2BBBB at 4:9-16, 5:6-13.) SB1909 thus expressly exempts all abortion providers and promoters from its reach.

15.     The Attorney General's Office stated that, in drafting SB1909, its "intent is to not enforce this law against *legitimate*, licensed medical providers." (Jansen Decl. ¶11(c), Ex. C thereto at 35-36, Email from Att'y Gen'l Sr. Policy Counsel Caitlyn McEllis to Ill. St. Med. Soc. Sr. Vice Pres. Erin O'Brien, 2/16/23) (emphasis added).) Thus, in addition to exempting abortion and/or emergency contraceptive providers and referrers, it also expressly exempts licensed healthcare professionals and licensed hospitals. (SB1909, Sec. 2BBBB at 4:21-5:1.)

16.     Upon passage of SB1909, the Attorney General widely distributed a press release adopting and incorporating the statement of Chief House Sponsor, Rep. Terra Costa Howard, that pro-life pregnancy centers are "fake clinics," and "so-called clinics," and further confirmed that SB1909 seeks to target the so-called "spread [of] false information" and "misleading information overstating the risks associated with abortion, including conveying false claims that abortion causes cancer or infertility."[1] The Attorney General's release demonstrates that, consistent with SB1909's express legislative intent, the law is not aimed at requiring uncontroversial and non-burdensome commercial disclosures or at the direct regulation of deceptive commercial practices that only indirectly affect speech. Rather, SB1909 directly prohibits pro-life pregnancy centers' speech on a matter of grave public concern—i.e., abortion—an issue the Supreme Court recently explained presents "a question of profound *moral* and social importance," about which "Americans continue to hold passionate and widely divergent views." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242, 2265 (2022).

---

[1] https://illinoisattorneygeneral.gov/news/story/attorney-general-raouls-legislation-to-address-deceptive-practices-by-crisis-pregnancy-centers-headed-to-governors-desk (permalinked at https://archive.ph/TIcVm) (Attached as Exhibit 1A.).

17.     SB1909 is intended to curtail the efforts of life-affirming organizations to "dissuade pregnant [women] from considering abortion care." (SB1909, Sec. 1 at 1:11-19.) The law faults life-affirming organizations for "pay[ing] for advertising . . . that is intended to attract consumers to their organizations and away from medical providers that offer" abortions, accusing the life-affirming organizations of providing misleading information "overstating the risks associated with abortion," including conveying information that "abortion causes cancer or infertility." (*Id.*, Sec. 1 at 1:19–2:3.) SB1909 further accuses life-affirming organizations of "concealing data that shows the risk of death associated with childbirth is approximately 14 times higher than the risk of death associated with an abortion." (*Id.*, Sec. 1 at 2:3-6.) Plaintiffs sincerely and reasonably believe all information they provide related to abortion is true, and all such information is evidence-based.[2]

18.     The General Assembly declares in SB1909 that the state has an interest in regulating speech that "interfere[s] with an individual's ability to make autonomous, informed, and evidence-based decisions" and "have timely access to quality reproductive health care that adheres to accepted standards of medical practice or care." (SB1909, Sec. 1 at 2:17-24.)

19.     In reality, SB1909 *reduces* the ability of pregnant women to receive information necessary to make an "autonomous" and "informed" decision. Instead of that autonomous decision, SB1909 would cabin a pregnant woman's decision-making process by allowing only the limited data approved by the state, instead of allowing her to hear both sides' advocacy and information before making an abortion decision.

---

[2] *See, e.g.*, https://nifla.org/abortion-not-safer-women-childbirth/ (permalinked at https://archive.ph/HKoNq).

6

20.     Prior to the Supreme Court's decision last year in *Dobbs v. Jackson Women's Health Organization*, over 40,000 abortions were performed in Illinois annually—a number expected to significantly increase in the future, because each state bordering Illinois has more stringent abortion restrictions on the books.

21.     The Illinois government's strident pro-abortion views are clear. Over the past eight years, the General Assembly has enacted a flurry of pro-abortion legislation: limiting conscience rights for healthcare professionals who object to participating in abortions (99th Ill. Gen. Assem., Senate Bill 1564, 2016 Sess.); repealing prohibitions on Medicaid funding for elective abortions (100th Ill. Gen. Assem., House Bill 40, 2017 Sess.); declaring abortion to be a "fundamental right," repealing the 1975 Abortion Law and nearly all substantive limits on the abortion procedure (101st Ill. Gen. Assem., Senate Bill 25, 2019 Sess. ("Reproductive Health Act")); repealing Illinois' requirement of parental notice prior to a minor obtaining an abortion (102d Ill. Gen. Assem, House Bill 370, 2021 Sess.); repealing prohibitions on non-physicians performing certain surgical abortions, creating a fund to pay for abortion clinical training, and mandating private insurers to provide chemical abortifacients without a copay (102d Ill. Gen. Assem., House Bill 4664, 2022 Sess.); and the measure at issue here, SB1909, among others.

22.     From the Governor on down, every state constitutional officer and majorities of both houses of the General Assembly are "100% pro-choice." *See, e.g.,* https://www.personal-pac.org/about/history/ ("The 2020 election helped secure the pro-choice majority in both the House and Senate."). Access to abortion in Illinois is widespread and virtually unlimited, and abortion providers are politically protected and privileged.

23.     Regardless of the State of Illinois's viewpoint and policy preferences regarding abortion, the State cannot use its power to silence opposing viewpoints. But this is exactly what SB1909 seeks to do.

24.     Under the guise of regulating "deceptive" practices, the State of Illinois threatens to punish Plaintiffs and any other organization wishing to express and advocate for pro-life views with burdensome investigations and costly litigation, should the Attorney General determine that a life-affirming organization's pro-life speech (as expressly targeted by SB1909) constitutes a deceptive practice, with the goal of imposing the ultimate punishment of crippling civil penalties and/or dissolution.

25.     The Attorney General's Office took the position during legislative hearings on SB1909 that the Deceptive Business Practices Act *already regulates* any actual deceptive trade practices by life-affirming organizations. Even so, the Attorney General urged the General Assembly to pass this new law, which singles out religious and pro-life speech and organizations for disparate treatment. Before SB1909, the Deceptive Business Practices Act did not single out any particular type of speech or viewpoint regarding pregnancy or abortion for heightened scrutiny by the State.

26.     The State also took this action against life-affirming organizations in the absence of any evidence that such organizations engage in deceptive practices, beyond a handful of unverified complaints to a third-party abortion advocacy organization and a few alleged anecdotal examples.

27.     In short, SB1909 is not only unwise and unnecessary, but also an egregious affront to the First Amendment's guarantees of freedom of speech, assembly, and religious exercise, as

well as the Fourteenth Amendment's guarantees of equal protection, due process of law, and the right to continue a pregnancy.

28.     To prevent imminent and irreparable harm to these essential constitutional rights, Plaintiffs ask for this Court's immediate intervention to declare SB1909 unconstitutional and enjoin its enforcement.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under the Constitution and laws of the United States.

30.     This Court has authority to issue the relief sought pursuant to 28 U.S.C. §§1343(a), 2201, and 2202 and 42 U.S.C. §§1983 and 1988.

31.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2). Defendant maintains offices and performs his official duties in this district and division, and a substantial part of the events giving rise to the claims has been and is occurring in this district and division.

## THE PARTIES

32.     Plaintiff National Institute of Family and Life Advocates ("NIFLA") is a religious non-profit corporation duly incorporated under the laws of Virginia, with its principal place of business at 10333 Southpoint Landing Blvd, Suite 107, Fredericksburg, VA 22407.

33.     NIFLA is composed of member pregnancy centers from across the nation, including 81 in the state of Illinois that constitute "limited services" pregnancy centers, as defined by SB1909, and are therefore regulated by SB1909. NIFLA has several member centers headquartered and operating in the Western Division of the Northern District of Illinois.

34.     Plaintiff Women's Help Services d/b/a 1st Way Life Center & Focus Women's Center is a faith-based non-profit pregnancy resource center ministry dedicated to empowering

women by providing them with information and education for prenatal development, child birth-ing, parenting, and child development. Women's Help Services also provides material resources such as maternity clothes, baby clothes, baby items, baby food, diapers, and more. It is headquar-tered and has a facility in Johnsburg, Illinois, with another facility in McHenry, Illinois, both in the Western Division of the Northern District of Illinois.

35.     Plaintiff Rockford Family Initiative ("RFI") is a religious non-profit organization headquartered in and dedicated to promoting family values in the Rockford, Illinois area, in the Western Division of the Northern District of Illinois. RFI advocates for the love and protection of children in the womb and offers help to their mothers free of charge.

