**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; WOMEN'S HELP SERVICES D/B/A 1ST WAY LIFE CENTER & FOCUS WOMEN'S CENTER; ROCKFORD FAMILY INITIATIVE; RELEVANT PREGNANCY OPTIONS CENTER, and PRO-LIFE ACTION LEAGUE, on behalf of themselves and their clients, | ) ) ) ) ) ) ) ) ) | Case No.: 23-cv-50279 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT ....................................................................................................................4

    I.    SB1909 Must be Enjoined to Protect Plaintiffs' First Amendment Rights. ......................5

      A.    SB1909 Unconstitutionally Burdens Plaintiffs' Freedom of Speech. ............................5

          1.    SB1909 regulates Plaintiffs' speech based on content and viewpoint. ....................5

          2.    The First Amendment Protects Plaintiffs' Speech. ...................................................7

          3.    Professional speech and even "false" speech remain protected (even assuming, arguendo, Plaintiffs' speech was false). ................................................................10

          4.    SB1909 fails at every applicable level of scrutiny. ................................................13

    II.   SB1909 is Unconstitutionally Vague and Overbroad. ......................................................24

    III.  SB1909 Unconstitutionally Burdens Plaintiffs' Religious Exercise. ...............................28

    IV.  Plaintiffs Satisfy the Remaining Factors for an Immediate Injunction. ...........................30

CONCLUSION .................................................................................................................31

i

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elanis*,
   No. 21-475, 2023 WL 4277208 (U.S. June 30, 2023).........................................................*passim*

*Animal Legal Def. Fund v. Wasden*,
   878 F.3d 1184 (9th Cir. 2018) ...............................................................................................21

*Animal Legal Defense Fund v. Kelly*,
   9 F.4th 1219 (10th Cir. 2021) ...........................................................................................12, 13

*Bella Health and Wellness v. Weiser*,
   No. 123-cv-00939-DDD-SKC, 2023 WL 2978108 (D. Colo. Apr. 15, 2023).........................25

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) ...........................................................................................................14, 19

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) .......................................................................................19, 20, 21, 29

*Cal. Democratic Party v. Jones*,
   530 U.S. 567 (2000) ...............................................................................................................15

*Carson v. Makin*,
   142 S. Ct. 1987 (2022) ............................................................................................................15

*Center for Individual Freedom v. Madigan*,
   697 F.3d 464 (7th Cir. 2012) .............................................................................................24, 28

*Christian Legal Society v. Walker*,
   453 F.3d 853 (7th Cir. 2006) ..................................................................................................30

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .......................................................................................................14, 15, 18

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S. Ct. 1464 (2022) ..............................................................................................................6

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ......................................................................................20

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ..................................................................................24, 26

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ......................................................................................25

*Danco Lab'ys, LLC v. All. for Hippocratic Med.,*
    143 S. Ct. 1075 (2023). ................................................................................16

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ...............................................................................7, 10

*Doe v. Rokita,*
    54 F.4th 518 (2022) ..........................................................................11, 12, 18

*Elrod v. Burns,*
    427 U.S. 347 (1976) ......................................................................................30

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014) ..................................................................*passim*

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ......................................................................................20

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ..............................................................................15, 29

*GEFT Outdoors, LLC v. City of Westfield,*
    922 F.3d 357 (7th Cir. 2019) ..........................................................................5

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ................................................................................17, 26

*Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.,*
    879 F.3d 101 (4th Cir. 2018) ..........................................................8, 9, 14, 20, 31

*Higher Soc'y of Ind. v. Tippecanoe Cnty., Ind.*,
    858 F.3d 1113 (7th Cir. 2017) ................................................................. 30

*Hoeg v. Newsom*,
    No. 2:22-cv-01980 WBS AC, 2023 WL 414258 (E.D. Cal. Jan. 25, 2023) ........................... 27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ................................................................. 9, 10

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*,
    56 F.4th 437 (7th Cir. 2022) ................................................................. 30

*Janus v. Am. Fed'n of State Cnty., & Mun. Emps., Council 31*,
    138 S. Ct. 2448 (2018) ................................................................. 8

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ................................................................. 28

*Kennedy v. Bremerton Sch. Dist.*,
    4 F.4th 942 (9th Cir. 2021) ................................................................. 22

*Lyng v. Nw. Indian Cemetary Protective Ass'n*,
    485 U.S. 439 (1988) ................................................................. 28

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................. 6, 8, 22, 28

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................. 3

*NAACP v. Button*,
    371 U.S. 415 (1963) ................................................................. 5, 11

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................. 11

*NIFLA v. Becerra*,
    138 S. Ct. 2361 (2018) ................................................................. *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................30

*People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*,
    60 F.4th 815 (4th Cir. 2023) ....................................................................12

*Police Dep't of City of Chi. v. Mosley*,
    408 U.S. 92 (1972) ...................................................................................5

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) .............................................................................8, 13

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ....................................................................5, 6, 7, 14

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................................................................6, 10

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) .................................................................................9

*Snyder v. Phelps*,
    562 U.S. 443 (2011) .................................................................................7

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011). ...............................................................6, 7, 13, 14, 18

*Stenberg* v. *Carhart*,
    530 U.S. 914 (2000) ...............................................................................17

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ..................................................................14, 29, 30

*Thomas v. Collins*,
    323 U.S. 516 (1945). ..............................................................................15

*Turner Broad. System Inc. v. FCC*,
    512 U.S. 624 (1994) ...............................................................................15

*United States v. Alvarez*,
   567 U.S. 709 (2012) ......................................................................................12

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000) .................................................................................19, 20

*United States v. Stevens*,
   559 U.S. 460 (2010) ......................................................................................14

*USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*,
   402 F.Supp.3d 427 (N.D. Ill. 2019) ..............................................................4

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ......................................................................................31

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................................................5

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) ..........................................................................9, 14, 23

**Statutes**

815 ILCS 505 *et seq* .........................................................................................1

815 ILCS 505/2 ..............................................................................................26

815 ILCS 505/2JJ ...........................................................................................26

815 ILCS 505/2KK ..........................................................................................26

815 ILCS 505/2PP ...........................................................................................26

815 ILCS 505/2Q .............................................................................................26

815 ILCS 505/2Z .............................................................................................26

815 ILCS 505/7(a)-(b) ......................................................................................4

815 ILCS 505/10(a), (c) ....................................................................................4

Cal. Bus. & Prof. Code § 2270(a) .................................................................................27

Senate Bill 1909 (103d Ill. Gen. Assem., 2023 Sess.) ("SB1909") ......................................*passim*

SB1909, Sec. 2BBBB .................................................................................................*passim*

**Other Authorities**

Daniel Funke and Daniela Flamini, "A guide to anti-misinformation actions around the world," Poynter, updated June 22, 2023, https://www.poynter.org/ifcn/anti-misinformation-actions/ .27

NIFLA, "Abortion is Not Safer For Women Than Childbirth," https://nifla.org/abortion-not-safer-women-childbirth/ (last visited June 21, 2023) ....................................................................8

Coleman, P., *A serious misrepresentation of the relative safety of induced abortion compared to childbirth published in a leading medical journal*, retrieved Feb. 6, 2012 (NIFLA); Reardon, D., *Rehash of abortion safety claims ignores all inconvenient evidence to the contrary*, January 2012, https://nifla.org/abortion-not-safer-women-childbirth/ (last visited June 21, 2023)..........................................................................................................................................8

Margaret M. Gary, Donna J. Harrison, "Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient," The Annals of Pharmacology, Vol. 40, Feb. 2006, https://www.aaplog.org/wp-content/uploads/2011/07/MifeSAEharrison-pdf-copy.pdf...........16

Planned Parenthood of Illinois, "Care. Delivered.," "Abortion pill-by-mail," https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/abortion-pill-mail (last visited June 21, 2023) ...........................................................16

Planned Parenthood of Illinois, "In-Clinic Abortion," "In-Clinic Abortion Procedures at a Glance," https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/clinic-abortion (last visited June 21, 2023)...................................17

## INTRODUCTION

Today, Illinois enacted a law that openly and broadly targets pro-life pregnancy help ministries—and only pro-life pregnancy help ministries—for crippling fines and other civil penalties based solely on Illinois's disagreement with their religiously motivated pro-life speech and viewpoint. In so doing, Illinois tramples on pro-life organizations' protected speech and religious freedom, in violation of the First and Fourteenth Amendments to the U.S. Constitution.

