# EXHIBIT B

2023 WL 414258
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Tracy HØEG, M.D., Ph.D.; Ram Duriseti, M.D., Ph.D.; Aaron Kheriaty, M.D.; Pete Mazolewski, M.D.; and Azadeh Khatibi, M.D., M.S., M.P.H., Plaintiffs,
v.
Gavin NEWSOM, Governor of the State of California, in his official capacity; Kristina Lawson, President of the Medical Board of California, in her official capacity; Randy Hawkins, M.D., Vice President of the Medical Board of California, in his official capacity; Laurie Rose Lubiano, Secretary of the Medical Board of California, in her official capacity; Michelle Anne Bholat, M.D., M.P.H., David E. Ryu, Ryan Brooks, James M. Healzer, M.D., Asif Mahmood, M.D., Nicole A. Jeong, Richard E. Thorp, M.D., Veling Tsai, M.D., and Eserick Watkins, members of the Medical Board of California, in their official capacities; and Rob Bonta, Attorney General of California, in his official capacity; Defendants.
Letrinh Hoang, D.O.; Physicians for Informed Consent, a not-for profit organization; and Children's Health Defense, California Chapter, a California Nonprofit Corporation; Plaintiffs,
v.
Rob Bonta, in his official capacity as Attorney General of California; and Erika Calderon, in her official capacity as Executive Officer of the Osteopathic Medical Board of California; Defendants.

No. 2:22-cv-01980 WBS AC,
No. 2:22-cv-02147 WBS AC
|
Signed January 25, 2023

**Synopsis**
**Background:** Physicians licensed by the Medical Board of California and by the Osteopathic Board, and advocacy organizations representing the interests of doctors and patients, brought separate § 1983 actions against Governor of California, Attorney General of California, Executive Officer of the Osteopathic Medical Board of California, and President and Vice President of the Medical Board of California, and related parties, alleging that California statute providing that it shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment, and the development, safety, and effectiveness of COVID-19 vaccines, was unconstitutional under the First and Fourteenth Amendments. Plaintiffs filed separate motions seeking a preliminary injunction to enjoin the State of California from enforcing statute.

**Holdings:** The District Court, William B. Shubb, Senior District Judge, held that:

[1] physicians had Article III standing;

[2] one physician, as patient, had Article III standing;

[3] advocacy organizations had Article III standing;

[4] lowering standard for vagueness was not warranted;

[5] plaintiffs were likely to succeed on vagueness challenge;

[6] inclusion of term "false information" as a separate element failed to cure provision's vagueness; and

[7] establishment of a likelihood of success on vagueness challenge sufficiently established that both the public interest and the balance of the equities favored a preliminary injunction to enjoin enforcement of statute.

Motions granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (37)

[1]  **Injunction** ⟜ Grounds in general; multiple factors

To succeed on a motion for a preliminary injunction, plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.

[2] **Injunction** ⟶ Extraordinary or unusual nature of remedy

**Injunction** ⟶ Clear showing or proof

Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

[3] **Federal Civil Procedure** ⟶ In general; injury or interest

The court has a duty to evaluate all parties' standing.

[4] **Federal Civil Procedure** ⟶ In general; injury or interest

In order to invoke the jurisdiction of the federal courts, a plaintiff must establish the irreducible constitutional minimum of Article III standing. U.S. Const. Art. 3, § 2, cl.1.

[5] **Federal Civil Procedure** ⟶ In general; injury or interest

**Federal Civil Procedure** ⟶ Causation; redressability

Article III standing has three elements: (1) injury-in-fact, meaning the plaintiff must allege concrete and particularized and actual or imminent harm to a legally protected interest; (2) causal connection such that the injury must be fairly traceable to the conduct complained of; and (3) redressability, meaning a favorable decision must be likely to redress the injury-in-fact. U.S. Const. Art. 3, § 2, cl.1.

[6] **Constitutional Law** ⟶ Freedom of Speech, Expression, and Press

Challenges that involve First Amendment rights present unique standing considerations because of the chilling effect of sweeping restrictions on speech. U.S. Const. Amend. 1.

[7] **Constitutional Law** ⟶ First Amendment in General

When the challenged law implicates First Amendment rights, the Article III standing inquiry tilts dramatically toward a finding of standing. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amend. 1.

[8] **Federal Civil Procedure** ⟶ In general; injury or interest

In the context of a pre-enforcement challenge to the constitutionality of a law, a plaintiff satisfies the injury-in-fact requirement for Article III standing where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. U.S. Const. Art. 3, § 2, cl.1.

[9] **Federal Civil Procedure** ⟶ In general; injury or interest

The following three-factor inquiry helps to determine whether a threat of enforcement is genuine enough to confer an Article III injury required for standing: (1) whether the plaintiff has a concrete plan to violate the law, (2) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings, and (3) whether there is a history of past prosecution or enforcement. U.S. Const. Art. 3, § 2, cl.1.

[10] **Civil Rights** ⟶ Criminal law enforcement; prisons

Physicians sufficiently alleged a concrete plan to violate California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19, weighing in favor of finding of credible threat of prosecution so as to confer an Article III injury, required for standing to bring pre-enforcement First Amendment challenge seeking injunction to

enjoin enforcement of statute, by alleging that they had provided specific advice to patients about potential health risks of COVID-19 vaccines and boosters, had informed patients of flaws in research supporting vaccines, boosters, and universal masking, and had discussed with patients possible use of off-label treatments, that their conduct contradicted scientific consensus at the time, and that they intended to continue providing such advice and treatment or that their conduct would be chilled by statute's enforcement. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amend. 1; Cal. Bus. & Prof. Code § 2270.

[11]  **Civil Rights**   Injury and Causation

Physicians established a credible threat of enforcement of California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19, weighing in favor of finding of injury-in-fact required for Article III standing to bring pre-enforcement First Amendment challenge seeking to enjoin enforcement of statute, by alleging that physicians' beliefs about their conduct did not preclude enforcing agencies from determining that conduct violated challenged statute, it was plausible that agencies would determine that their conduct violated statute given ambiguity of statutory terms, and government had failed to disavow enforcement of the law. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amend. 1; Cal. Bus. & Prof. Code § 2270.

[12]  **Federal Civil Procedure**   In general; injury or interest

The third factor for determining whether a threat of enforcement is genuine enough to confer an Article III injury required for standing, concerning the history of enforcement, carries little weight when the challenged law is relatively new and the record contains little information as to enforcement. U.S. Const. Art. 3, § 2, cl.1.

[13]  **Civil Rights**   Criminal law enforcement; prisons

Lack of enforcement history with respect to California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19 was not dispositive in weighing against finding of credible threat of prosecution for establishing an injury-in-fact required for Article III standing to bring pre-enforcement First Amendment challenge to statute, given that statute had been in effect for less than a month, and action was initiated prior to statute coming into effect. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amend. 1; Cal. Bus. & Prof. Code § 2270.