36.     Plaintiff Relevant Pregnancy Options Center ("Relevant") is a religious non-profit corporation duly incorporated under the laws of Illinois, with its principal place of business at 2653 Plaza Drive, Highland, Illinois. Relevant strives to help women by providing free pregnancy test-ing, caring, support, education on fetal development, labor and delivery, and parenting classes for both mothers and fathers. Relevant also provides many material items needed for a baby such as diapers, wipes, car seats, and baby clothes. It also assists mothers in locating resources such as housing, childcare, food, and medical assistance at no cost to them.

37.     Plaintiff Pro-Life Action League ("PLAL"), founded in 1980 by noted pro-life ac-tivist Joe Scheidler, is one of the oldest and most effective outreaches for life in the country. It is a religious non-profit corporation headquartered in Aurora, Illinois and dedicated to saving unborn children through nonviolent direct action.

38.     Plaintiffs sue on behalf of themselves and their clients.

39.     Defendant Kwame Raoul is the Attorney General of Illinois and is sued in his official capacity. He is authorized to enforce SB1909, which his office drafted, at his personal direction.

## FACTUAL BACKGROUND

**National Institute of Family and Life Advocates**

40.     NIFLA is a non-profit membership organization comprised of a network of both medical and non-medical centers providing pro-life information services to women in unplanned pregnancies.

41.     NIFLA is incorporated as a religious organization.

42.     NIFLA provides both medical and non-medical life-affirming pregnancy centers with legal resources and counsel, with the aim of developing a network of life-affirming ministries in every community across the nation in order to achieve an abortion-free America.

43.     NIFLA's mission is to empower the choice for life by equipping pregnancy centers with legal counsel and support; enabling pregnancy centers to convert to medical clinic status; and energizing pregnancy centers with a renewed vision for the future.

44.     NIFLA has never been cited by or received a warning from the State of Illinois for engaging in deception or otherwise making misrepresentations.

45.     NIFLA has 81 member centers in Illinois, over 60 of which offer limited obstetric ultrasound and other medical services under the supervision of their respective medical directors who are licensed Illinois medical physicians. NIFLA and its centers provide their services free of charge.

46.     NIFLA's member centers do not provide or refer for abortion or emergency contraception, and do not affiliate with organizations or providers who provide abortion or emergency contraception.

47.     Most of NIFLA's Illinois members are religious organizations that pursue their pro-life message and activities as an exercise of their religious beliefs.

48.     NIFLA's own religious mission includes helping those members advance their religious beliefs.

49.     NIFLA's Illinois members are regulated under SB1909 as so-called "limited services pregnancy centers."

50.     NIFLA has organizational standing to represent all of its Illinois member pregnancy centers, both licensed and unlicensed. *See New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

51.     The members of NIFLA would otherwise have standing to sue in their own right in this case.

52.     The interests that NIFLA seeks to protect are fundamental to NIFLA's purpose, including the purpose to support its life-affirming pregnancy center members and enable them to carry out their missions consistent with their pro-life and religious viewpoints.

53.     Neither the claims asserted nor the relief requested requires participation of all of NIFLA's individual members in this suit, but can be awarded to NIFLA's members as a group.

**Relevant Pregnancy Options Center**

54.     Relevant is a non-profit Christian organization located in Highland, Illinois that provides competent and caring reproductive services to the women in its community.

55.     Relevant is a member of NIFLA.

12

56. Relevant exists to provide compassionate and competent reproductive healthcare to women and couples facing an unplanned pregnancy. To this end, it provides free pregnancy testing, options counseling, education, and physical and emotional support to the women in its community.

57. Relevant does not provide or refer for abortion or emergency contraception, and it has no affiliates that provide abortion or emergency contraception.

58. Relevant is a religious organization and pursues its pro-life message and activities as an exercise of its religious belief that a pregnancy is a gift of God from the moment of conception that should not be destroyed by abortion.

59. Pursuant to its pro-life viewpoint, Relevant provides its services to women facing unplanned pregnancies to empower the women it serves to choose life for their child, rather than abortion.

60. While it has religious objections to performing or providing referrals for abortions, Relevant does discuss abortion as one of many options available to its clients as it seeks to empower women to make informed choices regarding their futures.

61. Additionally, while Relevant does not currently provide medical services, it is in the process of establishing on-site medical services under the direction and supervision of a licensed physician. Relevant has never been cited by or received a warning from the State of Illinois for engaging in deception or otherwise making misrepresentations.

**Women's Help Services**

62. Women's Help Services is a Christian organization with locations in Johnsburg & McHenry, Illinois that has been serving the women of its community for over 43 years.

63. It seeks to empower women by providing them with information and education for prenatal development, child birthing, parenting, and child development.

64. Women's Help Services provides a variety of free materials essential for new moms, including maternity clothes, baby clothes, baby items, baby food, and diapers. It also hosts parenting classes for both moms and dads along with a Mom Support Group that meets regularly. For those who respond negatively to a past abortion experience, Women's Help Services provides supportive counseling and mentors.

65. Additionally, Women's Help Services provides referrals to its clients to address their specific needs. It therefore offers referrals to community agencies for financial aid, housing medical care, adoption, legal concerns, and psychological assistance.

66. Women's Help Services also operates a life-affirming pregnancy clinic that provides free medical treatment to its clients. The clinic offers a variety of services, including pregnancy testing, testing and treatment for certain sexually transmitted diseases, and limited OB ultrasounds.

67. Women's Help Services does not provide or refer for abortion or emergency contraception, and it does not have any affiliates that provide abortion or emergency contraception.

68. Like Relevant, Women's Help Services is a religious organization and pursues its pro-life message and activities as an exercise of its religious belief that life begins from the moment of conception and that abortion is the wrongful taking of a human life.

69. Women's Help Services discusses abortion in many of the services it provides, but its religious beliefs prohibit it from promoting or participating in any manner in abortion, including providing referrals to or affiliating with organizations that provide abortions.

70. Women's Help Services has never been cited by or received a warning from the State of Illinois for engaging in deception or otherwise making misrepresentations.

**Sidewalk Counseling Organizations**

14

71.     Plaintiffs RFI and PLAL are religious non-profit organizations that provide side-walk counseling in Illinois to women and couples facing an unplanned pregnancy.

72.     RFI's ministry is based in Rockford, Illinois and has been serving its community for over 25 years.

73.     PLAL's ministry is national and includes serving communities in Illinois and be-yond for over 40 years, since its inception in 1980.

74.     RFI's and PLAL's staffs and volunteers provide counseling services to women con-sidering abortions. PLAL also authors and publishes pamphlets for use in pro-life advocacy and sidewalk counseling.

75.     As part of the counseling process, RFI and PLAL engage in discussions regarding pregnancy, abortion, and unborn life and provide pamphlets and brochures containing information on these topics in conjunction with those discussions.

76.     Should a woman or couple choose to consider options other than abortion, RFI and PLAL assist with connecting these individuals to life-affirming pregnancy help ministries located in their communities.

77.     RFI and PLAL both convey pro-life messages as an exercise of their religious be-liefs that life begins from the moment of conception, that all children are a gift from God, and that abortion is the wrongful taking of a human life. Because of these religious beliefs, both RFI and PLAL have religious objections to providing referrals for abortions and emergency contraception or affiliating with an organization that provides abortions or emergency contraception.

78.     RFI and PLAL require all staff and volunteers to be honest and provide accurate information when engaging in sidewalk counseling activities. All brochures and pamphlets pro-vided by RFI and PLAL are medically accurate.

15

79. Neither RFI nor PLAL have been cited by or received a warning from the State for engaging in deception or otherwise making misrepresentations.

**SB1909**

80. Today, the State of Illinois enacted Senate Bill 1909, which amended the Deceptive Business Practices Act with new provisions targeting life-affirming organizations' alleged "unfair methods of competition or unfair or deceptive acts or practices." It became effective immediately upon being signed by Governor Pritzker.

81. Section One of SB1909 expresses the General Assembly's "Legislative Intent": to chill and deter speech by life-affirming organizations.

82. SB1909 accuses life-affirming organizations like Plaintiffs of "purporting to provide comprehensive reproductive health care services" while seeking "to dissuade pregnant [women] from considering abortion care through deceptive, fraudulent, and misleading information and practices, without any regard for a pregnant [woman's] concerns or circumstances." (SB1909, Sec. 1 at 1:11-19.)

83. SB1909 states that life-affirming organizations like Plaintiffs use advertising to attract women "away from medical providers that offer comprehensive reproductive care," (i.e., those that provide abortions), by using "inaccurate or misleading information" such as "overstating the risks associated with abortion, including conveying untrue claims that abortion causes cancer or infertility and concealing data that shows the risk of death associated with childbirth is approximately 14 times higher than the risk of death associated with an abortion." (*Id.*, Sec. 1 at 1:19–2:6.)

84.     SB1909 asserts that statements made by life-affirming organizations are intended "to cause undue delays and disruption to protected, time-sensitive, reproductive health care services." (*Id.*, Sec. 1 at 2:6-8.)