This new law, Senate Bill 1909 (103d Ill. Gen. Assem., 2023 Sess.) ("SB1909"), adds a new subcategory in Illinois's Consumer Fraud and Deceptive Business Practices Act ("Deceptive Business Practices Act"), 815 ILCS 505 *et seq*. It is designed to apply singularly to so-called "limited services pregnancy centers," defined as any organization or facility that "has a primary purpose" to provide "pregnancy-related services," including options counseling, but does not participate in providing abortion or "emergency contraception."[1] SB1909 prohibits these "limited" centers, and only these centers, from engaging in undefined "deception," "misrepresentation," and "omission[s]" of "material fact[s]," among other things, in the offering or provision of "pregnancy related services," or with the intent "to interfere with . . . access to a provider of abortion or emergency contraception," or "to induce an individual to enter or access [a] limited services pregnancy center." (*See* Exhibit 1 to Verif. Cmplt., Enrolled SB1909, Sec. 2BBBB(b)(1)-(4).)

SB1909 includes a lengthy "Legislative intent" section which makes clear that it is not aimed at quintessentially commercial business deception, but rather at pro-life organizations' speech on a matter of utmost public concern—information about abortion and its alternatives:

> [People have] fundamental rights . . . to make autonomous decisions about their own reproductive health, including the fundamental right to use or refuse reproductive health care. . . . The advertisements *and information* given by ["limited services

---

[1] Plaintiffs reasonably understand that "emergency contraception" is abortifacient given that it can operate by ending pregnancy after fertilization. (Verif. Cmplt. ¶9, n.1.)

pregnancy centers"] provide grossly inaccurate or misleading information overstating the risks associated with abortion, including conveying untrue claims that abortion causes cancer or infertility and concealing data that shows the risk of death associated with childbirth is approximately 14 times higher than the risk of death associated with abortion. This *misinformation* is intended to cause undue delays and disruption to time-sensitive, reproductive health care services . . . (See SB1909, Sec. 1 at p. 2:6) (emphasis added).

At the same time, SB1909 allows abortion-promoting organizations and other providers of pregnancy-related services, including all of the state's licensed health care professionals and licensed hospitals,[2] to engage in their own disputed speech on abortion, which is not otherwise restricted by the Deceptive Business Practices Act. In other words, organizations willing to speak the state's preferred message on abortion and/or emergency contraception are entirely exempt, while SB1909 brings the full force of the Attorney General's Office to bear against those with sincere objections to those practices. This viewpoint discrimination is per se unconstitutional, and it also fails the exacting scrutiny required of content-based restrictions on speech.

The legislative history of SB1909 also confirms its intent to restrict protected pro-life speech. For example, when asked by a member of the Senate Executive Committee whether SB1909 could be used to forbid pro-life organizations from urging that "Life begins at conception" or to compel them to state that abortion is safer than childbirth, the Deputy Attorney General for Policy, Ashley Hokenson, testified that "we [the Attorney General's Office] would evaluate on a case-by-case basis." (Senate Cmte. Tr. at 24:24-25:11, 27:24-28:2, Ex. A to Breen Decl.) When a member of the House Health Care Availability & Accessibility Committee asked whether SB1909 could be used to require a pro-life pregnancy center to "state upfront that it does not provide abortions or emergency contraception," again Ms. Hokenson said it would be up to the Attorney

---

[2] SB1909 expressly exempts licensed health care professionals and licensed hospitals from the meaning of "limited services pregnancy center." SB1909, Sec. 2BBBB(a) ("Limited services pregnancy center").

2

General—the official charged with enforcing SB1909—"on a case-by-case basis." (House Cmte. Tr. at 34:20-25, Ex. C to Breen Decl.) The U.S. Supreme Court has already held that such discriminatory compelled disclosures (even absent such unbridled discretion) directly violate the First Amendment in *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018). That decision was not an invitation to skirt the U.S. Constitution by creative legislating. *NIFLA* was—and remains—a strong, clear affirmation of pro-life pregnancy centers' Free Speech rights.

Nonetheless, the Attorney General celebrated the passage of SB1909 with a press release quoting an Illinois legislator tarring pro-life pregnancy centers as "fake clinics."[3] (Verif. Cmplt. ¶16 and Ex. 1A thereto.) He criticized these pregnancy help centers for not offering "comprehensive [abortion] reproductive health services," not providing "the full range of information and care," and having as their "mission . . . to convince pregnant people to carry to term and not have an abortion." (Id.) And he confirmed that SB1909 targets pro-life pregnancy centers' provision of so-called "false information" and "misleading information," such as allegedly "overstating the risks associated with abortion." (Id.) Furthermore, when SB1909's Chief House Sponsor was asked during floor debate whether SB1909 would apply to pro-life pregnancy centers "if they say abortion is sin" or "contraception is wrong," she stated it "would be [up to] the Attorney General." (House Floor Tr. at 19:1-9, Ex. D to Breen Decl.)

It is difficult to conceive of a law more hostile to the First Amendment. As Justice Scalia once put it, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). SB1909 immediately and expressly restricts the protected speech of Plaintiffs in this case—pro-life pregnancy centers and sidewalk counseling organizations that do not provide or refer for abortion or emergency contraception—based on the notion that pro-life speech is

---

[3] https://illinoisattorneygeneral.gov/news/story/attorney-general-raouls-legislation-to-address-deceptive-practices-by-crisis-pregnancy-centers-headed-to-governors-desk.

"misinformation," and on pain of a $50,000 fine "per violation," injunctions from providing preg-

nancy-related services, loss of authority to remain open in Illinois, private civil suits, and attorney's

fees and costs, among other consequences. 815 ILCS 505/7(a)-(b), 505/10(a), (c).[4]

At bottom, the First Amendment prohibits government from restricting speech—including

*religious* speech—it disfavors by labeling it "misinformation," especially while exempting com-

parable speakers espousing a viewpoint it prefers. SB1909 must be immediately enjoined.

## <u>ARGUMENT</u>

"The standards for granting a temporary restraining order and preliminary injunction are

the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F.Supp.3d 427, 433

---

[4] Plaintiffs incorporate by reference the Factual Background of the accompanying Verified Complaint, at ¶¶40-136. In summary, Plaintiffs are the National Institute of Family and Life Advocates ("NIFLA"), a religious non-profit composed of member pregnancy centers across the nation, including 81 in Illinois, over 60 of which offer limited obstetric ultrasound and other medical services under the supervision of a licensed medical director (Verif. Cmplt. ¶¶32-33, 40-53); Women's Help Services, a faith-based non-profit preg-nancy resource center ministry with locations in Johnsburg and McHenry, Illinois, that also offers such services as limited obstetric ultrasound, STD testing, and pregnancy tests (id. ¶¶34, 62-70); Relevant Preg-nancy Options Center ("Relevant"), a religious non-profit providing pregnancy services in Highland, Illi-nois, and is in the process of establishing on-site medical services under the direction of a licensed physician (id. ¶¶36, 54-61); Rockford Family Initiative, a religious non-profit that provides sidewalk counseling and pregnancy help services in Rockford, Illinois (id. ¶¶35, 71-79); and Pro-Life Action League ("PLAL"), a religious non-profit that provides sidewalk counseling, sidewalk counseling materials, and pregnancy help services in Illinois and nationally (Id. ¶37, 71-79).