[14]  **Civil Rights**   Criminal law enforcement; prisons

Physicians had Article III standing to bring pre-enforcement First Amendment challenge with respect to California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19, by alleging a credible threat of prosecution that was clearly traceable to statute that could be redressed through an injunction enjoining enforcement of statute. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amend. 1; Cal. Bus. & Prof. Code § 2270.

[15]  **Constitutional Law**   Occupation, employment, and profession

Patient had Article III standing to bring First Amendment vagueness challenge under the Fourteenth Amendment's Due Process Clause for California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19, by alleging that statute interfered with patient's right to receive information from her doctors. U.S.

Const. Art. 3, § 2, cl.1; U.S. Const. Amends. 1, 14; Cal. Bus. & Prof. Code § 2270.

[16] **Constitutional Law** ⚬ Due Process

Where the effect of a vague statute would infringe upon a party's First Amendment rights, Article III standing requirements to challenge the statute under the Fourteenth Amendment's Due Process Clause are broader than they otherwise might be. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amends. 1, 14.

[17] **Constitutional Law** ⚬ Due Process

Where a statute interferes with a plaintiff's First Amendment right to receive information, she has Article III standing to challenge the law as void for vagueness under the Fourteenth Amendment's Due Process Clause, even if it does not apply to her. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amends. 1, 14.

[18] **Associations** ⚬ Suits on Behalf of Members; Associational or Representational Standing

When suing on behalf of its members, an organization must show that its members would have individual standing, the issues are germane to the organization's purpose, and neither the claim nor the requested relief requires individual participation.

[19] **Associations** ⚬ Health and medical care

**Civil Rights** ⚬ Criminal law enforcement; prisons

Advocacy organizations representing physicians who intended to violate California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19, or whose speech had been chilled by statute, and representing patients who contended that statute interfered with their right to receive information from doctors, had Article III standing to bring pre-enforcement First Amendment challenge seeking injunction to prevent enforcement of statute on vagueness grounds under Fourteenth Amendment's Due Process Clause; organizations' members would have had individual standing, issues were germane to organizations' purposes of advocating for medical freedom and right to receive information pertinent to children's health, and neither claims nor requested relief required individual participation. U.S. Const. Art. 3, § 2, cl.1; U.S. Const. Amends. 1, 14; Cal. Bus. & Prof. Code § 2270.

[20] **Constitutional Law** ⚬ Certainty and definiteness; vagueness

A statute is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause when it either fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. U.S. Const. Amend. 14.

[21] **Constitutional Law** ⚬ Certainty and definiteness; vagueness

The operative question under the fair notice theory for determining whether a statute is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause is whether a reasonable person would know what is prohibited by the law. U.S. Const. Amend. 14.

[22] **Constitutional Law** ⚬ Certainty and definiteness; vagueness

When determining whether a statute is unconstitutionally vague under the Fourteenth Amendment's Due Process clause, the terms of a law cannot require wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings. U.S. Const. Amend. 14.

[23] **Constitutional Law** 🔑 Certainty and definiteness; vagueness

When determining whether a statute is unconstitutionally vague under the Fourteenth Amendment's Due Process clause, the standardless enforcement theory asks whether the law provides objective standards that establish minimal guidelines to govern enforcement. U.S. Const. Amend. 14.

[24] **Constitutional Law** 🔑 Particular Issues and Applications

Vague statutes are particularly objectionable under the Fourteenth Amendment's Due Process Clause when they involve sensitive areas of First Amendment freedoms because they operate to inhibit the exercise of those freedoms. U.S. Const. Amends. 1, 14.

[25] **Constitutional Law** 🔑 Particular Issues and Applications

When a challenged law implicates First Amendment rights, a facial challenge based on vagueness is appropriate under the Fourteenth Amendment's Due Process Clause. U.S. Const. Amends. 1, 14.

[26] **Constitutional Law** 🔑 Certainty and definiteness; vagueness

In considering a facial vagueness challenge under the Fourteenth Amendment's Due Process Clause, the court considers whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. U.S. Const. Amend. 14.

[27] **Constitutional Law** 🔑 Certainty and definiteness; vagueness

In evaluating question of vagueness of a statute under Fourteenth Amendment's Due Process Clause, courts usually look to a term's common meaning, but if the law regulates the conduct of a select group of persons having specialized knowledge, then the standard is lowered for terms with a technical or special meaning. U.S. Const. Amend. 14.

[28] **Civil Rights** 🔑 Injunction

Primary term at issue "contemporary scientific consensus" in California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19, defined as false information that is contradicted by contemporary scientific consensus contrary to the standard of care, did not have an established technical meaning in the medical community, and thus lowering standard for vagueness was not warranted when determining likelihood of success on grounds of Fourteenth Amendment vagueness challenge, in support of injunctive relief to enjoin statute's enforcement; term was a poorly defined concept, there were different notions of scientific consensus, including informal consensus and formal consensus, and term often referred to pronouncements of public health officials during pandemic. U.S. Const. Amends. 1, 14; 🚩 Cal. Bus. & Prof. Code §§ 2270, 🚩 2270(b)(4).

[29] **Constitutional Law** 🔑 Public health

**Health** 🔑 Validity

Term "scientific consensus" in definition of "misinformation" in California statute prohibiting physicians from disseminating misinformation related to COVID-19 lacked sufficient statutory definition, narrowing context, or settled legal meaning, and failed to provide sufficiently objective standards to focus reach of statute, rendering definition of "misinformation" unconstitutionally vague in violation of due process, and thus physicians were likely to succeed on vagueness challenge, as would support injunction to enjoin statute's enforcement; physicians were unable to determine if their intended conduct contradicted

scientific consensus, and accordingly what the law prohibited, statute's language provided no way to determine which of multiple interpretations was appropriate, and COVID-19 was a quickly evolving area of science that in many aspects eluded consensus. U.S. Const. Amend. 14; Cal. Bus. & Prof. Code §§ 2270, 2270(b)(4).

[30] Health ⟶ Requisite skill, training, qualifications

In the realm of professional negligence, the "standard of care" requires that medical service providers exercise that degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances.

[31] Civil Rights ⟶ Injunction
Constitutional Law ⟶ Public health
Health ⟶ Validity

Provision in California statute prohibiting physicians from disseminating misinformation related to COVID-19, and defining "misinformation" as contradicted by contemporary scientific consensus contrary to the standard of care improperly conflated "information" with "advice" or "treatment," and was grammatically incoherent, as would support finding that physicians established a likelihood of success on Fourteenth Amendment due process vagueness challenge, as element of injunctive relief to enjoin statute's enforcement; concept of "standard of care" pertains to the nature and quality of treatment that doctors provide or fail to provide, not information, and term "standard of care" failed to provide additional context in which to understand meaning of term "scientific consensus" and did not address chilling effect caused by statute's unclear phrasing and structure. U.S. Const. Amend. 14; Cal. Bus. & Prof. Code § 2270.

[32] Constitutional Law ⟶ Certainty and definiteness; vagueness

While statutes need not be written with mathematical precision to withstand a due process vagueness challenge, they must be intelligible. U.S. Const. Amend. 14.

[33] Negligence ⟶ Standard of Care

By its very nature, the standard of care applies to care, not information.