85.     Thus, to prohibit life-affirming organizations' alleged "unfair methods of competition or unfair or deceptive acts or practices," SB1909 forbids any use of "deception, fraud, false pretense[s], false promises, or misrepresentation, or the concealment, suppression, or omission of any material fact, with the intent that others rely upon the concealment, suppression, or omission of such material fact," by a "limited services pregnancy center": (1) "to interfere with or prevent an individual from seeking to gain entry or access to a provider of abortion or emergency contraception," (2) "to induce an individual to enter or access the limited services pregnancy center," (3) "in advertising, soliciting, or otherwise offering pregnancy-related services," (4) or "in conducting, providing, or performing pregnancy-related services." (*Id.*, Sec. 2BBBB at 5:14–6:6.)

86.     SB1909 defines "limited services pregnancy center" to mean an organization with the primary purpose of providing "pregnancy-related services" that does not: (1) provide abortions or emergency contraception, (2) provide referrals for abortions or emergency contraception, or (3) otherwise affiliate with an organization that provides abortions or provides or prescribes emergency contraception. (SB1909, Sec. 2BBBB at 4:9-20.)

87.     SB1909 does not consider any other service besides performing or facilitating abortion and "emergency contraception" as a factor in whether a pregnancy center's services are "limited."

88.     SB1909 defines "pregnancy-related services" broadly to mean "any medical service, or health counseling service, related to the prevention, preservation, or termination of pregnancy" such as "contraception and contraceptive counseling, pregnancy testing, pregnancy

diagnosis, pregnancy options counseling, limited obstetric ultrasound, obstetric ultrasound, obstetric sonogram, sexually transmitted infections testing, and prenatal care." (*Id.*, Sec. 2BBBB at 5:6-13.)

89.     SB1909 expressly exempts (1) any healthcare professional licensed by the Illinois Department of Financial and Professional Regulation, (2) any hospital licensed under the Illinois Hospital Licensing Act and its affiliates, and (3) any hospital licensed under the University of Illinois Hospital Act and its affiliates. (*Id.*, Sec. 2BBBB at 4:21–5:1.)

90.     SB1909 defines "limited services pregnancy center" so narrowly that the only organizations subject to SB1909's regulations are organizations with moral or religious objections to abortion and emergency contraception, while defining "pregnancy-related services" broadly enough to encompass any conceivable activity in which a life-affirming organization like Plaintiffs might engage. Organizations that provide or refer or associate with those who provide or refer for abortion or emergency contraception are entirely exempt.

91.     Accordingly, the effect of SB1909 is that each and every statement or omission made by life-affirming organizations is uniquely subject to scrutiny under SB1909 as a potential unfair method of competition or unfair or deceptive act or practice.

92.     The Deceptive Business Practices Act authorizes civil actions by both the Attorney General and private citizens to enforce its provisions, including those of SB1909. (815 ILCS 505/7, 505/10a.)

93.     The Attorney General may initiate an investigation into an alleged unfair method of competition or unfair or deceptive act or practice either *sua sponte* or upon receiving a complaint from a citizen of an alleged unlawful practice. (815 ILCS 505/3.)

94. If the Attorney General opens an investigation, he has the power to issue subpoenas, require oral and written testimony from the accused under oath, and even obtain a court order to impound "any record, book, document, account, paper, or sample of merchandise" obtained during the course of the Attorney General's investigation. (815 ILCS 505/3, 505/4.)

95. If the Attorney General, in his sole discretion, determines that an organization has violated SB1909, he may file suit against that organization seeking up to $50,000 in civil penalties. (815 ILCS 505/7.) Additionally, the Attorney General may seek an injunction, revocation of any license or other certificate authorizing an organization to operate in the State, or even the dissolution of the organization. (*Id.*)

96. Additionally, the Deceptive Business Practices Act authorizes civil actions by any person who alleges to have suffered "actual damage as a result of a violation of this Act." (815 ILCS 505/10a.)

97. In sum, SB1909 targets life-affirming organizations with the threat of investigations, subpoenas, civil liability, and even dissolution for expressing sincere religious beliefs, should the Attorney General or a private citizen who disagrees with those religious views determine that such expressions are deceptive or misleading.

**The Attorney General's Statements on SB1909**

98. In Committee hearings and Floor debate, the Attorney General took credit for drafting SB1909, sending his Deputy Attorney General for Policy, Ashley Hokenson, to the Senate and House Committee hearings on the measure.

99. In each chamber, Ms. Hokenson testified, to explain the bill and the Attorney General's aims in advocating its passage into law.

100. Ms. Hokenson alleged that the Attorney General's Office had received complaints and reports of misconduct by pregnancy centers. Despite requests from committee members for those complaints and reports, none were provided to committee members.

101. Only one specific instance of alleged wrongful conduct was described in committee, about which Ms. Hokenson stated, "The final push for our office to initiate this legislation came last fall when the Attorney General witnessed this conduct with his own eyes." She explained that the Attorney General personally visited a Planned Parenthood abortion facility in Fairview Heights, Illinois, and his driver nearly stopped, prior to entering the parking lot, in response to being approached by pro-life sidewalk counselors on a public right of way. As further described by Ms. Hokenson, "Now, imagine the confusion and trauma this must create for a person who is traveling to an abortion provider in Illinois under incredibly stressful circumstances, coping with pregnancy, rushing to a time-sensitive appointment for abortion care, and meeting the confusion." (Senate Cmte. Tr. at 5:7-12 (Ex. A to Breen Decl.))

102. Ms. Hokenson specifically objected to pro-life sidewalk counselors wearing "bright colored vests" and displaying "check-in" signage on the public right of way, outside of the Fairview Heights abortion facility. (Id. at 4:6-7.)

103. During the same Senate committee hearing, in response to a question from Sen. Jil Tracy about the need for Senate Bill 1909, Ms. Hokenson stated that the Deceptive Business Practices Act already provides remedies in situations of alleged fraud and deception by a so-called "limited services pregnancy center": "So, the language that is here in this bill comes from… It's mirrored in section 2 of the Consumer Fraud Act. Again, this bill clarifies our ability to already do this under Consumer Fraud Act [sic]. We just think clarity is better than the current status. But,

under the [Deceptive Business Practices Act], we can already bring claims for unfair and deceptive practices." (Id. at 21:4-10.)

104.    And in response to a similar inquiry from Sen. Neil Anderson, "But the pregnancy centers don't currently, they are not currently in the [Deceptive Business Practices Act]?" Ms. Hokenson responded, "They are. We thought this would be a good idea to clarify that." (Id. at 29:24-30:2.)

105.    However, Ms. Hokenson could provide no examples of claims ever brought against an organization providing pregnancy counseling under the Deceptive Business Practice Act. Nor would Ms. Hokenson give a definitive answer as to what speech the Attorney General would consider "misleading" under Senate Bill 1909—each time asked, she responded, "we would evaluate on a case-by-case basis" or words to that effect. In fact, this was Deputy Attorney General Hokenson's answer, even when presented with the specific statements in Senate Bill 1909 that were flagged as supposedly "misleading" or "concealing material facts."

106.    For example, the Senate Executive Committee Hearing on March 29, 2023, included the following exchanges:

- **Senator Rezin**: "If the pregnancy crisis groups do not state that [the risk of death from childbirth is (allegedly) approximately 14 times higher than the risk of death associated with abortion] or believe that fact . . . would you say that . . . they're committing unfair and deceptive practices . . . ?"

  **Deputy AG Hokenson**: "[W]e would evaluate these cases on a case-by-case basis, so I don't have any information in front of me as to how that would be evaluated."

  (Senate Cmte. Tr. at 24:24-25:11.)

- **Senator Rezin**: "Is it the intent of the Attorney general to investigate a pregnancy help center if it says that the induced abortion leads to preterm birth?"

  **Deputy AG Hokenson**: "Senator, we would evaluate on a case-by-case basis." (Id. at 26:10-14.)

- **Senator Rezin**: "Is it the intent of the Attorney General to investigate a pregnancy center if it says that [] induced abortion is a risk factor for placenta previa?"

  **Deputy AG Hokenson**: "Senator, we would evaluate on a case-by-case basis." (Id. at 26:15-19.)

- **Senator Rezin**: "Is it the intent of the Attorney General to investigate a pregnancy center if it says that the induced abortion is associated with higher risk of miscarriage?"

  **Deputy AG Hokenson**: "Senator, we would evaluate on a case-by-case basis." (Id. at 26:20-15.)

- **Senator Rezin**: "Would this bill make it a violation to state that life begins at conception?"

  **Deputy AG Hokenson**: "If that is what they would like to say, we would evaluate on a case-by-case basis." (Id. at 27:24-28:2.)

- **Senator Rezin**: "Who makes the decision if it is deceptive, and how do you make that decision?"