NIFLA's National Commitment of Care and Competence requires all NIFLA members to ensure that clients and the public receive "truthful," "honest," and "accurate[]" information from its member pregnancy cen-ters' communications, including in Illinois. (id. ¶122-23 and Ex. 2 thereto.) This Commitment applies to Plaintiff Relevant as a NIFLA member. (id. ¶55.) Women's Health Center has a similar commitment. *See* https://focuswomenscenter.com/en/schedule/about-us/

As discussed below, SB1909 extends to any "*organization* or facility" that provides "pregnancy-related services," includes "health counseling services" in this context, including "pregnancy options counseling." SB1909, Sec. 2BBBB ("Limited services pregnancy center) (emphasis added); ("Pregnancy-related ser-vices"). The law is thus broad enough to cover the sidewalk counseling organizations like Plaintiffs PLAL and Rockford Family Initiative, consistent with supporters' intent expressed in Committee hearings. *See infra*.

4

n.5 (N.D. Ill. 2019). Plaintiffs must show (1) a likelihood of success on the merits; (2) irreparable harm; and (3) the balance of harms and public interest favor a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "'This Circuit employs a sliding scale approach for this balancing: if a [movant] is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a [movant] is to win the more that balance would need to weigh in its favor.'" *Best Choice Meats*, 402 F.Supp.3d at 433 (quoting *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019)). Plaintiffs easily meet this standard.

**I.      SB1909 Must be Enjoined to Protect Plaintiffs' First Amendment Rights.**

**A.      SB1909 Unconstitutionally Burdens Plaintiffs' Freedom of Speech.**

SB1909 purports to prevent "deception" in the provision of "pregnancy-related services" by censoring Plaintiffs' pro-life speech and compelling them to express a contrary viewpoint. But a "[s]tate cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). SB1909 also *exempts* the speech of abortion facilities, licensed providers, and hospitals wishing to speak on the same topic, from a different viewpoint. But it is a fundamental principle that "government must afford all points of view an equal opportunity to be heard." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). Illinois's refusal to do so here is unconstitutional.

**1.      SB1909 regulates Plaintiffs' speech based on content and viewpoint.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests" (i.e., satisfy strict scrutiny). *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* The First Amendment also

5

"requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys," and "[c]ommercial speech is no exception." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). This is all the more acute "in the fields of medicine and public health, where *information can save lives*." *NIFLA*, 138 S. Ct. at 2370 (emphasis added).

Further, "[w]hen the government targets not subject matter, but particular *views* taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added). Here, SB1909 unquestionably restricts (and compels) Plaintiffs' speech based on both content and viewpoint.

On its face, SB1909 applies to Plaintiffs' speech entirely due to its "communicative content." *Reed*, 576 U.S. at 163. The law targets certain *types* of speech expressed while providing or advertising for "pregnancy-related services." (SB1909, Sec. 2BBBB(b)(1)-(2).) By regulating speech, including "information" (*id.* at Sec. 1) that the state vaguely declares to be "deceptive," "misrepresentati[ve]," or "omi[tting] . . . material fact[s]," in the offering or provision of (pro-life) pregnancy-related services, SB1909 "draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163. The law requires "enforcement authorities to examine the content of the message[s] . . . conveyed" by life-affirming organizations "to determine whether [*deceptive* communication] has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (internal quotes omitted); *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022) (regulating speech's "substantive message" is content-based).

Further, SB1909 is content-based because it targets the *topics* Plaintiffs do and don't discuss. The statute applies only to what it calls "*limited* services pregnancy centers," which are deemed "limited" and not "comprehensive" solely because they do not refer for or provide abortion or emergency contraception. (SB1909, Sec. 2BBBB at 4:9-20. (emphasis added).) In other words,

the speech of those who support or refer for abortions or emergency contraception is *not* scruti-nized under SB1909, while the speech of those who do not support or refer for abortion is re-stricted. SB1909 "thus has the effect of preventing [life-affirming organizations]—and only [life-affirming organizations]—from communicating with [pregnant women] in an effective and in-formative manner." *Sorrell*, 564 U.S. at 564. In short, SB1909 "singles out specific subject matter for differential treatment" and is thus content-based. *Reed*, 576 U.S. at 169.

Worse, and for similar reasons, SB1909 plainly targets particular *viewpoints* on abortion.[5] SB1909 regulates expression about "pregnancy-related services" only by *pro-life* pregnancy min-istries made while advertising, offering, or carrying on "pregnancy-related services," including where it "interfere[s] with . . . access to . . . abortion" or "induce[s] . . . access" to a pro-life pregnancy center. (SB1909, Sec. 2BBBBI(b).) The law thus effectively targets advocating for a pro-life viewpoint in the ongoing "rancorous national controversy" on the subject of abortion. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2279 (2022).

### 2. The First Amendment protects Plaintiffs' speech.

Plaintiffs' "speech on [such] public issues occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (internal quotes omitted); *see also Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014) ("mandating . . . espous[al] [of] the government's position on a con-tested public issue[] deprives [pregnancy centers] of their right to communicate freely on matters of public concern") (internal quotes omitted). This special protection bars Illinois from "licens[ing] one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry

---

[5] Plaintiffs note that if this Court's analysis is "confined to viewpoint discrimination, some legislators might [] infer[] that if the law were reenacted with a broader base and broader coverage it then would be upheld." *NIFLA* v., 128 S. Ct. at 2378-79 (Kennedy, J., concurring). Thus, Plaintiffs focus on both content- and viewpoint-discrimination here.

rules," even under the auspices of regulating deceptive practices. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 392 (1992). SB1909's direct targeting of pro-life pregnancy ministries "facilitate[s] speech on only one side of the abortion debate" and is thus "a clear form of viewpoint discrimination" against protected speech. *McCullen*, 573 U.S. at 485.

For example, SB1909 expressly alleges that pro-life pregnancy ministries "conceal[] data that [allegedly] shows the risk of death associated with childbirth is approximately 14 times higher than the risk of death associated with an abortion." (SB1909, Sec. 1, at 2:1-6.) Plaintiffs dispute that statistic. Indeed, Plaintiff NIFLA has an entire webpage reasonably disputing that view, and it encourages its members to do so as well.[6] (Verif. Cmplt. ¶128(1)(a); *see* Decl. of Prof. Michael New ¶¶9-23 ("14-times" claim "stems from a research methodology with numerous critical weaknesses" & studies from Denmark, Finland, and California show risk of death higher for abortion than childbirth) & ¶¶24-27 (abortion positively associated with increased risk of breast cancer).) But under SB1909 and its express legislative intent, such information is ostensibly forbidden in Plaintiffs' clinics, while abortion facilities, hospitals, and licensed physicians remain free to convey the "abortion-is-14-times-safer-than-childbirth" canard to their patients. The State is free to convey its own views on abortion, "but not through the means of imposing unique limitations upon speakers who . . . disagree." *R.A.V.*, 505 U.S. at 396; *see also Janus v. Am. Fed'n of State Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) ("Whenever . . . a State prevents individuals from saying what they think on important matters or compels them to voice ideas with

---

[6]https://nifla.org/abortion-not-safer-women-childbirth/ (citing Coleman, P., *A serious misrepresentation of the relative safety of induced abortion compared to childbirth published in a leading medical journal*, retrieved Feb. 6, 2012; Reardon, D., *Rehash of abortion safety claims ignores all inconvenient evidence to the contrary*, January 2012) (permalinked at https://archive.ph/HKoNq).

which they disagree, it undermines" the ends of the First Amendment in preserving "our demo-cratic form of government" and "further[ing] the search for truth.").[7]

As the Fourth Circuit recognized in *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.*, "[a] speech edict aimed directly at those pregnancy clinics that do not provide or refer for abortions is neither viewpoint nor content neutral and 'raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace.'" 879 F.3d 101, 112 (4th Cir. 2018) (emphasis added) (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). In *Greater Balt.*, the Fourth Circuit struck down a Baltimore ordinance requiring "limited-service pregnancy centers" to post notices that they do not provide or refer for abortions or "comprehensive" contraception, because, although the Court did not "begrudge the City its viewpoint, [] neither may the City disfavor only those who disagree." *Id.* at 112. The same is true here: Illinois may be entitled to its viewpoint, but it may not disfavor only the viewpoint of pro-life pregnancy ministries with whom it disagrees.