[34] Civil Rights ⟶ Injunction
Constitutional Law ⟶ Public health
Health ⟶ Validity

Inclusion of term "false information" as a separate element in California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19 failed to cure provision's vagueness, as would support finding that physicians established a likelihood of success on Fourteenth Amendment due process vagueness challenge, as element of injunctive relief to enjoin statute's enforcement; COVID-19 was such a new and evolving area of scientific study, and it may have been hard to determine which scientific conclusions were "false" at a given point in time. U.S. Const. Amend. 14; Cal. Bus. & Prof. Code §§ 2270(b)(2), 2270(b)(4).

[35] Constitutional Law ⟶ Due process

The court must consider any limiting construction that a state court or enforcement agency has proffered in a vagueness challenge under the Fourteenth Amendment's Due Process Clause. U.S. Const. Amend. 14.

[36] Constitutional Law ⟶ Judicial rewriting or revision

Rewriting a statute is a job for the California legislature, if it is so inclined, and not for the court.

[37] Civil Rights ⚖ Injunction

Establishment of a likelihood that California statute providing that it shall constitute unprofessional conduct for a physician to disseminate misinformation or disinformation related to COVID-19 was vague in violation of Fourteenth Amendment's Due Process Clause sufficiently established that both the public interest and the balance of the equities favored a preliminary injunction to enjoin enforcement of statute. U.S. Const. Amend. 14; 🚩Cal. Bus. & Prof. Code § 2270.

**West Codenotes**

**Validity Called into Doubt**

🚩Cal. Bus. & Prof. Code § 2270

**Attorneys and Law Firms**

Gregory Dolin, Pro Hac Vice, Washington, DC, Jenin Younes, Pro Hac Vice, District of Columbia, DC, Laura B. Powell, Pleasant Hill, CA, for Plaintiffs.

Aaron Lent, Megan R. O'Carroll, Health Quality Enforcement, Sacramento, CA, Kristin A. Liska, Office of the Attorney General, San Francisco, CA, for Defendants.

MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

 *1  Plaintiffs Tracy Høeg, Ram Duriseti, Aaron Kheriaty, Pete Mazolewski, and Azadeh Khatibi (collectively, "Høeg plaintiffs") brought a § 1983 action against Gavin Newsom, in his official capacity as Governor of California; Rob Bonta, in his official capacity as Attorney General of California; Kristina Lawson, in her official capacity as President of the Medical Board of California (the "Medical Board"); Randy Hawkins, in his official capacity as Vice President of the Medical Board; Laurie Rose Lubiano, in her official capacity as Secretary of the Medical Board; and Michelle Anne Bholat, David E. Ryu, Ryan Brooks, James M. Healzer, Asif Mahmood, Nicole A. Jeong, Richard E. Thorp, Veling Tsai, and Eserick Watkins, in their official capacities as members of the Medical Board. (Høeg Compl. (Docket No. 1).) The Høeg plaintiffs are physicians licensed by the Medical Board.

Plaintiffs Letrinh Hoang, Physicians for Informed Consent, and Children's Health Defense, California Chapter [1] (collectively, "Hoang plaintiffs") brought a § 1983 action against defendants Rob Bonta, in his official capacity as Attorney General of California, and Erika Calderon, in her official capacity as Executive Officer of the Osteopathic Medical Board of California (the "Osteopathic Board"). (Hoang Compl. (Docket No. 1).) Plaintiff Hoang is a physician licensed by the Osteopathic Board. The remaining two plaintiffs are organizations representing the interests of doctors and patients.

Plaintiffs in these related cases (see Høeg Docket No. 21; Hoang Docket No. 9.) allege that Assembly Bill ("AB") 2098 [2] is unconstitutional under the First and Fourteenth Amendments of the U.S. Constitution. Plaintiffs filed separate motions seeking a preliminary injunction to enjoin the State of California from enforcing AB 2098. (Høeg Notice of Mot. and Mem. In Support of Mot. for Prelim. Inj. ("Høeg Mot.") (Docket No. 5); Hoang Mot. for Prelim. Inj. and Mem. of Law ("Hoang Mot.") (Docket No. 4).)

I. The Challenged Statute

A. Statutory Provisions

AB 2098, codified at 🚩Cal. Bus. & Prof. Code § 2270, took effect on January 1, 2023. The statute provides that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." 🚩Cal. Bus. & Prof. Code § 2270(a) (emphasis added).

The statute defines "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." 🚩Id. § 2270(b)(4)

(emphasis added). The statute defines "disinformation" as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead." Id. § 2270(b)(2) (emphasis added).

**\*2** The misinformation or disinformation must be conveyed "[by] the licensee to a patient under the licensee's care in the form of treatment or advice." Id. § 2270(b)(3). Physicians and surgeons licensed by the Medical Board or the Osteopathic Board (the "Boards") are covered by the statute. Id. § 2270(b)(5).

The Boards are tasked with enforcing AB 2098. The statute augments the definition of "unprofessional conduct," id. § 2270(a), which is a pre-existing basis for disciplinary action by the Boards, see id. § 2234. Unprofessional conduct also includes, but is not limited to, "gross negligence," "repeated negligent acts," and "incompetence." Id.

### B. Legislative Findings

At the time AB 2098 was enacted, the California Legislature made several findings. The Legislature found that "[t]he global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians." AB 2098, 2021-22 Reg. Sess. (Cal. 2022) § 1(a). The Legislature also found that "[d]ata from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated." Id. § 1(b). It further stated that "[t]he safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC." Id. § 1(c).

The Legislature then addressed the policy problems the bill was designed to remedy. The bill first states that "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk," with "major news outlets [reporting that] some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals." Id. §§ 1(d), 1(e). The bill states that in response to these concerns, the Legislature previously "declared health misinformation to be a public health crisis, and urged the State of California to commit to appropriately combating health misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians." Id. § 1(g). The Legislature also noted that "[t]he Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information." Id. § 1(f).

### II. Preliminary Injunction Standard

**[1] [2]** To succeed on a motion for a preliminary injunction, plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir. 2011). "[I]njunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22, 129 S.Ct. 365.

### III. Article III Standing[3]

**\*3 [3] [4] [5]** To determine whether plaintiffs are entitled to a preliminary injunction, the court must first determine whether they have standing to challenge AB 2098. "In order to invoke the jurisdiction of the federal courts, a plaintiff must establish 'the irreducible constitutional minimum of standing.' " Lopez v. Candaele, 630 F.3d 775, 785 (9th Cir. 2010) (quoting Lujan v. Def. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Article III standing has three elements: "(1) injury-in-fact--plaintiff must allege concrete and particularized and actual or imminent harm to a legally protected interest; (2) causal connection--the injury must be fairly traceable to the conduct complained of; and (3) redressability--a favorable decision must be likely to redress the injury-in-fact." Barnum Timber Co. v. U.S. EPA, 633 F.3d 894, 897 (9th Cir. 2011) (citing Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130) (internal quotation marks omitted).