  **Deputy AG Hokenson**: "Typically the courts would decide, based on the evidence that we bring, and based on the evidence that the opponents would bring. . . . The court would be the deciding factor." (Id. at 27:19-23, 28:11-12.)

107. Additionally, the House Health Care Availability & Accessibility Committee Hearing on April 25, 2023, included the following exchanges (House Cmte. Tr., Exhibit C to Breen Decl.):

- **Rep. Haas**: "From the legislative intent of this bill . . . it's intended to regulate what organizations can say about the risks associated with abortion; correct?"

  **Deputy AG Hokenson**: "We would evaluate each thing on a case-by-case basis."

- **Rep. Haas**: "Again, with the legislative intent, this bill prohibits organizations from making claims that abortion causes cancer or infertility, correct . . . ?"

  **Deputy AG Hokenson**: "We would evaluate each on a case-by-case basis."

- **Rep. Haas**: "Again, this bill requires organizations discussing the risks of abortion to tell women that the risk of death associated with childbirth is approximately 14 times higher than the risk of death associated with abortion; correct?"

  **Deputy AG Hokenson**: "We would evaluate each thing on a case-by-case basis."

- **Rep. Haas**: "And not providing this information is considered concealing [a] material fact, correct?"

  **Deputy AG Hokenson**: "We would evaluate each one on a case-by-case basis."

- **Rep. Haas**: "So to be clear, this would prohibit a covered organization from claiming that a woman who has an abortion has a higher risk of death than a woman who gives birth; correct?"

  **Deputy AG Hokenson**: "We would evaluate each on a case-by-case basis."

- **Rep. Haas**: "This bill would . . . require covered organizations to advise and state upfront that it does not provide abortions or emergency contraceptives; correct?"

  **Deputy AG Hokenson**: "We would evaluate each thing on a case-by-case basis."

- **Rep. Haas**: "This would be considered a material fact; correct?"

  **Deputy AG Hokenson**: "We would evaluate each case on a case-by-case basis."

- **Rep. Haas**: "That would have to be listed in advertisements and that would need to be posted in pregnancy centers; correct?"

  **Deputy AG Hokenson**: "We would evaluate each on a case-by-case basis."

- **Rep. Haas**: "Would it be a violation to tell a woman that the abortion pill reversal is possible?"

  **Deputy AG Hokenson**: "We would evaluate each case on a case-by-case basis."

- **Rep. Haas**: "That the claim that a woman who has taken the first abortion pill may still be able to reverse an abortion as well?"

  **Deputy AG Hokenson**: "We would evaluate each on a case-by-case basis."

- **Rep. Haas**: "How is a covered organization supposed to know what is or is not material fact?"

  **Deputy AG Hokenson**: "We would evaluate each on a case-by-case basis."

- **Rep. Haas**: "Do you have any other examples of misrepresentations or material facts? . . . in relation to this bill."

  **Deputy AG Hokenson**: ". . . Again, it would be on a case-by-case basis."

(House Cmte. Tr. at 33:15-36:6.)

108. Further, during the House Floor Debate on SB1909, when asked if the law would apply to pro-life pregnancy centers "if they would say abortion is sin," the bill's Chief House Sponsor, Rep. Howard, responded: "That would be the Attorney General's Office to make that determination on a case-by-case basis." Additionally, when asked if it's permissible for pro-life pregnancy centers to "say contraception is wrong," Howard responded: "The Attorney General's

24

Office would make that determination on a case-by-case basis." (House Floor Tr. at 19:1-9, Ex. D to Breen Decl.) Attorney General Raoul came to the House Floor for this debate and was sitting next to Rep. Howard as she described the scope of Raoul's SB1909. (Id. at 10:17-20.)

109.    The Attorney General's press release on SB1909's passing expressly cited Rep. Howard and adopted the notion that pro-life pregnancy centers are "fake clinics" and doubled down on the fact SB1909 seeks to prohibit their so-called "false information" and "misleading information," including about whether childbirth is safer for the mother than abortion.[3] In short, the Attorney General (SB1909's undisputed progenitor) has acknowledged the statute can apply to core protected speech on issues of grave public concern, including to quintessentially religious speech, consistent with its express legislative intent. These are matters of "profound moral and social importance," according to the Supreme Court, about which there is an ongoing "rancorous national controversy." *Dobbs*, 142 S. Ct. at 2279. The Attorney General's statements make clear that SB1909 illegitimately aims to censor one side of that controversy in the context of pregnancy related services, precisely where Plaintiffs' pro-life speech may be most persuasive.

### FOIA Request and Response

110.    After Deputy Attorney General Hokenson's testimony before the Senate Executive Committee, PLAL's Project Coordinator, John Jansen, sent a Freedom of Information Act (FOIA) request to the Illinois Attorney General's Office, requesting copies of the "reports" and "com-plaints" (in the past ten years) that Hokenson said the Attorney General's Office had received "about crisis pregnancy centers." (Jansen Declaration ¶¶2-4.) The request also sought documenta-tion supporting the Deputy's testimony that the Attorney General himself had "witnessed . . . with

---

[3] https://illinoisattorneygeneral.gov/news/story/attorney-general-raouls-legislation-to-address-de-ceptive-practices-by-crisis-pregnancy-centers-headed-to-governors-desk (permalinked at https://archive.ph/TIcVm). (Attached as Exhibit 1A.).

his own eyes" deception by a pro-life pregnancy center during a visit to a Planned Parenthood facility in Illinois. (Id. ¶¶5-6) It further requested all communications and supporting documentation showing the input provided by the Illinois Hospital Association, the Illinois Medical Society, or their representatives, in drafting SB1909, pursuant to the Deputy AG's acknowledgment of such input during the above-referenced hearing. (Id ¶¶7-8.)

111.    In a rolling FOIA production spanning nearly two months, the Attorney General could not produce even one verifiable complaint from clients of Illinois pro-life pregnancy centers to its office for alleged violations of the Deceptive Business Practices Act, contrary to Ms. Hokenson's testimony. (Id. ¶12) The production instead included a handful of documents about squabbles between pro-life advocates and abortion facility staff, with none of the incidents resulting in any arrests or legal action. Many incidents did not even involve law enforcement, and those that did were resolved with little to no controversy. (Id. ¶11(a), Ex. C thereto at 1-32.)

112.    The response also included an unverified, two-page document, apparently from the Chicago Abortion Fund, an abortion advocacy organization, alleging eight (8) isolated issues over an unknown period of time at what appear to be mostly (or entirely) out-of-state pregnancy centers. (Id. ¶11(b), Ex. C thereto at 33-34.) All of the allegations are entirely undated, unverified, and otherwise unsubstantiated. (Id.) *See also* Senate Cmte. Tr. at 34:7-10 (Senate Sponsor Sen. Villanueva explaining that the Chicago Abortion Fund shared stories "of people who have called into a hotline," which stories overlap with those provided in the AG's FOIA response; the AG's FOIA response had failed to identify the source for the eight isolated and unverified allegations made against unknown pregnancy centers in unknown locations).

113.    The FOIA response also included emails from a Senior Policy Counsel for the Attorney General to a legislative staff member and representative of the Illinois State Medical Society

26

explaining that "the intent" of SB1909 is that it not be applied "*legitimate*, licensed medical providers" (Jansen Decl. ¶11(c), Ex. C thereto at 35-36) (emphasis added).

114.    Another FOIA response document recorded an email from one of the Senate Sponsors of SB1909, Senator Cristina Castro, requesting that the Attorney General's Office regulate Crisis Pregnancy Centers which "run[] around with a [sic] RV parked at churches offering free ultrasounds." (Jansen Decl. ¶11(a)(6), Ex. C thereto at 23-29.)

115.    Finally, the response included three-year-old emails from July 2020 emails from Brigid Leahy, Vice President of Public Policy for Planned Parenthood of Illinois Action, to the Illinois Attorney General's Office complaining about so-called "fake clinics" (pro-life pregnancy centers) allegedly offering "misinformation" to women "to try to get them not to get healthcare at Planned Parenthood and decide not to have abortions." (Jansen Decl. ¶11(e), Ex. C thereto at 38-41.) She specifically complained about "the opening of a fake clinic right next to our health center in Aurora and an uptick in action at the health center in Fairview Heights." (Id.) Ms. Leahy was one of the two witnesses put forward by the proponents of SB1909 at the Senate Executive Committee Hearing (Senate Cmte. Tr. at 6:7-10:22) and the House Health Care Availability & Accessibility Committee Hearing (House Cmte. Tr. 6:21-10:7.)

116.    The lack of actual complaints in the FOIA production was raised repeatedly at the April 25, 2023 House Health Care Availability and Accessibility Committee Hearing on SB1909. When Rep. Bill Hauter, M.D., confronted Deputy Attorney General Hokenson with this fact, she did not deny it:

- **Rep. Hauter**: "…Is there any written evidence in the last ten years that you can produce for us that shows any of these things that you're saying; that's it common

and a huge problem that we have to make a separate law that only focuses on one side of this issue?"