Moreover, by regulating omissions and concealments of disputed facts, SB1909 unlawfully compels speech. Mandatory disclosure laws are generally content-based, since "compelling indi-viduals to speak a particular message . . . alters the content of their speech." *NIFLA*, 138 S. Ct. at 2361 (cleaned up). "Although the State may at times 'prescribe what shall be orthodox in com-mercial advertising' by requiring the dissemination of 'purely factual and uncontroversial infor-mation,' . . . outside that context it may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)); *accord 303 Creative LLC v. Elenis*, No. 21-476, 2023 WL 4277208, at *13 (U.S. June 30,

---

[7] Illinois's view on this issue is also an inherently moral position, since it ignores the "risk of death" to the unborn child, making its viewpoint discrimination here all the more evident. (Verif. Cmplt. ¶3.).

2023).[8] This applies "not only to expressions of value, opinion, or endorsement, but equally to statements of fact" (or alleged fact) "the speaker would rather avoid." *Id.* Indeed, last month the Supreme Court recognized that "[n]o government . . . may affect a speaker's message by forcing her to accommodate other views," nor "alter the expressive content of [the speaker's] message." *303 Creative*, 2023 WL 4277208, at *13 (cleaned up). The Supreme Court recently reaffirmed this principle in the pregnancy-center context when it struck down disclosure mandates on "licensed" and "unlicensed" pro-life pregnancy centers. *NIFLA*, 138 S. Ct. at 2371. Here, the speech targeted by SB1909 is obviously controversial, as it concerns "a profound moral issue on which Americans hold sharply conflicting views." *See Dobbs*, 142 S. Ct. at 2240. Illinois cannot compel the disclosure of controverted "facts" on that issue, with which Plaintiffs disagree, under the threat of investigations, lawsuits, and crippling fines.

Accordingly, because SB1909 blatantly restricts protected speech based on viewpoint, it is *per se* unconstitutional. *See Rosenberger*, 515 U.S. at 828-29 (government "must abstain from regulating speech when the specific . . . opinion or perspective of the speaker is the rationale for the restriction"). "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

### 3. Professional speech and even "false" speech remain protected (even assuming, arguendo, that Plaintiffs' speech were false).

Nor can the State alter Plaintiffs' speech under the guise of ensuring "medically appropriate care," "evidence-based decisions," and "accurate" professional speech. (SB1909, Sec. 1., at 1:10, 2:1, 2:21-24.) The Supreme Court has observed that the "danger of content-based regulations in

---

[8] SB1909 is so flawed that it fails even under *Zauderer*, as discussed further below.

the fields of medicine and public health . . . are also present in the context of professional speech," because it "pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *NIFLA*, 138 S. Ct. at 2374. Doctor-patient "candor is crucial"; and "[p]rofessionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields." *Id.* at 2374-75 (emphasis added). These good-faith disagreements "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive,'" even if one side is ultimately proven erroneous. *New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964) (citing *NAACP. v. Button*). SB1909 tramples over this protected space by seeking to "manipulat[e] the content of doctor-patient" and other pregnancy-center "discourse" with which it disagrees. *NIFLA*, 138 S. Ct. at 2374.

To be sure, the Supreme Court "has upheld regulations of professional conduct that *incidentally* burden speech," including requirements that affect speech "only as part of the *practice* of medicine." *Id.* at 2373 (first emphasis added, second in original). As the Seventh Circuit recently put it, this means "[p]hysicians must tell patients about drugs' side effects and provide information that enables informed consent to risky procedures such as surgery." *Doe v. Rokita*, 54 F.4th 518, 520 (2022). At the same time, "a state may not enforce requirements *disconnected from medical care*," i.e., that do more than merely "require medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Id.* at 521 (emphasis added) (holding informed consent requirement that abortion providers tell patients about statutorily prescribed options for disposal of fetal remains is an incidental regulation of speech). Indeed, the Supreme Court recently noted that it has "rejected [] time after time" the notion that "a government forcing an individual to create speech on weighty issues with which she

11

disagrees" is merely an incidental burden on speech. *303 Creative*, 2023 WL 4277208, at *14. Here, Plaintiffs do not provide abortion at all, and thus SB1909's regulation of Plaintiffs' speech about abortion (e.g., its risks and details about types of abortion, etc.) is "disconnected from [any] medical care" Plaintiffs actually provide. *Id.* at 520. Verif. Cmplt. ¶¶45, 64, 128(1)-(5). SB1909 also restricts even the speech of pro-life organizations that do not provide medical services. *See* SB1909, Sec. 2BBBB(a) ("Pregnancy-related services" includes "any medical service, *or health counseling service*") (emphasis added); *see also* Verif. Cmplt. ¶¶45, 61 (Approximately 20 NIFLA clinics in Illinois do not provide medical services; nor does Plaintiff Relevant Pregnancy Options Center currently). And SB1909 expressly exempts all licensed health care professionals from its strictures, further indicating it is not intended as an informed consent regulation. *See* SB1909, Sec. 2BBBB(a).

Further, unlike the disclosure mandate upheld in *Rokita*, Plaintiffs "contend that the required notice[s]" (e.g., that childbirth allegedly comes with a 14 times greater risk of death than abortion) are categorically "false and misleading," *id.* at 520. Plaintiffs vigorously and reasonably disagree with Illinois's views on these hotly disputed issues. *See supra*. In short, SB1909 is not an informed consent regulation nor an otherwise indirect regulation of speech as part of professional conduct. Instead, it directly regulates Plaintiffs' speech as such on a matter of utmost public concern, based on Illinois's disagreement with their viewpoint.

Finally, government may restrict "false" speech, as SB1909 purports to do, only when it causes "some . . . legally cognizable harm." *United States v. Alvarez*, 567 U.S. 709, 719 (2012) (plurality); *id.* at 734 (Breyer, J., concurring). Courts have recognized that prohibiting "false" speech because of its *viewpoint or speaker* is *not* a "legally cognizable harm" under *Alvarez*. *See Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) ("Even if deception used

to obtain consent to enter is unprotected speech due to the entry upon private property [of animal facilities], Kansas may not discriminate between speakers based on the unrelated issue of whether they intend to harm or help the enterprise."); *accord People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 824 (4th Cir. 2023).

Here, even assuming arguendo Plaintiffs' targeted speech were indisputably false and unprotected (it is not), SB1909 prohibits "deception" only by "limited services pregnancy centers," including where there is intent to "interfere with or prevent" access to "a provider of abortion or emergency contraception," or to "induce access to" a "limited services pregnancy center." SB1909, Sec. 2BBBB(b)(1)-(2). SB1909 thus targets only false speech with *a pro-life intent*. But "[t]he government may not make unprotected speech a 'vehicle[ ] for content discrimination unrelated to [its] distinctively proscribable content.'" *Kelly*, 9 F.4th. at 1247 (quoting *R.A.V.*, 505 U.S. at 383-84 (holding that ordinance prohibiting *some* fighting words but not others violates First Amendment)).

Moreover, SB1909's targeted harm is the prevention of timely access to abortion and emergency contraception—but this alleged "harm" could just as well result from *true*, persuasive pro-life speech. Therefore, "the 'harm'" Illinois "seeks to avoid is the type of harm that is not only legally non-cognizable but legally protected: that arising out of true speech on a matter of public concern." *Id*. at 1235; *see also Sorrell*, 564 U.S. at 576 ("[T]he fear that speech might persuade [generally] provides no lawful basis for quieting it.").

Thus, whatever label the State puts on it, SB1909 infringes on protected speech.