**[6] [7]** Challenges that involve First Amendment rights "present unique standing considerations" because of the

"chilling effect of sweeping restrictions" on speech. [Ariz. Right to Life Pol. Action Comm. v. Bayless, 320 F.3d 1002, 1006 (9th Cir. 2003)](). "In order to avoid this chilling effect, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." [Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1171 (9th Cir. 2018)]() (internal quotation marks omitted). Accordingly, when the challenged law "implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." [LSO, Ltd. v. Stroh, 205 F.3d 1146, 1155 (9th Cir. 2000)]().

A. Individual Physician Plaintiffs

**[8]** In the context of a pre-enforcement challenge to the constitutionality of a law, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " [Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014)]() (quoting [Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)]()); see also [Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1015 (9th Cir. 2013)]() (applying this standard to a facial vagueness challenge).

**[9]** The Ninth Circuit applies a "three-factor inquiry to help determine whether a threat of enforcement is genuine enough to confer an Article III injury": "(1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.' " [Tingley v. Ferguson, 47 F.4th 1055, 1067 (9th Cir. 2022)]() (quoting [Thomas v. Anchorage Equal Rts. Comm'n, 220 F.3d 1134, 1139 (9th Cir. 2000)]() (en banc)). In the context of a pre-enforcement challenge on First Amendment grounds, a plaintiff "need only demonstrate that a threat of potential enforcement will cause him to self-censor." [Id. at 1068]().

**[10]** Plaintiffs Høeg, Duriseti, Kheriaty, Mazolewski, and Hoang have sufficiently alleged a concrete plan to violate the challenged law. Plaintiffs state that they have provided specific advice to patients about potential health risks of COVID-19 vaccines and boosters and have informed patients of flaws in the research supporting vaccines and boosters. (Suppl. Decl. of Dr. Tracy Høeg ("Høeg Suppl. Decl.") (Høeg Docket No. 26-1) ¶¶ 4-5; Suppl. Decl. of Dr. Aaron Kheriaty ("Kheriaty Suppl. Decl.") (Høeg Docket No. 26-2) ¶ 12; Suppl. Decl. of Dr. Pete Mazolewski ("Mazolewski Suppl. Decl.") (Høeg Docket No. 26-3) ¶ 5; Decl. of Dr. Letrinh Hoang ("Hoang Decl.") (Hoang Docket No. 4-1) ¶ 5.) Plaintiffs also state that they have informed patients about flaws in the research supporting universal masking, and at times have advised patients against wearing masks based on the patients' individual needs. (Høeg Suppl. Decl ¶ 6; Kheriaty Suppl. Decl. ¶¶ 3-6; Mazolewski Suppl. Decl. ¶ 3.) Plaintiff Duriseti states that he treated COVID-19 patients with non-invasive ventilatory support rather than intubation early in the pandemic. (Decl. of Ram Duriseti ("Duriseti Decl.") (Høeg Docket No. 1-3) ¶ 8.) Plaintiff Hoang additionally states that she has discussed the possible use of off-label treatments for COVID-19 with her patients. (Hoang Decl. ¶ 2.)

**\*4** Physician plaintiffs state that, in these instances, their conduct contradicted the "scientific consensus" at the time, as determined by public health agencies like the CDC or by common practice in the medical field. (See, e.g., Decl. of Pete Mazolewski ("Mazolewski Decl.") (Høeg Docket No. 1-5) ¶ 13; Høeg Suppl. Decl. ¶¶ 6-7; Duriseti Decl. ¶ 8; Kheriaty Suppl. Decl. ¶ 7; Hoang Decl. ¶¶ 3-4.) The Hoang plaintiffs provide an expert declaration by Dr. Sanjay Verma, which similarly concludes that much of the advice and treatment provided in these situations has previously contradicted or currently contradicts the "consensus." Dr. Verma cites to numerous examples of contrary guidance provided by the CDC on the issues of masking and [vaccination](). (See Decl. of Dr. Sanjay Verma ("Verma Decl.") (Hoang Docket No. 4-1) at 20-32.)

Some of the physician plaintiffs intend to continue providing such advice and treatment to patients in the future. (Kheriaty Suppl. Decl. ¶ 6; Mazolewski Suppl. Decl. ¶ 5; Hoang Decl. ¶ 15.) Others indicate that their conduct will be chilled by AB 2098.[4] (Høeg Suppl. Decl. ¶ 3; Duriseti Decl. ¶ 16.) The physician plaintiffs have therefore established a concrete plan to violate the challenged law. See [Tingley, 47 F.4th at 1068]() (the Ninth Circuit "do[es] not require plaintiffs to specify 'when, to whom, where, or under what circumstances' they plan to violate the law when they have already" engaged in conduct "arguably" proscribed by the

law) (quoting Thomas, 220 F.3d at 1139); id. (in the context of a pre-enforcement challenge on First Amendment grounds, a plaintiff "need only demonstrate that a threat of potential enforcement will cause him to self-censor").

[11] Physician plaintiffs have also established a credible threat of enforcement. They aver that they intend to convey truthful information and provide treatment consistent with the standard of care. However, plaintiffs' beliefs about their conduct do not preclude the enforcing agencies from determining that their conduct violates the challenged statute. See Susan B. Anthony List, 573 U.S. at 162-63, 134 S.Ct. 2334 (in determining whether plaintiffs have established a threat of enforcement, plaintiffs' conduct need only "arguably" be proscribed by the challenged statute and plaintiffs' beliefs about their conduct are not dispositive). Based on plaintiffs' explanations of the advice and treatment they provide contrary to public health recommendations, it is plausible that the Boards will determine that their conduct violates AB 2098. This fear is especially reasonable given the ambiguity of the term "scientific consensus" and of the definition of "misinformation" as a whole, as discussed in further detail in Section IV. The government's "failure to disavow enforcement of the law" further weighs in favor of standing. See Tingley, 47 F.4th at 1068.

[12] [13] "The third factor, concerning the history of enforcement, carries 'little weight' when the challenged law is 'relatively new' and the record contains little information as to enforcement." Id. at 1068 (quoting Cal. Trucking Ass'n v. Bonta, 996 F.3d 644, 653 (9th Cir. 2021)). AB 2098 has been in effect for less than a month, and this action was initiated prior to AB 2098 coming into effect. Unsurprisingly, the parties have presented no history of enforcement. The lack of enforcement history "weighs against standing but is not dispositive." Id. at 1069 (internal quotation marks omitted).

*5 [14] As the first and second factors weigh in favor of standing, the court concludes that plaintiffs have established an injury-in-fact. See id. Because the injury alleged--a credible threat of prosecution under AB 2098--is "clearly traceable" to AB 2098, and "can be redressed through an injunction enjoining enforcement of that provision," physician plaintiffs have standing to challenge it. See Valle del Sol, 732 F.3d at 1016.

B. Individual Patient Plaintiff

[15] Although plaintiff Khatibi is a physician licensed by the Medical Board, she asserts standing as a patient, on the basis that AB 2098 interferes with her right to receive information from her doctors.