- **Deputy AG Hokenson**: "…As many of you know, our office takes in complaints in various ways. I've had conversations with members, one-to-one, about a complaint from their district that wouldn't necessarily go through our consumer complaint file form. We responded to the FOIA as it was sent." (House Cmte. Tr. 37:7-21.)

117. However, the Attorney General's Office indicated that it withheld no relevant complaint records—the Office redacted personal information but withheld only very limited information (LEADS data, documents from IDFPR it provided the AG in relation to a single investigation, a single 13-page newspaper article, "2 pages of social media posts," and preliminary AG office drafts relating to SB1909). (Jansen Decl. ¶12, Ex. B thereto at 5, 9-10, 14.) In short, the FOIA production confirmed that SB1909 was not based on any formal (or documented informal) complaints to the Attorney General's Office by clients of pro-life pregnancy centers at all, contrary to Deputy Attorney General Hokenson's testimony. Rather, in drafting SB1909, the Attorney General's Office relied largely on sidewalk squabbles having nothing to do with pregnancy centers; the unsubstantiated hearsay of an abortion-advocacy organization about unknown pregnancy clinics in unknown locations; and on a Planned Parenthood lobbyist's complaint about alleged pregnancy center "misinformation" that was ostensibly causing women to "decide" not to have abortions. The FOIA production only confirmed that SB1909 targets pro-life pregnancy help ministries based on Illinois's disagreement with their pro-life viewpoint.

**Plaintiffs' Speech is Subject to SB1909, but Abortion Facilities' Speech is Not**

118.     Plaintiffs believe they have religious obligations to engage in outreach to their communities and share their religious beliefs and relevant scientific information on issues related to pregnancy, motherhood, sexuality, abortions, and unborn life.

119.     When sharing those beliefs and that information, Plaintiffs' religious beliefs also require them to do so with the utmost honesty and integrity. Plaintiffs believe that deception of any kind would be sinful. Plaintiffs therefore strive to always convey truthful and medically accurate statements to their clients and potential clients regarding abortion, pregnancy, and unborn life. This pure speech regards matters of public concern and is thus quintessentially protected by the First Amendment, and not traditionally prohibited by deceptive trade practices laws.

120.     Plaintiffs are unaware of any complaints ever being filed with the State of Illinois accusing Plaintiffs of engaging in deceptive business practices of any kind.

121.     Moreover, the General Assembly failed to present any evidence during its committee hearings and debates indicating widespread efforts by life-affirming organizations to engage in misleading or deceptive practices.

122.     NIFLA's National Commitment of Care and Competence requires all NIFLA members to ensure that "[c]lients always receive honest and open answers"; "[c]lients receive accurate information about pregnancy, fetal development, lifestyle issues, and related concerns"; and all of its "advertising and communications are truthful and honest, and accurately describe the services" NIFLA's members offer. (Attached as Exhibit 2.)

123.     This same Commitment of Care and Competence makes clear that NIFLA does not "offer, recommend or refer for abortions, abortifacients, or contraceptives" but is "committed to offering accurate information about related risks and procedures." This same commitment applies

to Relevant as a NIFLA member. Women's Help Services has a similar commitment contained on its website, https://focuswomenscenter.com/en/schedule/about-us/.

124.    NIFLA's centers provide brochures with pro-life information to pregnant women. It is NIFLA policy that each member center must have its Medical Director approve any brochures with medical information, for those clinics with such a Director. For NIFLA members that are not medical clinics, it is still NIFLA policy that all information provided to clients must be medically current and accurate, as approved by a medical doctor or designee such as a medical advisory committee.

125.    Women's Help Services distributes medical information to pregnant women only after review by its own medical staff for accuracy at the time of publication, followed by periodic review and updates as information changes.

126.    Relevant distributes pro-life literature to pregnant women that has been produced by the third-party organizations Care Net, Heartbeat International, and Focus on the Family, which it understands has been medically approved.

127.    Plaintiffs' outreach efforts include in-person conversations, brochures, webpages, and social media posts. Such outreach efforts easily fall within the categories of statements and omissions regulated by SB1909.

128.    Indeed, Plaintiffs' quintessentially protected literature and information (ostensibly forbidden by SB1909) includes, but is not limited to, the following:

(1) NIFLA pamphlet on the "Possible Risks" of the abortion pill, and its explanation that "Online Mail Order Abortion Pills Have Even More Risks," which contradicts the pro-choice view that the abortion pill, and the "abortion pill by mail," is entirely

30

safe.[4] *See* NIFLA, Abortion Pills: Know The Facts and Risks (Attached as Exhibit 3.)

> (a) NIFLA also publishes a webpage reasonably disputing the view that abortion is allegedly safer than childbirth, observing that the "14-times-safer-than-childbirth" position is based on a single article published more than 10 years ago that has since been persuasively debunked by such experts as Priscilla Coleman, Ph.D., and David Reardon, Ph.D.[5] NIFLA also cites competing research from Finland showing that in actuality, "abortion is associated with an elevated risk of death, while carrying to term is associated with a lowered risk of death."[6] NIFLA thus recommends to its member clinics that "[a] copy of this article would be helpful to have in your [clinics] for reference or to allow clients to read," since "[m]others considering abortion deserve honest information."[7]

(2) Women's Health Services brochures on the facts of fetal development and details about the types and risks of possible abortion procedures. See "Your Pregnancy" (attached as Exhibit 4); "Abortion Procedures" (attached as Exhibit 5); and "Abortion Procedures Risks and Side Effects" (attached as Exhibit 6).

---

[4] https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/abortion-pill-mail (permalinked at https://archive.ph/J4H86).

[5] https://nifla.org/abortion-not-safer-women-childbirth/ (citing Coleman, P., "A serious misrepresentation of the relative safety of induced abortion compared to childbirth published in a leading medical journal," retrieved Feb. 6, 2012; Reardon, D., "Rehash of abortion safety claims ignores all inconvenient evidence to the contrary," January 2012) (permalinked at https://archive.ph/HKoNq).

[6] Id. (citing Reardon, D., Straham, T., Thorp, J., Shuping, M., "Deaths associated with abortion compared to childbirth: a review of new and old data and the medical and legal implications," Journal of Contemporary Health Law & Policy, 2003; 20(2); 279-327).

[7] Id.

(3) Relevant shares a magazine titled "Before You Decide" with its clients; the magazine contains, among other things, information about fetal development, details about abortion procedures, testimony from women who have decided against abortion, and information about the emotional, spiritual, and physical risks of abortion (including its association with breast cancer)—supported by numerous citations to scientific journal articles. (Attached as Exhibit 7.) It also provides information about "Abortion Pill Reversal," explaining that, "Under a doctor's care, some women have successfully continued their pregnancies and given birth to healthy babies after taking just the first pill (mifepristone) of a medical abortion," by "using natural progesterone off-label to counteract the effects of the abortion pill." *Id.* at 15. It emphasizes that "Women should not attempt to counteract the abortion pill without the assistance of a medical professional," and provides an 877 hotline and a link to abortionpillreversal.com for more information.[8]

---

[8] The current abortion pill regimen involves a two-pill process to complete—first, mifepristone to block the hormone progesterone, thus breaking down the uterine lining otherwise necessary to sustain life; and second, misoprostol 24 to 48 hours later, causing contraction of the uterus and pushing out the pregnancy. *See* NIFLA, Exhibit 3, at p.2; *see also* https://www.plannedparenthood.org/uploads/filer_public/42/8a/428ab2ad-3798-4e3d-8a9f-213203f0af65/191011-the-facts-on-mifepristone-d01.pdf (permalinked at https://archive.ph/D3IM3). As indicated, abortion pill reversal involves administering natural progesterone to counter-act the unnatural mifepristone, to thus protect the uterine lining. *See* https://abortionpillreversal.com/abortion-pill-reversal/overview (permalinked at https://archive.is/BxpjJ). One recent study showed a 64% to 68% fetal survival rate among women who received progesterone after taking mifepristone. George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 24-25 (2018), https://pubmed.ncbi.nlm.nih.gov/30831017/. These findings were consistent with prior medical studies confirming the efficacy of post-mifepristone progesterone treatment to preserve pregnancy. George Delgado et al., *Progesterone use to reverse the effects of mifepristone*, 46 Annals Pharmacotherapy 1723, 1723 (2012), https://pubmed.ncbi.nlm.nih.gov/23191936/; *see also* Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 Folia Endocrinologica Japonica 497 (1989) (studying pregnancies of lab rats and finding 100% efficacy of progesterone treatment in preserving rats' pregnancies after having received mifepristone), https://pubmed.ncbi.nlm.nih.gov/2776921/.