### 4.    SB1909 fails at every applicable level of scrutiny.

Even if SB1909 were not per se unconstitutional as viewpoint discriminatory (it is), the new law still fails any applicable scrutiny, whether strict, intermediate, or the *Zauderer* standard for even uncontroversial disclosure requirements. *Cf. NIFLA*, 138 S. Ct. at 2375-78. Indeed, the

Supreme Court has narrowed the differences between these standards in analyzing statutes that directly regulate speech based on its content, no matter the context.[9] Even in the commercial sphere (although Plaintiffs' speech is not commercial, *see, e.g.*, Verif. Cmplt. ¶10, 45, 56, 64; *accord Greater Balt. Ctr.*, 879 F.3d at 108), "[t]he First Amendment requires heightened scrutiny" whenever the law "is directed at certain content and is aimed at particular speakers." *Sorrell*, 564 U.S. at 566, 567; *see also id.* at 582 (Breyer, J., dissenting) (disagreeing with and highlighting the now "specially 'heightened' First Amendment standards" the Court requires for such restrictions); *accord 303 Creative*, 2023 WL 4277208, at *15. And *NIFLA* likewise made clear that under "intermediate scrutiny," "[p]recision . . . must be the touchstone when it comes to regulations of speech, which so closely touc[h] our most precious freedoms"; and even disclosure requirements for *uncontroversial* facts under *Zauderer* must be "no broader than reasonably necessary," nor "unduly burdensome or unjustified." 138 S. Ct. at 2376, 2377 (alterations in original) (quotes omitted). SB1909 fails these tests at every turn.

### a.    SB1909 fails strict scrutiny.

To survive strict scrutiny, a state must prove that the challenged law both "advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *see also Reed,* 576 U.S. at 171 (stating the state must show a content-based speech regulation "furthers a compelling interest and is narrowly tailored to achieve that interest").[10] "That standard is not watered down; it really

---

[9] Of course, there is a "well-defined and narrowly limited" exception for content-based restrictions on obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, "the prevention and punishment of which have never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (internal quotes omitted). None of these exceptions apply here.

[10] The Supreme Court borrows across subject areas when applying strict scrutiny under the First Amendment. *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011) (free speech) (using *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993) (free exercise) to describe features of strict scrutiny.

means what it says." *Tandon v. Newsom*, 141 S. Ct. 1294, 1298 (2021). When strict scrutiny applies, a state law "rare[ly]" survives. *Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022). SB1909 is not one of the rare laws that can clear this high bar.

**Compelling Interest:** The test for determining whether an asserted interest is compelling "is not to be made in the abstract" but rather "in the circumstances of this case" by looking at the particular "aspect" of the interest as "addressed by the law at issue." *See Cal. Democratic Party v. Jones,* 530 U.S. 567, 584 (2000); *see also Lukumi*, 508 U.S. at 546 (rejecting assertion that protecting public health was compelling interest "in the context of these ordinances"). In other words, the State must have a "more precise" compelling interest in *applying the disputed policy to these Plaintiffs* (and those similarly situated). *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation" of fundamental rights like freedom of speech and freedom of religion. *See Thomas v. Collins*, 323 U.S. 516, 530 (1945). The State "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. System Inc. v. FCC*, 512 U.S. 624, 664 (1994).

Here, the State's purported interests are ensuring women can "make autonomous decisions about their own reproductive health" and "receive timely access to information and appropriate care," free from "deceptive and unfair practices," *see* SB1909, Sec. 1 at 1:6-11. These generalized goals are undermined by SB1909 itself and thus collapse upon the slightest, let alone strictest, scrutiny.

First, SB1909's reach is wholly underinclusive given its total exemption of abortion facilities, hospitals, and licensed medical professionals that provide pregnancy-related services. The Supreme Court has consistently noted that "[u]nderinclusiveness raises serious doubts about

15

whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S. Ct. at 2376. Indeed here, while stressing the importance of making "evidenced-based decisions" about one's "reproductive health," Sec. 1 at 2:20-22, SB1909 leaves abortion-providing facilities entirely free to promote abortion, on whatever terms they deem fit.

For example, Planned Parenthood of Illinois promotes "Abortion pill-by-mail" as "Care. Delivered," describing the "abortion pill" as "safe and effective."[11] But the American Association of Pro-Life Obstetricians and Gynecologists has long found otherwise, documenting 607 unique adverse events from the use of mifepristone, including five deaths, between 2000 and 2004.[12] It ultimately found "a significant risk of severe, life-threatening, or even lethal adverse events" from "the use of mifepristone in otherwise healthy young women."[13] It also found that "complete, accurate data concerning th[is] public health risk . . . are not being gathered through the FDA's Adverse Event Reporting System" and must be corrected.[14] Yet in 2016 the FDA *eliminated* four of the safety restrictions that conditioned its approval of mifepristone in 2000, including "the requirement for prescribers to report non-fatal adverse events from chemical abortion." *All. For Hippocratic Med. V. Food Med. V. Food & Drug Admin.*, No. 23-10362, 2023 WL 2913725, at *2 (5th Cir. Apr. 12, 2023).[15] Planned Parenthood of Illinois's website contains none of this "evidence-based" "information," or updates about the FDA's reduced safety restrictions, that many

---

[11] https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/abortion-pill-mail (permalinked at https://archive.ph/J4H86).

[12] https://www.aaplog.org/wp-content/uploads/2011/07/MifeSAEharrison-pdf-copy.pdf (permalinked at https://archive.ph/M9aeZ).

[13] *Id.* at 5.

[14] *Id.*

[15] The Supreme Court ultimately stayed the underlying district court injunction in that case. *See Danco Lab'ys, LLC v. All. for Hippocratic Med.*, 143 S. Ct. 1075 (2023).

women might find useful in "mak[ing] autonomous decisions about their own reproductive health." (*See* Verif. Cmplt. ¶130.)

Additionally, in describing the different kinds of "in-clinic abortions" it offers, Planned Parenthood of Illinois claims that Dilation and Evacuation ("D&E") abortion merely uses "[m]edical instruments and a suction machine" to "gently empty your uterus."[16] But no less than the Supreme Court, quoting the American Medical Association, has recognized that after 15 weeks' gestation, "dismemberment or other destructive procedures are more likely to be required" in D&E abortion "[b]ecause the fetus is larger at this stage of gestation (particularly the head), and because the bones are more rigid." *Stenberg* v. *Carhart*, 530 U.S. 914, 925 (2000). The required dismemberment "typically occurs as the doctor pulls a portion of the fetus through the cervix into the birth canal"—based on "the traction" of the abortion instruments "and the counter-traction of the internal os of the cervix." *Id.* (internal quotes omitted). For this reason, Justice Stevens noted that, alongside partial birth "Dilation and Extraction" ("D&X") abortion, D&E abortion "could equally be characterized as 'brutal,' involving as it does 'tear[ing] [a fetus] apart' and 'ripp[ing] off' its limbs." *Gonzales v. Carhart*, 550 U.S. 124, 182 (2007) (Stevens, J., dissenting) (internal citations omitted) (alterations in original). Here, Planned Parenthood of Illinois acknowledges it "provides in-clinic abortions up to 21 weeks and 6 days,"[17] yet it is silent on the admitted dismemberment involved in post-15-week D&E abortions. The Supreme Court has recognized that "some doctors may prefer not to disclose precise details of the means that will be used" in an "imminent surgical procedure," *Carhart*, 550 U.S. at 159. But that's of little relevance here, where Illinois restricts Plaintiffs' pro-life speech in the alleged interest of ensuring *fully* "autonomous, informed, and

---

[16] https://www.plannedparenthood.org/planned-parenthood-illinois/patient-resources/abortion-services/clinic-abortion (permalinked at https://archive.ph/TxB6M).

[17] *Id.*

evidenced-based" abortion decisions, while leaving Planned Parenthood of Illinois free to mislead-ingly describe a "brutal" abortion procedure as "gently empty[ing] your uterus."

The compelling interest test cannot be satisfied where, as here, the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Lukumi*, 508 U.S. at 546-47; *see also id.* (stating "a law cannot be regarded as protect-ing an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited").