[16] [17] The Supreme Court has stated that "the Constitution protects the right to receive information and ideas," which "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). Accordingly, "where the effect of a vague statute would infringe upon a party's First Amendment rights, standing requirements to challenge the statute under the Fourteenth Amendment Due Process Clause are broader than they otherwise might be." Arce v. Douglas, 793 F.3d 968, 987 (9th Cir. 2015) (citing Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); Maldonado v. Morales, 556 F.3d 1037 (9th Cir. 2009)). Thus, where a statute interferes with a plaintiff's First Amendment right to receive information, she has standing to challenge the law, even if it does not apply to her. Id. at 987-88.

Because AB 2098 implicates plaintiff Khatibi's First Amendment right to receive information, she has standing. See id.; see also Conant v. Walters, 309 F.3d 629, 632 (9th Cir. 2002) (deciding the merits of First Amendment challenge to statute prohibiting doctors from "recommending" medical marijuana, which was brought by patients who wanted access to treatment, physicians who feared enforcement of statute, and organizations representing such physicians and patients); Forbes v. Napolitano, 236 F.3d 1009, 1010 (9th Cir. 2000), amended, 247 F.3d 903 (9th Cir. 2000), amended, 260 F.3d 1159 (9th Cir. 2001) (deciding the merits of vagueness challenge to statute criminalizing certain medical procedures, which was brought by patients who wanted access to treatment and physicians who feared prosecution under statute).

C. Organizational Plaintiffs

In addition to the individual plaintiffs in both matters, there are two organizational plaintiffs in the Hoang matter:

Physicians for Informed Consent and Children's Health Defense.

 **[18]** "When suing on behalf of its members, an organization must show that its members would have individual standing, the issues are germane to the organization's purpose, and neither the claim nor the requested relief requires individual participation." Inland Empire Waterkeeper v. Corona Clay Co., 17 F.4th 825, 831 (9th Cir. 2021) (citing Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

Plaintiff Physicians for Informed Consent is a non-profit organization whose educational mission is to "deliver data on infectious diseases and vaccines, and unite doctors, scientists, healthcare professionals, attorneys, and families who support voluntary vaccination." (Decl. of Dr. Shira Miller (Hoang Docket No. 4-6) ¶ 3.) The claims here are clearly relevant to the organization's mission.

 *6  **[19]** Physicians for Informed Consent's membership includes physicians who intend to violate AB 2098 or who have been chilled by AB 2098, and patients who contend that AB 2098 interferes with their right to receive information. (See id. ¶¶ 4-6.) Like the individual physician and patient plaintiffs discussed above, the organization's members would have individual standing. The participation of individual members is not necessary for this action to proceed.

Plaintiff Children's Health Defense is a non-profit organization whose mission is to "end childhood health epidemics by working aggressively to eliminate harmful exposures, hold those responsible accountable, and to establish safeguards to prevent future harm," which "includes advocating for medical freedom, bodily autonomy, and an individual's right to receive the best information available based on a physician's best judgment." (Hoang Compl. ¶ 31.) The claims here are clearly relevant to the organization's mission.

Children's Health Defense's membership includes parents in California who contend that AB 2098 interferes with their right to receive information pertinent to their children's health. (Id. ¶ 33.) Like plaintiff Khatibi, the organization's members would have individual standing. The participation of individual members is not necessary for this action to proceed.

Because both organizations' members would have individual standing, the issues raised here are germane to the organizations' purposes, and neither the claims nor the requested relief require individual participation, the court concludes that Physicians for Informed Consent and Children's Health Defense have standing. See Inland Empire Waterkeeper, 17 F.4th at 831.

IV. Vagueness Challenge[5]

Having determined that plaintiffs have standing, the court next considers whether they have demonstrated a likelihood of success on the merits. Plaintiffs contend that the law's definition of "misinformation" is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment. AB 2098 defines misinformation as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." Cal. Bus. & Prof. Code § 2270.

 **[20]** A statute is unconstitutionally vague when it either "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); see also Hill v. Colorado, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); Tingley, 47 F.4th at 1089.

 **[21]** **[22]** **[23]** "The operative question under the fair notice theory is whether a reasonable person would know what is prohibited by the law." Tingley, 47 F.4th at 1089. "The terms of a law cannot require 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.' " Id. (quoting Holder, 561 U.S. at 20, 130 S.Ct. 2705). The standardless enforcement theory asks whether the law provides "objective standards" that "establish minimal guidelines to govern ... enforcement." See Gonzales v. Carhart, 550 U.S. 124, 150, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007).

 *7  **[24]** Vague statutes are particularly objectionable when they "involve sensitive areas of First Amendment freedoms" because "they operate to inhibit the exercise of those freedoms." Cal. Tchrs. Ass'n v. State Bd. of Educ., 271 F.3d 1141, 1150 (9th Cir. 2001) (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d

222 (1972)). The Supreme Court has said that "when a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" Holder v. Humanitarian L. Project, 561 U.S. 1, 19, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)); see also McCormack v. Herzog, 788 F.3d 1017, 1031 (9th Cir. 2015), abrogated on other grounds by Dobbs v. Jackson Women's Health Org., ––– U.S. ––––, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022) (applying heightened clarity requirement in vagueness challenge to statute that implicated a then-existing constitutional right). [6]

[25] [26] When the challenged law implicates First Amendment rights, a facial challenge based on vagueness is appropriate. Cal. Tchrs. Ass'n, 271 F.3d at 1149; see also City of Chicago v. Morales, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). In considering a facial vagueness challenge, the court "consider[s] whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" Holder, 561 U.S. at 18–19, 130 S.Ct. 2705 (quoting Hoffman Estates, 455 U.S. at 495, 102 S.Ct. 1186).

A. "Contemporary Scientific Consensus"

[27] "Usually, [courts] look to a term's common meaning, but if the law regulates the 'conduct of a select group of persons having specialized knowledge,' then the 'standard is lowered' for terms with a 'technical' or 'special meaning.'" Tingley, 47 F.4th at 1090 (quoting United States v. Weitzenhoff, 35 F.3d 1275, 1289 (9th Cir. 1993)). In Tingley, the Ninth Circuit applied a lower vagueness standard to psychologists, who challenged the terms "sexual orientation" and "gender identity" as unconstitutionally vague. Based on an expert declaration and the plaintiff's own usage of the term "gender identity" in describing his expertise, the Ninth Circuit concluded that the terms at issue were within the specialized knowledge of the regulated group. Id.

[28] In contrast, it is inappropriate to apply a lower vagueness standard here because, based on the record before the court, it appears that the primary term at issue--"contemporary scientific consensus"--does not have an established technical meaning in the medical community. Physician plaintiffs provide declarations explaining that "scientific consensus" is a poorly defined concept. (See Duriseti Decl. ¶¶ 7-13; Decl. of Dr. Tracy Høeg ("Høeg Decl.") (Docket No. 1-2) ¶¶ 11-24; Decl. of Dr. Aaron Kheriaty ("Kheriaty Decl.") (Docket No. 1-4) ¶¶ 7-10; Decl. of Dr. Pete Mazolewski ("Mazolewski Decl.") (Docket No. 1-5) ¶¶ 7-13; Decl. of Dr. Azadeh Khatibi ("Khatibi Decl.") (Docket No. 1-6) ¶¶ 8-11.) For example, Dr. Khatibi explains that there are different notions of scientific "consensus." These include "informal consensus," which refers to the general opinion of doctors, and "formal consensus," which refers to a process by which "a group of doctors with expertise in a particular topic come together to ... discuss[ ] and debate the evidence around a topic," and "arrive at some conclusions for general patient care guidelines," which are then published. (Khatibi Decl. ¶ 8.) Expert declarant Dr. Verma also explains that the term "scientific consensus," as it has come to be used during the pandemic, often refers to the pronouncements of public health officials. (See Verma Decl. ¶ 8.)