(4) Rockford Family Initiative brochure explaining and depicting the stages of fetal development, which includes an observation that "[a]t about 4 ½ months [the unborn baby] is able to experience pain," with citations to a New England Journal of Medicine article[9] and an expert witness report. (Attached as Exhibit 8.) It also passes out a brochure promoting, among other things, "Abortion Pill Reversal." (Attached as Exhibit 9.)

(5) PLAL brochure on the abortion pill explaining that "[w]hile it is often claimed that abortion pills are safe, the fact is we don't actually know how safe these drugs are." See PLAL, "The Abortion Pill: What You Need to Know" (attached as Exhibit 10). It also hands out a fact-sheet on "Getting to know Planned Parenthood," explaining, inter alia, that "prenatal care amounts to less than 0.1% of their total annual services," and that Planned Parenthood "provide[s] less than 1% of manual breast exams and pap tests each year and zero mammograms." (Attached as Exhibit 11.)

Plaintiffs' statements about abortion, pregnancy, and unborn life, etc., are true. However, with the General Assembly's recent declarations that these true statements are instead to be considered "misleading" and "omitting . . . material fact[s]" under SB1909, Plaintiffs are chilled from engaging in this truthful speech for fear of incurring fines, harassment, subpoenas, legal defense expenses, and additional actions against them taken by the Attorney General's Office.

129. Meanwhile, SB1909 does not prohibit abortion facilities' controversial and arguably inaccurate (at minimum) speech on abortion.

130. For example, Planned Parenthood of Illinois's website contains a page promoting the "Abortion pill-by-mail" as "Care. Delivered," and describing the "abortion pill" as "safe and

---

[9] https://www.nejm.org/doi/full/10.1056/NEJM198711193172105.

effective."[10] But the American Association of Pro-life Obstetricians and Gynecologists has long found otherwise, including via a systematic analysis studying adverse event reports submitted for the primary "abortion pill" drug, mifepristone, between 2000 and 2004.[11] In 2016 the FDA eliminated four of the safety restrictions that conditioned its approval of mifepristone in 2000, including "the requirement for prescribers to report non-fatal adverse events from chemical abortion." *All. for Hippocratic Med. v. Food Med. v. Food & Drug Admin.*, No. 23-10362, 2023 WL 2913725, at *2 (5th Cir. Apr. 12, 2023). Planned Parenthood of Illinois's website contains none of this "evidence-based" "information" that many women might find useful in "mak[ing] autonomous decisions about their own reproductive health" (SB1909, Sec. 1)—thus ostensibly fostering "patient perceptions of safety, convenience, and privacy" about use of the abortion pill that "do not accurately reflect the realities of the regimen."[12]

131. Additionally, in describing the different kinds of "in-clinic abortions" it offers, Planned Parenthood of Illinois states that a "D&E" (Dilation and Evacuation) abortion culminates in the use of "[m]edical instruments and a suction machine" to "gently empty your uterus."[13] But as the Supreme Court has recognized, after 15 weeks gestation "dismemberment or other destructive procedures are more likely to be required" in D&E abortion, "[b]ecause the fetus is larger at this stage of gestation (particularly the head), and because the bones are more rigid." *Stenberg v. Carhart*, 530 U.S. 914, 925 (2000) (quoting American Medical Association, Report of Bd. of Trustees on Late-Term Abortion, at 491). Such dismemberment "typically occurs as the doctor pulls a

---

[10] https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/abortion-pill-mail (permalinked at https://archive.ph/J4H86).

[11] https://www.aaplog.org/wp-content/uploads/2011/07/MifeSAEharrison-pdf-copy.pdf (permalinked at https://archive.ph/M9aeZ).

[12] Id.

[13] https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/clinic-abortion (permalinked at https://archive.ph/TxB6M).

portion of the fetus through the cervix into the birth canal"—based on "the traction" of the abortion instruments "and the counter-traction of the internal os of the cervix." *Id.* (internal quotes omitted). Justice Stevens described this procedure as "brutal" in *Gonzales v. Carhart*, 550 U.S. 124, 182 (2007) (Stevens, J., dissenting). Planned Parenthood's website is silent on these details of later-term D&E abortions, and is thus arguably deceptive and misleading, particularly for women in non-emergency situations who are simply interested in learning more details about their options.

132.    Even if Plaintiffs' statements about abortion were erroneous—which they are not— the statements would still be protected, for erroneous statements are inevitable in free debate and must be protected, if the freedoms of expression are to have the breathing space that they need to survive. Whether spoken by medical professionals or by lay people providing pregnancy support services, this speech on a matter of utmost public concern is protected speech.

133.    Accordingly, Plaintiffs' peaceable expression is deserving of the utmost protection under the Constitution of the United States, as speech on matters of public concern (whether scientific, moral, religious, or all of the above) operates the highest rung on the hierachy of speech protected by the First Amendment.

134.    At all times relevant to this Complaint, each and every one of the wrongful acts alleged here are attributable to Defendant, who acts under color of law for the State of Illinois.

135.    Plaintiffs are currently suffering imminent and irreparable harm because of Defendant's actions, which violate Plaintiffs' constitutional rights and leave them without an adequate remedy at law.

136.    Immediate action by this Court is required to enjoin SB1909 and prevent Plaintiffs from continuing to suffer irreparable injury.

## CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**First and Fourteenth Amendments — Freedom of Speech**
**(42 U.S.C. §1983)**

137.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-136 of this Complaint.

138.    The First Amendment's Free Speech Clause, made applicable to the states through the Fourteenth Amendment, protects Plaintiffs' rights to speak, to publish speech, to be free from content and viewpoint discrimination, to be free from unconstitutional conditions, to be free from vague laws allowing unbridled discretion, and to be free from overbroad laws.

139.    SB1909 subjects Plaintiffs to investigations, subpoenas, fines, injunctions, and even dissolution because of the pro-life content and viewpoint of their speech and because they are life-affirming organizations. SB1909 further subjects Plaintiffs to civil liability in private rights of action because of the pro-life content and viewpoint of their speech and because they are life-affirming organizations.

140.    The "Legislative Intent" Section One of SB1909 demonstrates that SB1909 targets Plaintiffs because of their pro-life views.

141.    If not for SB1909, Plaintiffs and their agents, including their staff and volunteers, would freely engage in protected speech, without hesitancy or fear of government punishment.

142.    Instead, Plaintiffs are unable to freely publish or display their desired outreach materials without fear of government penalty.

143.    Plaintiffs are currently suffering ongoing harm because of SB1909. Specifically, SB1909 infringes on Plaintiffs' rights under the Free Speech Clause of the First Amendment by chilling, deterring, and restricting Plaintiffs' protected speech.

144.   SB1909 regulates any statements or omissions made by Plaintiffs that: "interfere with or prevent an individual from seeking to gain entry or access to a provider of abortion or emergency contraception," "induce an individual to enter or access the limited services pregnancy center," are made "in advertising, soliciting, or otherwise offering pregnancy-related services," or are made "in conducting, providing, or performing pregnancy-related services."

145.   If those statements or omissions are deemed to be "unfair methods of competition or unfair or deceptive acts or practices" by either the Attorney General or a private individual, Plaintiffs face the prospect of subpoenas, litigation, fines, legal defense expenses, and even dissolution.

146.   SB1909 provides no guidance or definition as to the limits of what constitutes "unfair" competition or "deceptive acts or practices" in this context, but rather leaves that interpretation to the unbridled discretion of either the Attorney General or a private individual.

147.   SB1909 permits Illinois to punish disfavored speech on pregnancy, motherhood, sexuality, abortions, and unborn life, and other topics of concern to both Plaintiffs and the public.

148.   This targeting of certain pro-life speech also exacerbates SB1909's viewpoint discrimination.

149.   Further, SB1909 is underinclusive of the State's purported goal of ensuring women have the ability to make autonomous, informed, and evidence-based decisions regarding their pregnancies. SB1909 provides wholesale exemptions to any organization that provides abortions or referrals for abortion or emergency contraception or otherwise affiliates with an organization that provides abortion or emergency contraception. It also exempts any healthcare professional licensed by the Illinois Department of Financial and Professional Regulation, any hospital licensed under the Illinois Hospital Licensing Act and its affiliates, and any hospital licensed under the

University of Illinois Hospital Act and its affiliates. This underinclusiveness demonstrates the State's true intent of disfavoring pro-life viewpoints and speakers.

150.    Additionally, by creating liability for omissions of alleged material facts regarding abortion, pregnancy, and the unborn, SB1909 compels speech when Plaintiffs would otherwise wish to stay silent because of their good-faith divergent views on those issues (e.g., Illinois's controverted belief that childbirth is allegedly a 14-times greater threat to women's lives than abortion).

151.    SB1909's regulation and compulsion of such speech on disputed matters of public concern also make it overinclusive as to the state's purported goal of prohibiting actual deception via unprotected conduct. This significant overinclusiveness demonstrates SB1909 is not properly tailored to any alleged proscribable harms.