Nor can Illinois shirk this conclusion by arguing that abortion facilities' speech is already covered under the Deceptive Business Practices Act. The Attorney General has taken the position that pro-life pregnancy centers are also already covered under that Act. (Senate Cmte. Tr. at 21:5-10, 29:24-30:2, Ex. A to Breen Decl.) Yet it purports to "clarify" (id. at 30:1-2) via SB1909 that only so-called pro-life "misinformation" is a deceptive business practice, indicating that such speech was not clearly prohibited under pre-existing law after all. The same is all the more true of pro-abortion "misinformation." (*See* Verif. Cmplt. ¶¶21-22, describing Illinois's staunch pro-abor-tion government in recent years, *and* Ex. 1A thereto, AG press release indicating abortion facilities offer "full range" of information and care.) Further, "[t]he commercial marketplace . . . provides a forum where ideas and information flourish," and "the general rule is that the speaker and the audience, not the government, assess the value of the information provided." *Sorrell*, 564 U.S. at 579 (internal quotes omitted). SB1909 thus goes far beyond the Deceptive Business Practices Act by authorizing the prohibition of disputed speech (at worst) on a matter of public concern by pro-life pregnancy ministries, disconnected from any medical services Plaintiffs actually provide, with-out corresponding limits on abortion facilities' speech.[18]

---

[18]As noted, abortion facilities can still be subject to valid informed consent requirements as part of the practice of abortion, *see Rokita*, 54 F.4th at 520-21, but SB1909 does not impose such duties.

Additionally, the State has not shown the existence of the alleged concern underlying the law based on substantial evidence, relying instead entirely on "anecdote and supposition" to support the curtailment of vital constitutional rights. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000). While Defendant Raoul claims he has received "concerned reports about crisis pregnancy centers" "for years," (*see* Senate Cmte. Tr. at 4:5-6, Ex. A to Breen Decl.), a recent FOIA request confirmed he received *zero* complaints in the last 10 years from Illinois pregnancy center clients that such centers are violating the Deceptive Businesses Practice Act. (Jansen Decl. ¶12) Instead, the General Assembly relied largely on isolated and unsubstantiated reports by Chicago Abortion Fund, a partisan organization in the political debate about abortion that is exempted under SB1909, alleging a handful of women were "confused" by pro-life pregnancy centers. (Id. ¶11(b), Ex. C at 33-34) In fact, most, if not all, of the anecdotes failed to even allege that Illinois pro-life pregnancy centers were involved, let alone name specific centers. (Id.; *see also* Senate Cmte. Tr. at 34:7-36:9 (Sen. Villanueva at Senate Exec. Cmte. Hearing discussing Chicago Abortion Fund report without identifying a single clinic), and Senate Floor Tr. at 12:21-14:15, Ex. B to Breen Decl. (same, during Senate Floor Debate).) None of this evidence rises to the level of "compelling" or anything resembling it. Thus, the State has failed to "identify an actual problem in need of solving" or demonstrate that the curtailment of multiple constitutional rights is "actually necessary to the solution." *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011)).

All that remains is the state's interest in promoting "only *some* messages and *some* persons" by endeavoring to "eliminate disfavored [pro-life] ideas" via SB1909—an unquestionably *illegitimate* interest under the First Amendment. *303 Creative*, 2023 WL 4277208, at *16 (cleaned up).

**Least Restrictive Means:** Even assuming such a compelling interest did exist, SB1909 is not the least restrictive means for advancing those interests. "The least-restrictive-means standard

is exceptionally demanding," requiring the State to show that it lacks any other means of achieving

its interests "without imposing a substantial burden on the exercise of religion." *Burwell v. Hobby*

*Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014); *see also City of Boerne v. Flores*, 521 U.S. 507, 534

(1997). Defendant must show that there are zero less-restrictive alternatives. *See Playboy Entm't*

*Grp.*, 529 U.S. at 804; *see also Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly

tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

SB1909 does not and cannot satisfy this demanding standard for multiple reasons. First,

less restrictive means are readily available. Rather than censor or impose upon Plaintiffs' speech,

Illinois "could inform the women itself with a public-information campaign" about pro-abortion

"facts" that it (subjectively) deems incontrovertible, or about pro-life pregnancy centers them-

selves, and "could even post the information on public property near crisis pregnancy centers."

*NIFLA*, 138 S. Ct. at 2376 (holding that such alternative shows the regulation fails even interme-

diate scrutiny); *see also Greater Balt. Ctr.*, 879 F.3d at 112 (stating Baltimore could "inform[]

citizens about the scope of services offered at various facilities through a public advertising cam-

paign"); *Evergreen Ass'n, Inc.*, 740 F.3d at 250 (holding that such available alternative shows the

regulation fails even intermediate scrutiny).[19] Also, Illinois could seek to enforce its existing De-

ceptive Businesses Practices Act against any actual—and thus far unobserved—prohibitable de-

ception occurring at pro-life pregnancy centers, which the Attorney General states are already

covered under that Act. (Senate Cmte. Tr. at 29:24-30:2.) *Accord Greater Balt. Ctr.*, 879 F.3d at

112. Further, with respect to the State's interest in furthering access to emergency contraception,

the General Assembly demonstrated it can directly provide that drug in its recently passed Senate

Bill 1907, (103d Ill. Gen. Assem., Senate Bill 1907, 2023 Sess.), which requires that all public

---

[19] *See infra*, regarding SB1909's inability to pass even intermediate scrutiny.

20

college campuses in the state have emergency contraception available at "wellness kiosks." *Accord Hobby Lobby*, 573 U.S. at 729 (strict scrutiny may "require the Government to expend additional funds to accommodate citizens' religious beliefs").

Further, SB1909 is fatally over-inclusive. *See Brown*, 564 U.S. at 805 (speech regulations must not be substantially under- *or* over-inclusive). While SB1909's legislative history shows an intent to target some pro-life individuals who stand on public sidewalks while holding signs that say "check-in here" (Senate Cmte. Tr. at 5:4-7; House Cmte. Tr. at 5:14-19), the actual scope of the statute restricts a far greater amount of speech (i.e., alleged "misinformation") on matters of public concern related to abortion. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1205 (9th Cir. 2018) (Idaho prohibition on making unauthorized recordings at agricultural facilities was "over-inclusive and suppresses far more speech than necessary to further Idaho's stated goals of protecting property and privacy"). The Attorney General's representative admitted in testimony before the General Assembly that SB1909 may restrict and penalize a non-exempt person or organization for simply stating, "Life begins at conception," (Senate Cmte. Tr. at 27:24-28:2), or compel pro-life pregnancy centers to "state upfront" that they do not provide abortions or emergency contraception (House Cmte. Tr. at 34:20-25), despite the unmistakable holding of the U.S. Supreme Court declaring that such requirements are unconstitutional. *See NIFLA*, 138 S. Ct. at 2376; *see also Evergreen*, 740 F.3d at 249 ("A requirement that pregnancy centers address abortion, emergency contraception, or pregnancy care at the beginning of their contract with potential clients alters the centers' political speech by mandating the manner in which the discussion of these issues begins."). SB1909 thus restricts far more speech than necessary to achieve its supporters' own asserted goals. It easily fails strict scrutiny.

21

b.    **SB1909 also fails lesser scrutiny.**

Even assuming arguendo that strict scrutiny does not apply, SB1909 fails intermediate scrutiny and even the *Zauderer* standard for uncontroversial disclosure mandates. *See NIFLA*, 138 S. Ct. at 2375-78.

**Intermediate Scrutiny**: Under intermediate scrutiny, SB1909 "still must be narrowly tailored to serve a significant governmental interest," and thus it "must not burden substantially more speech than necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 586. Indeed, the requirement that a state interest must be "genuine, not hypothesized," *see supra*, is a "requirement in the context of intermediate scrutiny, such that it applies *a fortiori* in the strict-scrutiny context." *Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 942 (9th Cir. 2021).