*8 Defendants provide no evidence that "scientific consensus" has any established technical meaning; the expert declarations they offer are notably silent on the topic. (See Decl. of Dr. James Nuovo (Høeg Docket No. 23-1); Decl. of Dr. Angela Lim (Hoang Docket No. 16-2).) And contrary to defendants' argument, the mere fact that the statute regulates medical professionals does not trigger a lower vagueness standard. See Forbes, 236 F.3d at 1013 (applying a typical vagueness analysis and holding that challenged terms in statute regulating medical providers were unconstitutionally vague). The court therefore will not apply a lower vagueness standard here.

In Forbes, the Ninth Circuit considered a vagueness challenge to a law prohibiting medical "experimentation" or "investigation" involving fetal tissue from abortions unless necessary to perform a "routine" pathological examination. 236 F.3d at 1010. The court relied on testimony from the plaintiffs (who were physicians) and expert witnesses to evaluate the challenged terms, which were not defined by the statute. The experts "highlight[ed] doctors' lack of consensus about what procedures are purely experimental" and pointed out difficulties arising from the changing nature of scientific understanding, by which some "experiments" will eventually become recognized as "treatment." Id. at 1011-13. The terms "investigation" and "routine" were problematic because

multiple common definitions could apply in the medical community, which "[lacked] any official standards to help" define the terms. Id. at 1012. The Ninth Circuit reasoned that because the contested terms lacked sufficiently clear, commonly understood definitions in the medical community, and the statute failed to provide narrowing definitions, the statute was unconstitutionally vague. Id. at 1013. The lack of definitional clarity failed both to give doctors fair notice of what conduct was prohibited, and to give courts and law enforcement sufficient standards by which to narrow the terms' meanings. Forbes, 236 F.3d at 1013 (citing Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); and Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)).

[29] Like the contested terms in Forbes, "contemporary scientific consensus" lacks an established meaning within the medical community, and defendants do not propose one.[7] The statute provides no clarity on the term's meaning, leaving open multiple important questions. For instance, who determines whether a consensus exists to begin with? If a consensus does exist, among whom must the consensus exist (for example practicing physicians, or professional organizations, or medical researchers, or public health officials, or perhaps a combination)? In which geographic area must the consensus exist (California, or the United States, or the world)? What level of agreement constitutes a consensus (perhaps a plurality, or a majority, or a supermajority)? How recently in time must the consensus have been established to be considered "contemporary"? And what source or sources should physicians consult to determine what the consensus is at any given time (perhaps peer-reviewed scientific articles, or clinical guidelines from professional organizations, or public health recommendations)? The statute provides no means of understanding to what "scientific consensus" refers.

Judicial references to the concept of scientific consensus--in the context of COVID-19 as well as other disputed scientific topics--confirm that the term lacks an established meaning. Courts have based their understanding of scientific consensus on a wide range of sources, including U.S. professional organizations, international professional organizations, state and federal courts, U.S. scientific studies, international scientific studies, various federal agencies, and the state of California.[8]

**\*9** Because the term "scientific consensus" is so ill-defined, physician plaintiffs are unable to determine if their intended conduct contradicts the scientific consensus, and accordingly "what is prohibited by the law." See Tingley, 47 F.4th at 1089. As discussed in greater detail in Section III of this Order, plaintiffs represent that they have provided and would like to continue providing certain COVID-19-related advice and treatment that contradict the positions of public health agencies like the CDC. If the "consensus" is determined by United States public health recommendations, physician plaintiffs' intended conduct would contradict that consensus; if the same term is defined by other metrics, their conduct may be permissible. The language of the statute provides no way to determine which of multiple interpretations is appropriate.

Rather than merely providing the statute with "flexibility and reasonable breadth," the term "scientific consensus" makes it impossible to understand "what the ordinance as a whole prohibits." See Grayned, 408 U.S. at 110, 92 S.Ct. 2294. See also McCormack, 788 F.3d at 1030-31 (quoting Tucson Woman's Clinic v. Eden, 379 F.3d 531, 55 (9th Cir. 2004)) (statute requiring abortion providers to be "properly" staffed and have "satisfactory" admitting arrangements with hospitals was unconstitutionally vague because its terms "lack[ed] precise definition, and 'subject[ed] physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others.' "); Tucson Woman's Clinic, 379 F.3d at 554-55, abrogated on other grounds by Dobbs, --- U.S. ----, 142 S. Ct. 2228, 213 L.Ed.2d 545 (statute requiring health care providers to "ensure that a patient is ... treated with consideration, respect, and full recognition of the patient's dignity and individuality" was unconstitutionally vague because meanings of terms were "widely variable" and terms were "not medical terms of art").

Cf. Planned Parenthood of Cent. & N. Ariz. v. State of Ariz., 718 F.2d 938, 949 (9th Cir. 1983) ("counseling for abortion procedures" was not a vague term because it had a commonly understood meaning that a reasonable person would understand, and previous case law on abortion statutes sufficiently defined the term).

Defendants argue that while the scientific consensus may sometimes be difficult to define, there is a clear scientific

consensus on certain issues--for example, that apples contain sugar, that measles is caused by a virus, or that Down's syndrome is caused by a chromosomal abnormality. (Høeg Opp'n at 21; Hoang Opp'n at 21.) However, AB 2098 does not apply the term "scientific consensus" to such basic facts, but rather to COVID-19--a disease that scientists have only been studying for a few years, and about which scientific conclusions have been hotly contested. COVID-19 is a quickly evolving area of science that in many aspects eludes consensus.

Physician plaintiffs explain how, throughout the course of the COVID-19 pandemic, scientific understanding of the virus has rapidly and repeatedly changed. (Høeg Decl. ¶¶ 15-29; Duriseti Decl. ¶¶ 7-15; Kheriaty Decl. ¶¶ 7-10; Mazolewski Decl. ¶¶ 12-13.) Physician plaintiffs further explain that because of the novel nature of the virus and ongoing disagreement among the scientific community, no true "consensus" has or can exist at this stage. (See id.) Expert declarant Dr. Verma similarly explains that a "scientific consensus" concerning COVID-19 is an illusory concept, given how rapidly the scientific understanding and accepted conclusions about the virus have changed. Dr. Verma explains in detail how the so-called "consensus" has developed and shifted, often within mere months, throughout the COVID-19 pandemic. (Verma Decl. ¶¶ 13-42.) He also explains how certain conclusions once considered to be within the scientific consensus were later proved to be false. (Id. ¶¶ 8-10.) Because of this unique context, the concept of "scientific consensus" as applied to COVID-19 is inherently flawed. (See id.) See also Forbes, 236 F.3d at 1012 (indicating that the changing nature of a medical term's meaning is evidence of vagueness).