152.    Because SB1909 violates Plaintiffs' free-speech rights for all the reasons stated above, it must further a compelling interest in a narrowly tailored way.

153.    Punishing Plaintiffs' speech does not serve any legitimate, rational, substantial, or compelling government interest in a narrowly tailored way.

154.    Illinois has alternative, less restrictive means to achieve any legitimate interest it may possess rather than forcing Plaintiffs to abandon their free-speech rights. For example, it could simply rely on the Deceptive Business Practices Act as it already existed, without singling out Plaintiffs and their protected speech for disparate treatment. Illinois could also engage in its own public relations campaign to promote its own (controversial) views about pro-life pregnancy centers. SB1909 is also overbroad because it restricts a substantial amount of protected speech relative to any conceivable plainly legitimate sweep. In addition to its application to pro-life pregnancy centers' First Amendment speech, SB1909 defines "limited services pregnancy centers" to include

"organizations" that engage in "pregnancy options counseling," which would include organizations like Plaintiffs Pro-Life Action League and Rockford Family Initiative that engage in sidewalk counseling with women on public sidewalks outside of abortion facilities. These organizations engage in quintessentially protected pro-life speech (including leafleting) in a traditional public forum and express views with which Illinois strongly disagrees, and which are ostensibly regulated by SB1909. "[N]o form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 489 (2014). SB1909's legislative history also makes clear it is intended to regulate pro-life individuals on the public sidewalks. This overbreadth only further confirms SB1909's fatal lack of narrow tailoring.

155.    Accordingly, facially and as applied to Plaintiffs, SB1909 violates the First Amendment right to free speech.

156.    As such, SB1909 also violates the "reciprocal" "First Amendment right to receive information and ideas," since "freedom of speech necessarily protects the right to receive" protected speech, and may be asserted by speakers on listeners' behalf. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 757 (1976).

157.    SB1909 deprives women with unplanned or otherwise difficult pregnancies from receiving the full range of information and options in deciding whether or how to continue their pregnancies. This deprivation is based on the content and viewpoint of the restricted information, and on the speakers conveying it, without any compelling, legitimate, or rational interest in forcing women into pregnancy choices without being fully informed of their options.

158.    As a direct and proximate result of Defendant's conduct, Plaintiffs and their listeners have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and attorneys' fees.

## SECOND CAUSE OF ACTION
### First and Fourteenth Amendments — Free Exercise of Religion
### (42 U.S.C. §1983)

159.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-158 of this Complaint.

160.    The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits state action burdening the free exercise of religion.

161.    The Free Exercise Clause protects not only the right to harbor religious beliefs inwardly, but also the performance of or abstention from physical acts in accordance with their religious beliefs. Such acts include rights to operate, publish, speak, and not speak, in accordance with Plaintiffs' religious beliefs.

162.    The Supreme Court has interpreted the Free Exercise Clause to mean that the government may not enact non-neutral and non-generally applicable laws or policies that substantially burden a sincerely held religious belief unless they are narrowly tailored to a compelling government interest. Such laws are narrowly tailored only if they are the least restrictive means of achieving the asserted compelling interest.

163.    The Supreme Court has held that government regulations are not neutral and generally applicable whenever they treat any comparable secular activity more favorably than religious exercise.

164.    Moreover, any state action that discriminates on the basis of religion or targets religion for specially disfavored treatment is subject to strict scrutiny and must be invalidated unless it is justified by a compelling interest and is narrowly tailored to advance that interest.

165.    Plaintiffs have sincerely held religious beliefs that motivate and require them to operate their ministries in accordance with biblical moral teachings affirming the value and dignity of life at every stage, from the moment of conception, and to teach and explain those beliefs to the public and those they serve.

166.    SB1909 substantially burdens Plaintiffs' right to the free exercise of religion by forcing them to choose between complying with their religious beliefs or complying with Illinois law. Specifically, SB1909 inhibits Plaintiffs from freely following their religious beliefs about abortion, which includes obligations to inform others about their religious beliefs and scientific information about pregnancy and the unborn, and to perform acts of charity for those in need, because of the chilling effect of SB1909's threatened punishment.

167.    SB1909 is not a neutral or generally applicable law for multiple reasons.

168.    First, it subjects Plaintiffs and any other religiously motivated life-affirming reproductive healthcare providers to disfavored treatment while treating comparable secular organizations more favorably than religious exercise. Any organization that provides abortions or referrals for abortion or is otherwise affiliated with an organization that provides abortion is not subject to the burdens of SB1909, notwithstanding their promotion of controversial and arguably inaccurate (at minimum) information about abortion. Further, SB1909 categorically exempts any healthcare professional licensed by the Illinois Department of Financial and Professional Regulation, any hospital licensed under the Illinois Hospital Licensing Act and its affiliates, and any hospital licensed under the University of Illinois Hospital Act and its affiliates.

169. Moreover, SB1909 discriminates and imposes special disability upon Plaintiffs because of their religious beliefs. Specifically, SB1909 is informed by hostility toward life-affirming pregnancy services centers' religious beliefs and pro-life viewpoint, and it targets those centers' disfavored religious beliefs for punishment. Its object is to infringe upon or restrict life-affirming pregnancy services centers' practices because of their religious motivation. The punishments SB1909 authorizes in response to religious speech reflects government intolerance toward certain religious beliefs and restricts speech because of its religious nature.

170. SB1909 does not advance a compelling governmental interest.

171. SB1909 interferes with pregnancy services centers' religious speech without any substantial evidence of a compelling need for SB1909. Indeed, statements made by the Defendant's Office during the course of enacting SB1909 indicate that it targets pregnancy services centers because of their pro-life religious views on abortion. The Attorney General's press release even characterized pro-life pregnancy centers as so-called "fake clinics." SB1909 punishes Plaintiffs' profession of their religious beliefs and was designed to suppress their speech based on their own religious beliefs.

172. SB1909 is not the least restrictive means of achieving a governmental interest.

173. Illinois has alternative, less restrictive means to achieve any legitimate interest it may possess rather than forcing Plaintiffs to abandon the expression of their religious beliefs. For example, it could simply rely on the Deceptive Business Practices Act as it already existed without singling out Plaintiffs for disparate treatment. And it could engage in a public relations campaign promoting its own views about pro-life pregnancy centers. SB1909 also violates Plaintiffs' free

exercise rights under the hybrid-rights doctrine because it implicates free-exercise rights in conjunction with other constitutional protections, like the rights to free speech, expressive association, due process, and equal protection.

174.    SB1909 fails strict scrutiny. Punishing Plaintiffs' religious exercise also does not serve any legitimate, rational, substantial, or compelling government interest in a narrowly tailored way.

175.    Accordingly, facially and as applied to Plaintiffs, SB1909 violates the First Amendment right to free exercise of religion.

176.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Fourteenth Amendment — Equal Protection**
**(42 U.S.C. §1983)**

177.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-176 of this Complaint.

178.    The Equal Protection Clause of the Fourteenth Amendment forbids state action that discriminates on the basis of religion.

179.    A state violates the Equal Protection Clause when it treats one party differently from similarly situated parties based on a protected characteristic of the disfavored party, such as religion, and is not narrowly tailored to achieving a compelling government interest.

180.    Accordingly, the government may not discriminate against religion generally or against particular religious beliefs.

181.    SB1909 discriminates against Plaintiffs based on their religious beliefs by inhibiting Plaintiffs from freely following their religious beliefs about abortion or informing others about their religious beliefs and their free services while allowing other secular groups to freely express their beliefs on the same topic of reproductive healthcare. Targeting Plaintiffs' religious beliefs in this manner is never permissible and is therefore a denial of equal protection of the law.

182.    SB1909 fails strict scrutiny. Targeting Plaintiffs' religious beliefs for disparate treatment does not serve any legitimate, rational, substantial, or compelling government interest in a narrowly tailored way.

183.    Illinois has alternative, less restrictive means to achieve any legitimate interest it may possess rather than forcing Plaintiffs to abandon the expression of their religious beliefs. For example, it could simply rely on the Deceptive Business Practices Act as it already existed without singling out Plaintiffs for disparate treatment.

184.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, and attorneys' fees.

## FOURTH CAUSE OF ACTION
### Fourteenth Amendment — Procedural Due Process (Void for Vagueness)
### (42 U.S.C. §1983)

185.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-184 of this Complaint.

186.    The Due Process Clause of the Fourteenth Amendment guarantees persons the right to due process of law, which includes the right to be free from vague guidelines granting officials unbridled discretion.

187.   Plaintiffs' Fourteenth Amendment right to due process is violated by both the vague and overbroad language SB1909 uses as well as the lack of procedural safeguards included in the enforcement process.