SB1909 fails intermediate scrutiny for the reasons already discussed. *Accord Evergreen Ass'n*, 740 F.3d at 245, 250 (holding that pregnancy center disclosure mandate fails "under either intermediate scrutiny . . . or strict scrutiny," "considering both the political nature of the speech and the" availability of less restrictive means). The Supreme Court has already held that a substantially underinclusive speech regulation targeted at pro-life pregnancy centers, but not abortion facilities, fails intermediate scrutiny, arguendo. *See NIFLA*, 138 S. Ct. at 2375-76 (preliminarily enjoining mandate that licensed pro-life pregnancy centers, but not other facilities, inform women of the free public health services the State provides because it was "wildly underinclusive" as to its purpose of "educat[ing] low-income women about the services"; a "public-information campaign" would have been at least one more narrowly tailored means). The same is true here. By regulating and compelling only *pro-life* pregnancy centers' speech on a matter of public concern—but not that of abortion facilities, licensed healthcare providers, and hospitals—SB1909 is "wildly"

under- and over-inclusive as to the State's asserted goal of protecting women's "autonom[y]," "timely access to information," having "the full range of information and care," etc.—"including the fundamental right to use *or refuse* reproductive healthcare," SB1909, Sec. 1 at 1 (emphasis added). SB1909 thus fails intermediate scrutiny, too.

**_Zauderer_ Standard**: Further, under *Zauderer v. Office of Disciplinary Counsel*, the Supreme Court applies "a lower level of scrutiny" in the context of "commercial advertising" regarding "purely factual and uncontroversial information about the terms under which … services will be available." 471 U.S. at 651. "But even under *Zauderer*, a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *NIFLA*, 138 S. Ct. at 2377 (quoting *Zauderer*, 471 U.S. at 651). Here, as noted, SB1909 mandates *controversial* speech on a matter of public concern and applies regardless of whether Plaintiffs engage in commercial advertising. *See supra*. But even assuming *Zauderer* applies, a disclosure mandate that "distinguis[hes] among different speakers" is presumptively unjustified, because it "*run[s] the risk that the State has left unburdened those speakers whose messages are in accord with its own views*." *Id.* at 2378 (internal quotes omitted, emphasis added). And requiring pro-life pregnancy centers to promote the State's pro-abortion views would "drown[] out [their] own message." *Id.*; *see also Evergreen*, 740 F.3d at 249 (pregnancy center disclosure mandate "overly burdens Plaintiffs' speech" where "the context is a public debate over the morality and efficacy of contraception and abortion, for which many of the facilities regulated by [the law] provide alternatives"). Indeed, just as government "[can]not use its public accommodation statute to deny speakers the right to choose the content of their own message," *303 Creative*, 2023 WL 4277208, at *11 (cleaned up), Illinois cannot use its Deceptive Business Practices Act to do the same to pro-life pregnancy ministries. Thus it cannot satisfy even these minimal First Amendment requirements.

23

Accordingly, Plaintiffs are likely to succeed on the merits of their Free Speech claims.

## II.    SB1909 is Unconstitutionally Vague and Overbroad.

Additionally, SB1909 violates the Constitution's protections against vague and overbroad laws. A law violates the Due Process Clause "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). A statute is unconstitutionally vague if: (1) it fails to provide adequate "notice that will enable ordinary people to understand what conduct it prohibits;" or (2) it "authorize[s] . . . arbitrary or discriminatory enforcement." *Id.* at 56. "In cases where the statute abuts upon sensitive areas of basic First Amendment freedoms, . . . rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (internal quotes omitted).

Further, a statute is facially overbroad in violation of the First Amendment "if it prohibits a substantial amount of protected speech . . . relative to [its] plainly legitimate sweep." *Id.* at 476 (internal quotes omitted). "In the First Amendment context, vagueness and overbreadth are two sides of the same coin," serving as "alternative and often overlapping theories for relief on the same claim." *Id.* at 479 (internal quotes omitted).

SB1909 effectively provides no notice as to the scope of what constitutes prohibited "deception," "misrepresentation," "omissions" of "material facts," etc., in the provision of pro-life "pregnancy-related services." While the new law amends and employs terms from the already existing Deceptive Businesses Practices Act, this only heightens the confusion. By unconstitutionally targeting only pro-life speech, including in its express intent to prohibit alleged pro-life "misinformation" as a "deceptive" practice, SB1909 triggers First Amendment concerns not inherently present in the generally applicable Act. *See supra*.

SB1909's discriminatory scope and "Legislative intent" combine to present apparently un-answerable questions about whether the prohibition on "deception," "fraud," "misrepresentation," etc., includes all manner of pro-life speech by pro-life pregnancy centers, and what pro-abortion "material facts" they cannot "conceal[]" or "omi[t]" when speaking with a mother. Indeed, at the Senate Executive Hearing on the bill, Deputy Attorney General Ashley Hokenson was asked if it would be actionable "deception" under SB1909 for pregnancy centers to "say" any of the follow-ing: "that [] induced abortion leads to preterm birth"; "that induced abortion is a risk factor for placenta previa"; "that the induced abortion is associated with higher risk of miscarriage"; or even "*that life begins at conception*." In each instance *Ms. Hokenson could not say yes or no*, but re-peatedly asserted that the Attorney General would merely "*evaluate on a case-by-case basis*." (Senate Cmte. Tr. at 24:24-28:2.) When asked why the General Assembly is giving such "very, very subjective" "power to the Attorney General," Ms. Hokenson responded: "Because that is how the [Deceptive Business Practices] Act works."—wholly leaving the matter to the discretion of the Attorney General, in contravention of the First Amendment.[20] (Id. at 30:11-17.) Such brazen "un-bridled discretion in a government official over whether to permit or deny expressive activity" is unconstitutional. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988).

Worse, the Attorney General's Office admitted that SB1909's precise contours would be punted to the courts. When squarely asked "Who makes the decision of what is deceptive, and how do you make that decision," Ms. Hokenson responded: "Typically, the courts would decide," based

---

[20] At the House Health Care Availability & Accessibility Committee, Ms. Hokenson also admitted that SB1909 could restrict Plaintiffs' promotion of abortion pill reversal. (House Cmte. Tr. at 35:10-18, Ex. C to Breen Decl.) . *See* Verif. Cmplt. ¶128(3), n.9 & Count V. *See also Bella Health and Wellness v. Weiser*, No. 123-cv-00939-DDD-SKC, 2023 WL 2978108 (D. Colo. Apr. 15, 2023) (temporarily enjoining Colo-rado anti-"deception" law prohibiting distribution of "medication abortion reversal") (Ex. A to this Memo-randum); *see also id.* at ECF 48 (April 28, 2023) (denying preliminary injunction given state's promise not to enforce, pending state medical board's determination on abortion pill reversal).

on evidence in a particular case. (Id. at 27:19-23.) When pressed on whether "the Attorney General" will "be the deciding factor of what is deceptive and what's not deceptive" in this context, she stated: "No, Senator. The Court would be the deciding factor." (Id. at 28:11-12.)

That admission alone violates the bedrock vagueness principle that "[t]he Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who would be rightfully detained, and who should be set at large." *Morales*, 527 U.S. at 60 (emphasis added); *accord Head Corp. v. Sachen*, 682 F.2d 672, 678 (7th Cir. 1982). Thus, on the Attorney General's own admission, the "standard for making th[e] decision" about what is prohibited deception under SB1909 "is inherently subjective" and thereby unconstitutional. *Morales*, 527 U.S. at 62.

Apart from the Attorney General's unbridled discretion under SB1909, the law also lacks a scienter requirement that courts have said can "alleviate vagueness concerns" with respect to adequate notice. *Gonzales*, 550 U.S. at 149. The Deceptive Businesses Practices Act does not require a *knowing* violation. *See* 815 ILCS 505/2; SB1909; *Cripe v. Leiter*, 703 N.E.2d 100, 103 (Ill. 1998) ("even an innocent misrepresentation may be actionable under the Act.") (citation omitted).

This problem is all the more acute given that the General Assembly does include a "knowing" requirement in *other* sub-categories of the Deceptive Business Practices Act. *See, e.g.*, 815 ILCS 505/2Q (home-improvement repairs business name requirements); 815 ILCS 505/2Z (knowing violations of numerous *other* Illinois laws also violate the Deceptive Business Practices Act); 815 ILCS 505/2JJ (shoppers club disclosure restrictions); 815 ILCS 505/2KK (animal cremation services requirement); and 815 ILCS 505/2PP (mail disclosure requirement). The lack of a "knowing" requirement in SB1909 only confirms that ordinary citizens are left to wholly "speculate as to [its] meaning," *Morales*, 527 U.S. at 58, and it is thus impermissibly vague.