**\*10** The use of a poorly-defined, subjective term is particularly objectionable here because it serves to define the prohibited conduct, rather than merely explain the context in which the prohibition applies. See Gammoh v. City of La Habra, 395 F.3d 1114, 1120 (9th Cir. 2005), amended on denial of reh'g, 402 F.3d 875 (9th Cir. 2005). The term "scientific consensus" therefore lacks a sufficient "statutory definition[ ], narrowing context, or settled legal meaning[ ]," Tingley, 47 F.4th at 1089, and fails to provide sufficiently objective standards to "focus the statute's reach," Forbes, 236 F.3d at 1013, rendering the definition of "misinformation" unconstitutionally vague.

B. "Contrary to the Standard of Care"

The Ninth Circuit has held that "otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity." Gammoh, 395 F.3d at 1120 (emphasis added).

 **[30]** Defendants argue that the inclusion of the phrase "contrary to the standard of care" provides the definition of misinformation with adequate clarity. The court agrees that "standard of care" in itself is a well-defined concept in the realm of professional negligence. The standard of care "requires that medical service providers exercise that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." Barris v. County of Los Angeles, 20 Cal. 4th 101, 108, 83 Cal.Rptr.2d 145, 972 P.2d 966 (1999).

 **[31]** **[32]** However, far from clarifying the statutory prohibition, the inclusion of the term "standard of care" only serves to further confuse the reader. Under the language of AB 2089, to qualify as "misinformation," the information must be "contradicted by contemporary scientific consensus contrary to the standard of care." Cal. Bus. & Prof. Code § 2270. Put simply, this provision is grammatically incoherent. While "statutes need not be written with 'mathematical' precision, they must be intelligible." Valle del Sol, 732 F.3d at 1020 (quoting Forbes, 236 F.3d at 1011) (alterations adopted). It is impossible to parse the sentence and understand the relationship between the two clauses--"contradicted by contemporary scientific consensus" and "contrary to the standard of care."

 **[33]** One possible reading, as defendants argue, is that the two elements are entirely separate requirements that each modify the word "information." See also McDonald, 2022 WL 18145254, at \*7 (adopting this construction). However, this interpretation is hard to justify. If the Legislature meant to create two separate requirements, surely it would have indicated as such--for example, by separating the two clauses with the word "and," or at least with a comma. Further, the concept of "standard of care" pertains to the nature and quality of treatment that doctors provide or fail to provide. It is thus difficult to accept defendants' contention that the term "standard of care" modifies the word "information." By its very nature, the standard of care applies to care, not information. See Alef v. Alta Bates Hosp., 5 Cal. App. 4th 208, 215, 6 Cal.Rptr.2d 900 (1992) (the standard of care

determines "the minimum level of care to which the patient is entitled") (emphasis added).[9]

**\*11** Another equally plausible (or perhaps equally implausible) interpretation is that any time a doctor's conduct contradicts the scientific consensus, it is therefore contrary to the standard of care. Such a reading would distort the existing meaning of the term "standard of care" by creating an additional statutory definition in the context of COVID-19.

Even if the court adopted defendants' interpretation, the mere inclusion of an entirely separate element does not resolve the definition's vagueness. The term "standard of care" fails to provide additional context in which to understand the meaning of the term "scientific consensus." See Gammoh, 395 F.3d at 1120. More importantly, defendants' interpretation does nothing to address the chilling effect caused by the statute's unclear phrasing and structure. See Holder, 561 U.S. at 19, 130 S.Ct. 2705 ("a more stringent vagueness test" applies when the challenged statute chills First Amendment speech). As it stands, doctors reading the statute have no assurance that the statute will be interpreted by courts or applied by the Boards consistently with defendants' proposed interpretation.

C. "False Information"

[34] Defendants also argue that the inclusion of the term "false information" as a separate element further clarifies the definition, or at least provides truthfulness as a defense. (See Høeg Opp'n at 21-22; Hoang Opp'n at 21-22.) See also McDonald, 2022 WL 18145254, at \*7. While this reasoning may appear sound at first, drawing a line between what is true and what is settled by scientific consensus is difficult, if not impossible. The term "scientific consensus" implies that the object of consensus is provable or true in some manner. This is evident in the examples of "consensus" given by defendants--that apples contain sugar, that measles is caused by a virus, and that Down's syndrome is caused by a chromosomal abnormality. (See Høeg Opp'n at 21; Hoang Opp'n at 21.) These propositions are so universally agreed upon that they are considered factual. It is hard to imagine a scenario in which the Boards consider a proposition to be settled by the scientific consensus, yet not also "true."

Moreover, as discussed above, because COVID-19 is such a new and evolving area of scientific study, it may be hard to determine which scientific conclusions are "false" at a given point in time. The term "false information" thus fails to cure the provision's vagueness.[10]

D. Defendants' Proposed Construction

[35] [36] Defendants argue that even if the statutory text is unclear, the court should adopt the "narrower construction" they propose--namely that the definition of "misinformation" contains three separate requirements: (1) false information, (2) that is contradicted by contemporary scientific consensus, and (3) that is contrary to the standard of care. (See Høeg Opp'n at 20; Hoang Opp'n at 20.) See also McDonald, 2022 WL 18145254, at \*7 (adopting this construction of the statute). While the court must "consider any limiting construction that a state court or enforcement agency has proffered," CPR for Skid Row v. City of Los Angeles, 779 F.3d 1098, 1103 (9th Cir. 2015) (quoting Hoffman Estates, 455 U.S. at 494 n.5, 102 S.Ct. 1186), what defendants propose is not a narrowing or limiting construction at all. Rather, the proposed construction would require the court to essentially "[r]ewrite[e] the statute." See Valle del Sol, 732 F.3d at 1021. This "is a job for the [California] legislature, if it is so inclined, and not for this court." See id.

**\*12** Because the definition of misinformation "fails to provide a person of ordinary intelligence fair notice of what is prohibited, [and] is so standardless that it authorizes or encourages seriously discriminatory enforcement," Williams, 553 U.S. at 304, 128 S.Ct. 1830, the provision is unconstitutionally vague. Accordingly, the court concludes that plaintiffs have demonstrated a likelihood of success on the merits of their vagueness challenges.[11]

V. Non-Merits Factors

In addition to establishing a likelihood of success on the merits, plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in their favor; and that an injunction is in the public interest. Winter, 555 U.S. at 20, 129 S.Ct. 365.

[37] "[B]y establishing a likelihood that [the challenged law] violates the U.S. Constitution, [p]laintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1069 (9th Cir. 2014).

The plaintiffs have thus established the elements necessary to obtain a preliminary injunction.