188.   SB1909 uses undefined and overbroad terms and phrases such as "unfair methods of competition," "unfair or deceptive acts or practices," and provides no guidance as to what acts or statements by a "limited services pregnancy center" would constitute "deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of any material fact."

189.   SB1909's vague terms, listed above, exacerbate SB1909's First Amendment violations because they grant unbridled discretion to Defendant to ban or punish speech the government opposes and to mandate speech the government supports. SB1909 further authorizes individuals to file their own lawsuits against Plaintiffs based on their own opposition to Plaintiffs' speech or religious beliefs.

190.   These provisions use vague, overbroad, and undefined terms and guidelines, granting officials and individuals unbridled discretion. SB1909 is therefore vague and overbroad on its face and as applied to Plaintiffs and does not provide Plaintiffs fair notice.

191.   The Deputy Attorney General further confirmed this vagueness by refusing to clarify for inquiring legislators whether SB1909's terms apply to protected speech and instead stated that their meaning would be up to a court to decide.

192.   Defendant has the power to investigate, apply, and enforce SB1909, including through issuing subpoenas and filing civil lawsuits based on his own discretionary determination that SB1909 may have been violated.

193.     SB1909 does not serve any compelling, significant, legitimate, or even valid inter-est, nor is it narrowly tailored to achieve any purported interest asserted by Illinois.

194.     Thus, facially and as applied to Plaintiffs, SB1909's vague language and lack of procedural safeguards violate the Fourteenth Amendment right to due process under the laws.

195.     As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, enti-tling them to declaratory and injunctive relief, and attorneys' fees.

**FIFTH CAUSE OF ACTION**
**Fourteenth Amendment — Patients' Right to Continue Pregnancy**
**(42 U.S.C. §1983)**

196.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1-195 of this Complaint.

197.     This "Nation's history and constitutional traditions" "protect[] the decision to re-fuse unwanted medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 725 (1997).

198.     Individuals also have "the right to decide independently, with the advice of [their] physician[s], to acquire and to use needed medication." *Whalen v. Roe*, 429 U.S. 589, 603 (1977).

199.     Under *Dobbs*, the interest underlying States' traditional right to regulate and even prohibit abortion—i.e. their interest in the unborn child's life or "potential life," which is not at stake in other privacy rights, *see Dobbs*, 142 S. Ct. at 2257—also necessarily supports a woman's right to continue her own pregnancy in furtherance of that same interest, regardless of a state's policy favoring abortion. Indeed, just because there is no fundamental right to "destroy" what the Supreme Court has "call[ed] 'potential life'," *see id.* at 2258, does not mean women have lost the fundamental right to "deci[d]e . . . to bear [and] beget a child," *Eisenstadt v. Baird*, 405 U.S. 438,

453 (1972), since "[t]he exercise of th[at] right . . . does not destroy a 'potential' life," *Dobbs*, 142 S. Ct. at 2261.

200.    Illinois's Deputy Attorney General acknowledged at the House Health Care Availability & Accessibility Committee Hearing that SB1909 could prohibit "tell[ing] a woman that abortion pill reversal is possible," or conveying "that a woman who has taken the first abortion pill may still be able to reverse an abortion." *See supra*.

201.    SB1909 thus directly restricts and chills Plaintiffs' ability to communicate with their clients about the availability of abortion pill reversal, along with a variety of other information that may bear on a woman's decision to continue her pregnancy, *see supra*. This necessarily restricts their clients' and prospective clients' ability to continue a wanted pregnancy after taking mifepristone.

202.    SB1909's restriction on information about abortion pill reversal and other abortion-related topics directly violates women's rights (including Plaintiffs' clients' and prospective clients' rights) to bodily autonomy and against being coerced into an unwanted abortion.

203.    There is no compelling, legitimate, or rational reason for restricting information about abortion pill reversal and other related topics, especially since SB1909 does not restrict abortion facilities' ability to promote the alleged safety and efficacy of the abortion pill without telling women about the availability of abortion pill reversal.

204.    For the same reasons, this restriction is not even rationally related to any legitimate government interest.

205.    As a direct and proximate result of Defendant's conduct, Plaintiffs' current and prospective clients have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, and attorneys' fees.

## SIXTH CAUSE OF ACTION
### First and Fourteenth Amendments — Freedom of Expressive Association
### (42 U.S.C. §1983)

206.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1-205 of this Complaint.

207.     The First Amendment, made applicable to the states through the Fourteenth Amendment, protects the right of people to associate with others in pursuit of a wide variety of ends, including religious ends.

208.     The First Amendment prohibits the government from banning people from associating with others in an association expressing messages. It also prevents the forced inclusion in expressive associations of unwanted messages that significantly affect their ability to advocate their own public or private viewpoints.

209.     Plaintiffs are expressive associations because people with similar religious beliefs and viewpoints, including those on staff and volunteers, are joining together to assist and serve women in Illinois and to express their religious beliefs about the sanctity of life, sexuality, pregnancy, and motherhood.

210.     The volunteers and staff at Plaintiffs' organizations advocate the position that women deserve dignity, respect, and truth when seeking information and counsel about their pregnancy or a potential pregnancy.

211.     Subjecting Plaintiffs to SB1909's vague and overbroad speech regulations undermines their ability to advocate their faith-based position and their free association with women with whom they seek to associate.

212.     Because SB1909 infringes on Plaintiffs' expressive association rights, it is subject to strict scrutiny and must further a compelling interest in a narrowly tailored way.

213.    SB1909 does not serve any compelling, significant, legitimate, or even valid interest, nor is it narrowly tailored to achieve any purported interest asserted by Illinois.

214.    Thus, facially and as applied to Plaintiffs, SB1909 violates the right to expressive association protected by the First Amendment.

215.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, and attorneys' fees.

## PRAYER FOR RELIEF

Plaintiffs respectfully asks the Court to:

1.    Issue a temporary restraining order, preliminarily injunction, and permanent injunction restraining and enjoining Defendant, his officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with him, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with SB1909, on its face and as applied to Plaintiffs, such that:

    a.    The State is barred from enforcing any provisions of SB1909 applicable to "limited services pregnancy centers" as defined in SB1909, and

    b.    The State is barred from taking any adverse action, directly or indirectly, on the basis of SB1909 against any "limited services pregnancy centers" as defined in SB1909, or their staff, volunteers, or supporters;

2.    Declare that SB1909 violates the First and Fourteenth Amendments on its face and as applied to Plaintiffs;

3.    Award Plaintiffs nominal damages;

49

4.      Award Plaintiffs attorney's fees and costs under 42 U.S.C. §1988;

5.      Relieve Plaintiffs from posting any bond; and

6.      Award such other relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

THOMAS MORE SOCIETY

/s/Peter Breen
/s/Michael G. McHale[*]

Thomas L. Brejcha
Peter Breen
Joan M. Mannix
Michael G. McHale[*]
B. Tyler Brooks[†]
THOMAS MORE SOCIETY
309 W Washington St, Ste 1250
Chicago, Illinois 60606
(312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
jmannix@thomasmoresociety.org
mmchale@thomasmoresociety.org
tbrooks@thomasmoresociety.org
*Counsel for Plaintiffs*

[*] *pro hac vice to be filed, licensed solely in Nebraska*
[†] *licensed solely in North Carolina, South Carolina, Tennessee, and Michigan*

**<u>VERIFICATION</u>** -- NIFLA

     I, <u>     Tom Glessner     </u>, am over the age of 18 and represent Plaintiff National Institute of Family Life Advocates ("NIFLA") in this action. The allegations about NIFLA in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge. If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on: <u>     07/11/2023     </u>

<u>*Thomas A. Glessner*     </u>

**<u>VERIFICATION</u> -- Pro-Life Action League**


      I, _____Eric Scheidler_____, am over the age of 18 and represent Plaintiff Pro-Life Action League ("PLAL") in this action. The allegations about PLAL in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge. If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.


Executed on: _____07/11/2023_____


_____

**<u>VERIFICATION</u> -- Relevant Pregnancy Options Center**

      I,       Tricia Blasdel       , am over the age of 18 and represent Plaintiff Relevant Pregnancy Options Center ("Relevant") in this action. The allegations about Relevant in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge. If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on:       07/11/2023       

                                             *Tricia Blasdel*

## <u>VERIFICATION</u> -- Rockford Family Initiative

     I, _____Kevin Rilott_____, am over the age of 18 and represent Plaintiff Rockford Family Initiative in this action. The allegations about Rockford Family Initiative in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge. If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on: _____07/11/2023_____

_____

**<u>VERIFICATION</u> -- Women's Health Services**


      I, _____Judy K. Cocks_____, am over the age of 18 and represent Plaintiff Women's Health Services, d/b/a 1st Way Life Center & Focus Women's Center ("Women's Health Services") in this action. The allegations about Women's Health Services in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge. If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.


Executed on: _____07/11/2023_____


_____