26

This analysis accords with a recent decision by a California district court invalidating a California statute making it "unprofessional conduct" for doctors "to disseminate misinformation or disinformation related to COVID-19." *Hoeg v. Newsom*, No. 2:22-cv-01980 WBS AC, 2023 WL 414258, at *1 (E.D. Cal. Jan. 25, 2023) (quoting Cal. Bus. & Prof. Code § 2270(a)) (Ex. B to this Memorandum).[21] There, the challenged law defined "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." *Id.* The court granted a preliminary injunction against the law's enforcement on vagueness grounds, be-cause its operative terms like "contemporary scientific consensus" "lack[ed] an established mean-ing within the medical community; "[the State] d[id] not propose one"; and it was "so ill-defined" that "physician plaintiffs are unable to determine if their intended conduct contradicts the scientific consensus, and accordingly what is prohibited by the law." *Id.* at *8-9 (internal quotes omitted). The court deemed this especially true where "scientific conclusions" about COVID-19 "have been hotly contested." *Id.* at *9; *see also id.* at *11 ("[D]rawing a line between what is true and what is settled by scientific consensus is difficult, if not impossible."). The same is true here, in an even more "hotly contested" national discourse over what SB1909 deems undefined "misinformation," as discussed above.

SB1909 is also overbroad. Its definition of "limited services pregnancy centers," which includes "organizations" with a primary purpose of providing "pregnancy options counseling," reaches pro-life sidewalk counseling organizations whose volunteers stand on public sidewalks outside of abortion facilities, such as Plaintiffs Pro-Life Action League and Rockford Family

---

[21] The now-invalidated California law was, like SB1909, a noteworthy example of modern government restrictions on "disinformation" or "misinformation" about controversial topics, and the constitutional limits thereof. *See, e.g.*, Daniel Funke and Daniela Flamini, "A guide to anti-misinformation actions around the world," Poynter, updated June 20, 2023, https://www.poynter.org/ifcn/anti-misinformation-actions/ (permalinked at https://archive.ph/8sf6t).

Initiative.[22] (Verif. Cmplt. ¶¶71-79.) These areas "have immemorially been held in trust for the use of the public . . . for purposes of . . . communicating thoughts between citizens." *McCullen*, 573 U.S. at 476. "And handing out leaflets in the advocacy of a politically controversial viewpoint … is the essence of First Amendment expression; [n]o form of speech is entitled to greater protection." *Id.* at 489 (alterations in original) (internal quotes omitted). Placing such speech under an anti-"deception" Sword of Damocles—in addition to pro-life pregnancy centers' quintessentially protected speech discussed above—would restrict a truly "substantial amount of protected speech" in blatant violation of First Amendment overbreadth. *Madigan*, 697 F.3d at 476.

Accordingly, SB1909 is facially vague and overbroad, and Plaintiffs are likely to succeed on the merits for this reason alone.

### III. SB1909 Unconstitutionally Burdens Plaintiffs' Religious Exercise.

SB1909 also violates the Free Exercise by burdening Plaintiffs' religiously motivated speech while wholly exempting comparable abortion facilities that engage in their own disputed speech about abortion.

Where "a government entity has burdened [] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable,'" that policy must undergo strict scrutiny. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022). Religious exercise is plainly burdened when people are "coerced by the Government's action into violating their religious beliefs," or when "governmental action penalize[s] religious activity by denying any [religious] person an equal share of the rights, benefits, and privileges enjoyed by other citizens," *Lyng v. Nw. Indian Cemetary Protective Ass'n*, 485 U.S. 439, 449 (1988).

---

[22] *See also* House Cmte. Tr. at 5:6-19 (AG rep. admitting SB1909 intended to prohibit alleged pro-life "deception" on public sidewalks).

Here, SB1909 substantially burdens Plaintiffs' religious exercise. Plaintiffs engage in their respective pro-life pregnancy ministries for religiously motivated reasons. *See, e.g.*, Verif. Cmplt. ¶¶8, 47, 58, 68, 77. But SB1909 inhibits Plaintiffs from freely following their religious obligations to inform others about unborn life and abortion (including, in some circumstances, their religious beliefs on those topics) because of the statute's threat of investigations, lawsuits, steep fines, dissolution, and more. *See Hobby Lobby*, 573 U.S. at 720 ("economic consequences" that are "severe" are "surely [a] substantial" burden on religious exercise). The State thus "pressures" Plaintiffs to choose between their duties to God or their duties to the State, a textbook burden on free-exercise. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

SB1909 is also not generally applicable. A law lacks general applicability "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Indeed, the Supreme Court recently emphasized that a law triggers strict scrutiny if it "treat[s] any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id*. Also, a law is not generally applicable if it creates "a formal mechanism for granting exceptions." *Fulton*, 141 S. Ct. at 1879.

SB1909 restricts the religiously motivated expressions of religious, life-affirming organizations while explicitly exempting the expressions of secular abortion facilities from the law's requirements. It also exempts licensed healthcare professionals and hospitals, while further vesting the Attorney General with unrestrained authority to effectively grant individualized exemptions. These wholesale exemptions (or system of exemptions) undermine(s) the state's asserted interest

29

that women be fully and timely "informed" of all relevant information in making decisions about their "reproductive health." Because SB1909 treats secular speech by abortion providers and other healthcare providers more favorably than pro-life religious speech, it is not generally applicable. See *Tandon*, 141 S. Ct. at 1296.

Accordingly, SB1909 is subject to strict scrutiny under the Free Exercise Clause, as well, which it fails for the reasons already discussed. Plaintiffs are likely to succeed on this basis, too.

## IV.    Plaintiffs Satisfy the Remaining Factors for an Immediate Injunction.

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Higher Soc'y of Ind. v. Tippecanoe Cnty., Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (internal quotes omitted). The reason for this is simple: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries."). Thus, Plaintiffs unquestionably face irreparable harm.

Conversely, the public interest is not advanced by enforcing a law that tramples on constitutional rights. "[T]he balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Higher Soc'y*, 858 F.3d at 1116 (internal quotes omitted); *see also Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 453 (7th Cir. 2022) (holding the balance of equities favors enjoining "First Amendment harms"). And because the public interest favors an injunction, so too do the equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance-of-equities and public-interest "factors merge when the Government is the opposing party"). Given SB1909's egregious violation of Plaintiffs' constitutional rights, "the analysis

begins and ends with the likelihood of success" on Plaintiffs' constitutional claims. *Higher Soc'y*, 858 F.3d at 1116.

<u>**CONCLUSION**</u>

As the Fourth Circuit stated in striking down Baltimore's restriction on pro-life pregnancy center speech: "Weaponizing the means of government against ideological foes risks a grave violation of one of our nation's dearest principles: 'that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens by word or act their faith therein.'" *Greater Balt. Ctr.*, 879 F.3d at 113 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). SB1909 is Illinois's own weaponization of government power against pro-life pregnancy ministries' speech, and it is no less unconstitutional. SB1909 violates the First and Fourteenth Amendments and must be immediately enjoined.

Respectfully submitted,

THOMAS MORE SOCIETY

/s/Peter Breen
/s/Michael G. McHale*

Thomas L. Brejcha
Peter Breen
Joan M. Mannix
Michael G. McHale*
B. Tyler Brooks†
THOMAS MORE SOCIETY
309 W Washington St, Ste 1250
Chicago, Illinois 60606
(312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
jmannix@thomasmoresociety.org
mmchale@thomasmoresociety.org
tbrooks@thomasmoresociety.org
*Counsel for Plaintiffs*

* *pro hac vice to be filed, licensed solely in Nebraska*
† *licensed solely in North Carolina, South Carolina, Tennessee, and Michigan*