IT IS THEREFORE ORDERED that plaintiffs' motions for preliminary injunction (Høeg Docket No. 5; Hoang Docket No. 4) be, and the same hereby are, GRANTED. Pending final resolution of this action, defendants, their agents and employees, all persons or entities in privity with them, and anyone acting in concert with them are hereby ENJOINED from enforcing Cal. Bus. & Prof. Code § 2270 as against plaintiffs, plaintiffs' members, and all persons represented by plaintiffs.

**All Citations**

--- F.Supp.3d ----, 2023 WL 414258

**Footnotes**

1 Hereinafter, the court will refer to Children's Health Defense, California Chapter as "Children's Health Defense."

2 AB 2098 has been codified at Cal. Bus. & Prof. Code § 2270. Because the parties refer to the law as "AB 2098" throughout their briefs, the court will refer to the statute as AB 2098 for convenience.

3 Defendants initially disputed that the Høeg plaintiffs have standing (see Høeg Opp'n (Docket No. 23) at 6), though they all but conceded the issue at oral argument. Defendants did not argue that the Hoang plaintiffs lack standing. (See Hoang Opp'n (Docket No. 16).) Regardless, the court has a duty to evaluate all parties' standing. See Bernhardt v. County of Los Angeles, 279 F.3d 862, 868 (9th Cir. 2002).

4 Plaintiffs contend that the law was intended to intimidate them into not expressing their views. They point to the text of the statute, as well as its legislative history. See, e.g., Defs.' Ex. E, Assembly Report on Third Reading of AB 2098 (Høeg Docket No. 23-3 at 43-49) at 7 (noting that while the Boards may already have the ability to discipline licensees for the conduct proscribed by AB 2098, the statute will "make[ ] clear" that the Boards have such authority and thereby discourage licensees from sharing information that "undermine[s] public health efforts").

5 Judge Fred W. Slaughter of the Central District of California recently issued an order denying a similar motion for preliminary injunction in McDonald v. Lawson, No. 8:22-cv-01805. Judge Slaughter concluded that the physician plaintiffs had failed to establish a likelihood of success on the merits of their First and Fourteenth Amendment claims. 2022 WL 18145254, at *6, 16 (C.D. Cal. Dec. 28, 2022). The court notes that it is not bound by the McDonald court's decision, and for the reasons discussed herein, does not find that decision's reasoning on the vagueness issue persuasive.

6 Though the court does not reach plaintiffs' First Amendment challenges, AB 2098 clearly implicates First Amendment concerns. See Nat'l Inst. of Fam. & Life Advocs. v. Becerra, ––– U.S. ––––, 138 S. Ct. 2361, 2375, 201 L.Ed.2d 835 (2018) (stating that professional speech, including speech by medical providers, "is [not] exempt from ordinary First Amendment principles"); Conant, 309 F.3d at 637 (recognizing "the core First Amendment values of the doctor-patient relationship"). Accordingly, the court will apply a more exacting vagueness analysis.

| | |
|---|---|
| 7 | At oral argument, defense counsel declined to explain what specific conduct the law may prohibit, arguing that application of the law is highly fact-specific. |
| 8 | See, e.g., Coonce v. United States, ––– U.S. ––––, 142 S. Ct. 25, 28, 211 L.Ed.2d 267 (2021) (Sotomayor, J., dissenting) (clinical determinations by professional organizations including the American Psychological Association were "powerful evidence of medical consensus" on definition of intellectual disability); United States v. Scheffer, 523 U.S. 303, 309–10, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (citing "polarization" within the scientific community and disagreement among state and federal courts as evidence of "lack of scientific consensus" on efficacy of polygraphs); S. Bay United Pentecostal Church v. Newsom, 985 F.3d 1128, 1133-34 (9th Cir. 2021), cert. granted, judgment vacated, ––– U.S. ––––, 141 S. Ct. 2563, 209 L.Ed.2d 582 (2021) (citing public health framework published by State of California concerning COVID-19 masking, social distancing, and activity restrictions as representative of "scientific consensus"); Edmo v. Corizon, Inc., 935 F.3d 757, 769 (9th Cir. 2019) (citing an international professional organization's official standards of care as representative of scientific consensus on healthcare for transgender people); Ledezma-Cosino v. Sessions, 857 F.3d 1042, 1054 (9th Cir. 2017) (Thomas, J., dissenting) (citing determinations by American Medical Association and U.S. Surgeon General as reflecting "medical consensus"); Alaska Oil & Gas Ass'n v. Pritzker, 840 F.3d 671, 679 (9th Cir. 2016) (federal agency's consultation of "the best available research" was evidence of "scientific consensus" on climate change-related issue); Planned Parenthood Fed'n of Am., Inc. v. Gonzales, 435 F.3d 1163, 1172 (9th Cir. 2006), rev'd sub nom. Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ("By medical consensus, we do not mean unanimity or that no single doctor disagrees, but rather that there is no significant disagreement within the medical community."); Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1314 (9th Cir. 1995) (citing FDA's approval of a medication and "every published study here and abroad" as evidence of "consensus within the scientific community"); Keene v. City & Cnty. of San Francisco, No. 22-cv-01587 JSW, 2022 WL 4454362, at *3 (N.D. Cal. Sept. 23, 2022) (citing California Department of Public Health's determinations as evidence of "scientific consensus" on COVID-19); United States v. Smith, 538 F. Supp. 3d 990, 995, 997 (E.D. Cal. 2021) (Mueller, J.) (citing CDC public health guidelines as representative of scientific consensus on COVID-19 vaccination); United States v. Avalos-Villasenor, No. 16-cr-02189 GPC, 2021 WL 3534983, at *4 (S.D. Cal. Aug. 11, 2021) (citing "a recent study" conducted by the CDC for the proposition that COVID-19 vaccines are effective); Brach v. Newsom, No. 2:20-cv-06472 SVW AFM, 2020 WL 6036764, at *7 (C.D. Cal. Aug. 21, 2020) (characterizing "scientific consensus" as a higher standard than "the most reliable scientific evidence"). |
| 9 | The provision of AB 2098 stating that misinformation or disinformation must be conveyed "in the form of treatment or advice" is confusing for the same reason. See Cal. Bus. & Prof. Code § 2270(b)(3). A doctor's advice might suggest a particular course of action or treatment (e.g., "you should not get the vaccine"). This advice is distinct from any information that might be conveyed to a patient in conjunction with the advice (e.g., "scientific studies show that the vaccine carries a risk of health complications for patients in your situation"). The statute improperly conflates "information" with "advice" or "treatment." |
| 10 | The McDonald court noted that "scienter requirements alleviate vagueness concerns." See Gonzales, 550 U.S. at 149, 127 S.Ct. 1610. While the definition of "disinformation" includes a scienter requirement, there is no such requirement in the definition of "misinformation," which is at issue here. See Cal. Bus. & Prof. Code §§ 2270(b)(2), (b)(4). |

11  Because plaintiffs have established a likelihood of success on the grounds of their Fourteenth Amendment vagueness challenges, the court need not address the merits of their First Amendment arguments.

---

**End of Document**                                             © 2023 Thomson Reuters. No claim to original U.S. Government Works.