UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| National Institute of Family and Life Advocates, et al., ) ) ) Plaintiffs, ) ) v. ) ) Kwame Raoul, in his official capacity ) as Attorney General of the State of Illinois, ) ) Defendant. ) | No. 23 CV 50279 Honorable Iain D. Johnston |

**RULE 65 PRELIMINARY INJUCTION ORDER**

"Justice Scalia once said that he wished all federal judges were given a stamp that read 'stupid but constitutional.'" *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 714 (7th Cir. 2016). SB 1909 is both stupid and very likely unconstitutional. It is stupid because its own supporter admitted it was unneeded and was unsupported by evidence when challenged. It is likely unconstitutional because it is a blatant example of government taking the side of whose speech is sanctionable and whose speech is immunized—on the very same subject no less. SB 1909 is likely classic content and viewpoint discrimination prohibited by the First Amendment.

This order is entered under Federal Rule of Civil Procedure 65(d). Plaintiffs' motion for a preliminary injunction is granted. Defendant and those persons identified in Rule 65(d)(2) are bound by this order; specially, Illinois Attorney General Kwame Raoul, his officers, agents, servants, employees, and attorneys, as well as other persons who are in active concert or participation with those persons. Until further order of this Court or a superior court, Defendant and the persons bound by this order are enjoined from enforcing SB 1909 amending the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), 815 ILCS 505/1 *et seq*. Plaintiffs need not post a bond. *See Allen v. Bartholomew Cnty. Court Servs. Dep't*, 185 F. Supp. 3d 1075, 1087 (S.D. Ind. 2016); *Bader v. Wernert*, 178 F. Supp. 3d 703, 745 (N.D. Ind. 2016) (no reason to require bond when no danger that opposing party will incur any damages from the injunction). The reasons why this preliminary injunction is issued are stated below.

**PARTIES**

Plaintiffs are religious non-profit corporations and organizations. They are all pro-life entities. One plaintiff—National Institute of Family and Life Advocates (NIFLA)—appears to be an umbrella organization composed of members that are pregnancy centers and pregnancy resource centers, which are often referred to as "crisis pregnancy centers." Plaintiffs provide some services and resources. For example, they provide pregnancy testing, information on prenatal development, childbirth, parenting, and child development. They also provide items new parents would need, such as diapers, car seats, baby food, wipes, and baby clothes. There is no charge for the services or resources. At least three of the Plaintiffs are small budget, non-profit organizations funded entirely by charitable contributions and, to some extent, grants. One Plaintiff employs two nurses, but volunteers make up nearly all the ranks of these three Plaintiffs. Obviously, because of their nature and purpose, they don't offer information or resources about abortions. One of the Plaintiffs is Rockford Family Initiative, which is an organization that holds prayer vigils and whose members perform what is commonly referred to as "sidewalk counseling." It likewise does not charge for services and is comprised of volunteers. Plaintiffs allege and the Court finds that Plaintiffs would fall under the definition of "limited services pregnancy centers" under SB 1909.[1]

The defendant is Kwame Raoul. He is the Illinois Attorney General. According to the Verified Complaint, he is being sued in his official capacity. The Illinois Attorney General is the chief legal officer for the state under the Illinois Constitution. Ill. Const. Art. V § 15. The Verified Complaint alleges—and the Court finds—that Defendant Raoul and at least one member of his staff were the chief drafters and supporters of SB 1909. The evidence shows that Defendant Raoul obtained sponsors in both the Illinois House and Senate for SB 1909, and that a member of Defendant Raoul's staff (Deputy Attorney General for Policy Ashley Hokenson) was the primary witness at the legislative hearings. Defendant Raoul attended at least one of the legislative hearings while she testified in support of SB 1909. According to Ms. Hokenson, Defendant Raoul became interested in drafting this type of legislation based on the following incident: Defendant Raoul visited a Planned Parenthood abortion clinic in Fairview Heights, Illinois, and his driver was nearly stopped by a pro-life sidewalk counselor on a public right-of-way who was

---

[1] The Court is not entirely sure whether NIFLA would fall under the definition of "limited services pregnancy center." But, certainly, its member organizations and the other Plaintiffs meet the definition. Any standing concerns regarding NIFLA are resolved through associational standing. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (recognizing an association has standing to sue on behalf of its members when members would otherwise have standing to sue in their own right). As discussed in more detail later, the Court finds that the other Plaintiffs—including NIFLA affiliates—possess standing.

wearing a brightly colored vest and a "check-in" sign was located on the public right-of-way.

**ACT AND STATUTE AT ISSUE**

On at least one occasion, Deputy Attorney General Hokenson publicly represented that the Consumer Fraud Act applied to Plaintiffs alleged deceptive practices without the need to amend the Consumer Fraud Act with SB 1909. Despite this public representation, Defendant Raoul decided that the Consumer Fraud Act needed some "clarity" on the subject.[2] His efforts resulted in SB 1909. At the time of the signing of SB 1909 by Governor Pritzker, Defendant Raoul held a press conference extoling the need and virtues of SB 1909 while flanked by Planned Parenthood leadership and others representing the pro-choice movement.

The Consumer Fraud Act covers a lot of oceanfront, prohibiting activities ranging from attempting to pass off food as Halal to advertising for live musical performances by tribute bands. *See* 815 ILCS § 505/2LL; 815 ILCS § 505/2XX. But it's focus is on—as the name implies—deceptive and fraudulent *business* practices. Indeed, the Consumer Fraud Act focuses on trade and commerce. 815 ILCS 505/2. The Consumer Fraud Act defines "trade" and "commerce" to "mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated." 815 ILCS § 505/1(g).

SB 1909 amended the Consumer Fraud Act. The target of SB 1909 is on "limited services pregnancy centers" (Centers). So, it makes some sense to determine what type of organizations are covered under SB 1909. Centers are defined by both what they do and what they don't do. First, as to what they do, Centers offer or provide "pregnancy-related services" to individuals who are, or believe they are, pregnant. "Pregnancy-related services" means "any medical service, or heath counseling service, related to the prevention, preservation, or termination of pregnancy." Second, as to what they don't do, notably, Centers don't provide abortions, provide or prescribe emergency contraception, or provide referrals for these types of services. Centers are also defined by what they are and what they aren't. Centers "include" "an organization or facility that has employees, volunteers, or agents who are [licensed] health care professionals." But Centers aren't licensed health care professionals or licensed hospitals. Critically, SB 1909

---

[2] With all due respect to Steve Martin's observation that the French have a word for everything, the Court believes the Germans out do them. *See* https://www.fluentu.com/blog/german/weird-german-words-vocabulary/. The Germans have a word called "verschlimmbesserung." This noun essentially translates into English as "to the moment something is made worse by improvement." The verb form is "verschlimmbessern." As shown in this Order, in the most charitable light, Defendant Raoul engaged in verschlimmbessern.

specifically excludes from its scope abortion providers. SB 1909 does this by definition: "'Limited services pregnancy center' means an organization or facility, including a mobile facility, that . . . does *not* directly provide abortions or provide or prescribe emergency contraception, and has no affiliation with an organization or provider who provides abortions or provides or prescribes emergency contraception."

Now that we know who's in and who's out, it makes sense to determine what the targets of SB 1909 can't do under pain of up to a $50,000 penalty, injunction or dissolution. Centers are prohibited from engaging in certain acts. Specifically, Centers "shall not engage in unfair methods of competition or unfair or deceptive acts or practices." These prohibited acts include both affirmatively making statements as well as omitting information. Specifically, these methods, acts, or practices, include "the use or employment of any deception, fraud, false pretense, false promise, or misrepresentation." Moreover, as to omitting information, Centers are specifically prohibited from omitting "any material fact, with the intent that others rely upon the concealment, suppression, or omission of such material fact."

But these prohibited methods, acts, and practices must be done with the intention "to interfere with or prevent an individual from seeking to gain entry or access to a provider of abortion or emergency contraception;" [or] "to induce an individual to enter or access the [Center]."

The full body of SB 1909 is attached as an appendix to this Order.

**PLAINTIFFS' CLAIMS AND REQUESTED RELIEF**

Plaintiffs' verified complaint asserts claims based on Freedom of Speech, Free Exercise of Religion, Equal Protection, Due Process (Void for Vagueness), "Patients' Right to Continue Pregnancy", and Freedom of Expressive Association. The Verified Complaint seeks injunctive relief in the form of a temporary restraining order, preliminary injunction, and permanent injunction, a declaration that SB 1909 violates the First and Fourteenth Amendment on its face and as applied to Plaintiffs, and an award of nominal damages, attorneys' fees, and costs.

**STANDING**

When seeking a preliminary injunction, it is the plaintiff's burden to demonstrate standing, which is "at least as great as the burden of resisting a summary judgment motion." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990). A plaintiff must present by affidavit or other evidence specific facts rather "than general factual allegations of injury." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (citations omitted).

Under Article III of the Constitution, a plaintiff must establish standing by showing (1) an injury in fact; (2) that the challenged conduct caused the injury; and (3) some likelihood that the court's decision will remedy the injury. *Id.* An injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). Where the plaintiff brings a facial challenge under the First Amendment, a prior enforcement action is not required. *Speech First, Inc.*, 968 F.3d at 638. However, without an enforcement action, a plaintiff must make one of two showings to establish an injury in fact. "First, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat [that] the policy will be enforced against him when he does." *Id.* "Second, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* A credible threat or chilling effect injury is particularized, if it affects the plaintiff "in a personal and individual way." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016).

When a plaintiff is threatened by the possibility of enforcement of a law, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). When a threatened enforcement is sufficiently imminent, a plaintiff may bring a preenforcement challenge. *Id.* at 159; *Babbit v. Farm Workers*, 442 U.S. 289, 298 (1979) (a preenforcement suit is permitted when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."); *Ind. Right to Life Victory Fund v. Morales*, 66 F. 4th 625, 630 (7th Cir. 2023) (plaintiffs may bring a preenforcement challenge "only if they can allege a credible threat that the law will be enforced against them.") If a plaintiff has not alleged a "credible threat of prosecution" under the statute, federal courts lack subject-matter jurisdiction–no matter how strong the merits of the claims. *Ind. Right to Life Victory Fund*, 66 F.4th at 630. The Court must address the threshold jurisdictional questions before considering the merits. *Id.*

With only very minor exceptions discussed later, Defendant Raoul did not defend the merits of SB 1909—understandably so. Instead, his main defense was an attack on Plaintiffs' standing to challenge SB 1909. The Court finds that at this stage of the proceedings, Plaintiffs possess standing to challenge SB 1909 and seek a preliminary injunction.

Defendant Raoul argued that Plaintiffs lacked standing because, according to him, Plaintiffs were not subjects of an enforcement action nor were Plaintiffs able to show that they were imminently at risk of SB 1909 being enforced against them. Because there was no enforcement action against Plaintiffs, the Court proceeds to the "injury in fact" two-pronged analysis set forth in *Speech First*. 968 F.3d at 638.

5

Although a showing of either prong of the *Speech First* test is sufficient to establish an injury in fact, here Plaintiffs established both prongs. First, Plaintiffs showed their intentions to engage in conduct that would arguably be affected by SB 1909 in both their verified complaint and the over four hours of unrebutted testimony heard during the preliminary injunction hearing. Second, Plaintiffs' testimony established that SB 1909 would have a chilling effect on their speech. Each witness testified that they were not entirely deterred from continuing to engage in speech that was demonstrably pro-life and disallowed by SB 1909 because they were awaiting this Court's ruling on the motion. But each witness also showed that they felt threatened by the possibility of fines up to $50,000. The witness for Plaintiff Pro Life Action League described how the group had stopped the production and distribution of a pamphlet as a direct result of SB 1909. A more unambiguous chilling and self-censorship of protected speech there cannot be. What's more, sidewalk counseling training was canceled because of SB 1909 and a billboard campaign may be discontinued. Prayer vigil attendance plummeted. Finally, at least one Center did not know how it could operate in light of SB 1909. These concerns are not speculative. Defendant Raoul backed SB 1909 personally, his Deputy Attorney General refused to answer direct questions about the bill's impact on Plaintiffs and free speech concerns, and then Defendant Raoul held a widely covered press conference at Planned Parenthood upon SB 1909's enactment. This is the same Planned Parenthood that is engaged in a raging debate about what assertions are truthful, which is the core of SB 1909. Further, SB 1909 immunizes abortion providers for alleged deceptive practices under the Consumer Fraud Act. Only fools would not have their First Amendment rights chilled under these circumstances.

**LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

A preliminary injunction is an extraordinary remedy. *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020) (quoting *Whitaker v. Kenosha United Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)). A party seeking a preliminary injunction must establish the threshold elements that: (1) the plaintiff will suffer irreparable harm in the absence of court intervention; (2) that traditional legal remedies are not adequate; and (3) that the plaintiff has a likelihood of success on the merits. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). To satisfy the likelihood of success prong, the plaintiff must "make a strong showing of their chance of prevailing." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). The plaintiff faces a "significant burden" but "need not show that [he] definitely will win the case." *Id*. That showing "normally includes a demonstration of how the applicant proposes to prove the key elements of the case." *Id*. At a preliminary injunction hearing, the court is not bound by the strict rules of evidence and may consider reliable evidence that would otherwise be inadmissible at trial.

*Siaurora, Inc. v. State*, No. 3:22-cv-50038, 2022 U.S. Dist. LEXIS 31606, at *5 (N.D. Ill. Feb. 23, 2022); *Dexia Credit Loc. v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010).

If the plaintiff passes the threshold analysis, courts proceed to a balancing test, which acts more like a sliding scale approach. *Mays*, 974 F.3d at 818. The court weighs the effect on each party of the granting or withholding of the requested relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* But "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays*, 974 F.3d at 818.

**FACTUAL FINDINGS FOR PRELIMINARY INJUNCTION ORDER BASED ON THE RECORD**

In addition to the facts discussed throughout this Order, the Court makes the following factual findings under Rule 52(a)(2). Fed. R. Civ. P. 52(a)(2). These facts and the facts discussed throughout this Order come from the verified complaint, affidavits, and sworn testimony at the hearing.[3] The Court found Plaintiffs' witnesses to be sincere and credible. The Court may not agree with some of the witnesses' distinction between what is a fact and what is an opinion. But the Court finds their factual testimony to be credible.

---

[3] In Plaintiffs' memorandum in support of their motion for preliminary injunction, they noted the obvious problems with the provision of SB 1909 that prohibits alleged omissions of material fact. Specifically, if Plaintiffs' statements or written materials identified the risks associated with abortion, SB 1909 requires on pain of various sanctions that they state or include in their written materials the benefits or positive effects of abortion, which will apparently be determined by Defendant Raoul in bringing an enforcement action. And, again, abortion providers are under no similar obligation. Indeed, they are immunized by SB 1909 as to representations or omissions of material facts. At the hearing, the Court questioned several witnesses on this issue to elicit facts on the topic. Obviously, the Court had no inkling as to what the witnesses' answers would be. Defendant Raoul's counsel objected to the Court's questioning, and even strangely asked for a side bar conference in a bench proceeding to address the objection. The basis for the objection was that the Court was eliciting information not sought by Plaintiffs' counsel. The basis was not that the Court's analysis or interest was incorrect, which it wasn't. But the Court has a right and even a duty to elicit information from witnesses—particularly in a bench proceeding—so that it can make an informed decision. *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 873 (N.D. Ill. 2021) (*citing Tagatz v. Marquette University*, 861 F.2d 1040, 1045 (7th Cir. 1988) ("Judges, by the way, are not wallflowers or potted plants; and a district judge's efforts to test the strength of a party's statistical evidence by determining how sensitive it is to the design of the sample. . . is rather to be commended than condemned.") To ensure that Defendant Raoul was not concerned that the Court was biased, it asked counsel if that was the concern. Counsel did not assert the Court was biased.

7

Defendant Raoul offered *no* evidence at the preliminary injunction hearing. Instead, there were various representations by counsel as to generally how in their personal experience the Consumer Fraud Act was enforced. There was no representation that either counsel ever personally enforced the Consumer Fraud Act.

Although the Court is confident that some might have a different view or description of sidewalk counseling, the uncontested evidence at the preliminary injunction hearing described sidewalk counseling this way.[4] Volunteers approach—verbally, physically, or both—individuals entering abortion provider facilities and attempt to engage them in conversation. Although the sidewalk counselors are attempting to provide information and options—in their view, to provide a choice—the obvious goal is to dissuade these individuals from obtaining an abortion. Nobody is confused as to who sidewalk counselors are or what their goal is. Indeed, a sidewalk counselor wears a pro-life shirt and sometimes has a depiction of the Virgin Mary holding Baby Jesus with his arms outstretched.

Sidewalk counselors also provide literature or pamphlets. One example of a pamphlet contains information regarding fetus development supported by references. Another pamphlet discussed "abortion pill reversal," providing a toll-free telephone number and a QR-code to obtain more information. SB 1909 will affect the selection of what pamphlets they will use.

Plaintiff Rockford Family Initiative nearly always obtains its sidewalk counselors from attendees at its prayer vigils. After SB 1909 was enacted, the number of attendees at the prayer vigil decreased by about two-thirds—from about 100 to about 30. Those in attendance at the prayer vigil and in other discussions with the Director expressed concern that they would be sued for their statements during sidewalk counseling. For example, they were concerned that if they stated that a fetus is a human, they would be subject to enforcement by Defendant Raoul under SB 1909. The concern is justified. During testimony in support of SB 1909, when asked whether SB 1909 prohibited the statement that life begins at conception, Deputy Attorney General Hokenson gave the non-answer answer, "[W]e would evaluate on a case-by-case basis."

Although the veteran sidewalk counselors appear willing to continue—at least until the injunctive motion is ruled upon by the Court—they were concerned

---

[4] Again, despite being questioned about the lawsuit at the press conference that he attended with Planned Parenthood, being served the week before the preliminary injunction hearing, and receiving notice of the hearing two days before the hearing, Defendant Raoul presented no evidence or witnesses, including Deputy Attorney General Hokenson or anybody from Planned Parenthood. Court decisions are rendered on evidence presented to the Court. As we all hopefully understand at this point in this Nation's history, press conferences and press releases don't work in court.

that SB 1909 would be enforced against them. The newer sidewalk counselors were even more concerned about enforcement. The passage of SB 1909 will hinder its ability to recruit new sidewalk counselors.

As a result of the passage of SB 1909, Plaintiff Rockford Family Initiative cancelled training for sidewalk counselors. Rockford Family Initiative was awaiting what actions it would take until the Court rules on the injunction motion.

  One of the Plaintiffs is National Institute of Family and Life Advocates (NIFLA). NIFLA is non-profit organization funded by donations, grants, and membership dues, which are usually generated by charitable donations. NIFLA is an umbrella organization comprised of affiliates including 81 located in Illinois. Sixty of these affiliates provide medical services. These affiliates are not required to be licensed and are not licensed. The affiliates have a licensed physician as well as non-licensed physicians in the facilities. The non-licensed individuals provide peer-to-peer counseling. NIFLA creates literature for its affiliates. This literature is reviewed and approved by the medical director, who is a licensed physician. This literature is supported by references. One of the pamphlets that NIFLA provides to its affiliates for distribution is called "Abortion Pills Know the Facts and Risks." It discusses the side effects and risks associated with what is referred to as "the abortion pill." The pamphlet does *not* identify any positive aspects of the abortion pill. This pamphlet possesses a QR-code with citations to the information found in the brochure.

  NIFLA is concerned as to what Defendant Raoul will determine is "truthful." Apparently, a major issue causing much consternation in the pro-life and pro-choice debate is an assertion that "data shows the risk of death associated with childbirth is approximately 14 times higher than the risk of death associated with an abortion." Obviously, pro-choice proponents cite this assertion and claim it is "truthful." In contrast and not surprisingly, pro-life proponents dispute this assertion and claim it is untruthful. NIFLA and its affiliates assert that there is medical literature debunking this assertion. This statement is a talking point for Centers. NIFLA and its affiliates are concerned that they will be subject to an enforcement action by Defendant Raoul under SB 1909 if they continue to dispute the accuracy of the assertion. And their concern is justified. Again, during a legislative hearing on SB 1909, when specifically asked whether Centers would be committing a deceptive practice by not providing this disputed assertion, Deputy Attorney General Hokenson gave the non-answer answer, "[W]e would evaluate these cases on a case-by-case basis, so I don't have any information in front of me as to how that would be evaluated."

  Women's Health Services is another Plaintiff. It is supported by private donations. Through two facilities, it provides—free of charge—services for unplanned pregnancies. Like the other Centers, it provides a pamphlet to the

9

individuals who come to their facilities, which Women's Health Services refers to as "clients." Its pamphlets contain information regarding the negative side effects of abortion as well as providing detailed information about what occurs during various types of abortions, including "Intact Dilation and Extraction (D&X) (Partial Birth Abortion)." The pamphlets contain references to the various medical literature Plaintiffs assert support these representations. These pamphlets are reviewed for accuracy by its medical director who is a doctor of obstetrics and gynecology. The goal is to provide objective information, not information that is "pro-life." But, obviously, the ultimate goal is to prevent a client from having an abortion. The pamphlets do *not* contain information or references to literature evidencing any positive consequences of an abortion. The Executive Director of the Women's Health Services is concerned as to how SB 1909 will be enforced, so much so that its leadership team has held discussions and they are unsure as to how to operate the Center. Despite being reviewed by the medical director, the pamphlet currently used may no longer be used because of concerns as to how Defendant Raoul will enforce SB 1909. Similarly, Women's Health Services does not know whether it will continue with its billboard campaign in light of the enactment of SB 1909. Like the other Plaintiffs, it has not taken concrete action while the motion for injunctive relief is pending. But if the motion were not granted, it would "need to take a good hard look and then contact its attorneys".

Witnesses expressed concern that Defendant Raoul would bring an enforcement action based upon the failure of their literature to identify the positive effects of abortion because it would be an omission of material fact.

**CONCLUSION OF LAW**

The Court makes the following conclusions of law under Rule 52(a)(2). Fed. R. Civ. P. 52(a)(2).

### *Type of Challenge*

Plaintiffs have challenged SB 1909 both facially and as applied. These are the two ways to challenge a statute on First Amendment free speech grounds. *Field Day, LLC, v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006). A facial challenge considers only the text of the statute itself, not its application to the particular circumstances of an individual. *Id.* (citing *City of Lakewood v. Plain Dealer Pub., Co.*, 486 U.S. 750, 770 n.11 (1988)). Under a facial challenge, a plaintiff may sustain its burden in one of two ways. First, a plaintiff asserting a facial challenge may demonstrate that no set of circumstances exist under which the law would be valid, or that the law lacks any plainly legitimate sweep. *Educ. Media Co. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013). Second, a plaintiff asserting a facial challenge may also prevail if it shows that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the

10

statute's plainly legitimate sweep. *Id.* Under either scenario, the court assesses the law without regard to its impact on the plaintiff asserting the facial challenge. *Id.* In contrast, an as-applied challenge requires an analysis of the facts of a particular case to determine whether the application of a statute—even one constitutional on its face—deprived the individual to whom it was applied of a protected right. *Insley*, 731 F.3d at 298 n.5; *Field Day*, 463 F.3d at 174. As discussed further, the Court finds that Plaintiffs have met their burden to obtain a preliminary injunction because on this record at this stage of the proceedings SB 1909 facially violates the First Amendment and violates Plaintiffs' First Amendment rights as applied.

### *Content*

Content-based regulations "target speech based on its communicative content—are presumptively unconstitutional," and subject to strict scrutiny which "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). State regulation of speech is content based if a statute "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* To determine whether a regulation is content based requires courts to evaluate "whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Id.* The principal inquiry in determining content neutrality is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989). Facially neutral laws may also be content-based regulations if they were adopted by the government "because of disagreement with the message [the speech] conveys." *Id.* The government's purpose is the controlling consideration. *Id.* A statute alters the content of a speaker's speech by compelling individuals to speak a particular message or share particular pieces of information. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

SB 1909 is content based discrimination. The subject of the prohibited speech is not just abortion but speech that emphasizes the negative effects of abortion. What's more, there is ample evidence in the record before the Court at this time that SB 1909 was adopted because of Defendant Raoul's disagreement about the content of Plaintiffs' speech. The message of Plaintiffs' speech is subject to prohibition under SB 1909 but abortion providers' speech is specifically excluded from being sanctioned under the Consumer Fraud Act.

### *Viewpoint*

Federal courts are "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct., at 2378 (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). "Speaker-based laws runs the risk that a State has left

11

unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct. at 2378 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)). "Government discrimination among viewpoints . . . is a more 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 168–69 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Indeed, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. It follows that the government cannot regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* Nor can the government require an individual to "present a viewpoint not his own." *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001). Doing so is the "equivalent of forbidding him to say what he wishes to say." *Id.* The government cannot compel an individual to become an "instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (7th Cir. 1977)).

On its face, SB 1909 discriminates on viewpoint. Plaintiffs—both the Centers and the sidewalk counselors—are subject to civil penalties for alleged untruthful statements about, for example, the risks of intact dilation and extraction. In contrast, abortion providers are not subject to civil penalties. In the same vein, Plaintiffs are subject to civil penalties for omitting "material facts" but abortion providers are not. As the Court stated during the hearing without any pushback by Defendant Raoul's counsel, SB 1909 immunizes abortion providers from asserting something as untruthful as this: "Abortions cure male pattern baldness." But, in contrast, if Plaintiffs' brochures highlighted only the negative side effects of abortion, they may be subject to liability for omitting "material facts."

### *Strict Scrutiny*

When a government restricts or requires speech based on content or viewpoint, the government action must survive strict scrutiny analysis. *Reed*, 576 U.S. at 171. Under this standard, the government must prove that the restriction or required speech not only furthers a compelling interest but also that they do so in a narrowly tailored way to achieve that goal. *Id.* Restrictions that are underinclusive or overinclusive are not narrowly tailored. Indeed, to be narrowly tailored, the action must eliminate "no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

Generally, government has a compelling interest in regulating deception in health care. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 111 (4th Cir. 2018). But there must be evidence to support the finding that the interest is under attack. *Id.* In this case, however, when pushed by Plaintiffs to show the evidence, Defendant Raoul failed to meet his

burden. But rather than belabor the point, the Court will simply assume at this point for purposes of this motion that a compelling interest exists.

Assuming Defendant Raoul can prove that sufficient evidence exists to support his attempts to prevent what he deems to be deception, SB 1909 is in no way narrowly tailored to meet that goal. One well known way to combat this type of alleged deception is through a public awareness campaign. *Greater Balt.*, 879 F.3d at 112. More speech is the solution; not restricting unpopular speech. But, more importantly, another way to address this alleged deception or failure to provide material facts is by enforcing the Consumer Fraud Act as it existed without SB 1909. *Id.* Defendant Raoul's own Deputy Attorney General publicly stated that the Consumer Fraud Act—without SB 1909's explicit inclusion of Centers and sidewalk counselors and explicit exclusion of abortion providers—would address the alleged concerns. And it would do so without blatant content and viewpoint discrimination.

### *Not Commercial Speech*

Defendant Raoul casually attempted to defend SB 1909 under the commercial speech doctrine. Despite its thinness, the Court will address the argument.

"Commercial speech is usually defined as speech that does no more than propose a commercial transaction. However, because application of this definition is not always a simple matter, some speech outside this core notion may also be deemed commercial. Courts rely on three factors to identify such commercial speech: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech. Because of the difficulty of drawing bright lines that will clearly cabin commercial speech, the inquiry is fact-intensive. It is also one in which context matters." *Greater Balt. Ctr.*, 879 F.3d at 108 (cleaned up).

The speech—and omission of speech—involved in this case is not an advertisement. To some extent the speech refers to a service, but the service is general. But, most importantly, there is no economic motivation for the speech. Centers are not compensated by the individuals they speak to, provide pregnancy tests for, or give baby supplies to. The same is true for sidewalk counselors. There is no renumeration of any kind and there is no economic motivation of any kind. *Id.* at 108-09. In short, there is no commercial transaction in these interactions. SB 1909 is not a constitutional regulation of commercial speech.

### *Not Professional Speech*

Defendant Raoul made even less of an attempt to defend SB 1909 under the concept of professional speech. Again, for the sake of a full record, the Court will address it.

13

"Because the state has a strong interest in supervising the ethics and competence of those professions to which it lends its imprimatur, this sliding-scale review applies to traditional occupations, such as medicine or accounting, which are subject to comprehensive state licensing, accreditation, or disciplinary schemes. More generally, the doctrine may apply where the speaker is providing personalized advice in a private setting to a paying client." *Greater Balt. Ctr.*, 879 F.3d at 109 (cleaned up). To some extent, government can require professionals to disclose factual, uncontroversial information in their commercial speech. *NIFLA*, 138 S. Ct. at 2372.

Under SB 1909, licensed health care providers and licensed hospitals are exempted. Moreover, Centers are not licensed by Illinois. Of course, sidewalk counselors are not and need not be licensed in Illinois. So, SB 1909 applies to only unlicensed individuals in, at least sometimes, an unlicensed setting. Except for two nurses who are paid by a Center, the individuals performing the services for the Centers are not compensated. Some of the covered speech occurs in a private setting but other speech—like the sidewalk counseling—does not. The Centers and sidewalk counselors do *not* charge for their services. Moreover, SB 1909 does not require a professional to disclose factual, *uncontroversial* information. Of course, the type of speech at issue in this case is extremely controversial. SB 1909 is not a constitutional regulation of professional speech.

\*   \*   \*

Plaintiffs have met all the required elements to obtain a preliminary injunction because SB 1909 is facially unconstitutional and as applied to Plaintiffs. Plaintiffs have established by undisputed evidence that they will be irreparably harmed absent a preliminary injunction. Their First Amendment rights will more than likely be violated, which is an irreparable harm. There is no adequate remedy at law, and Defendant Raoul does not argue otherwise. And, as shown in detail in this Order, they have more than a likelihood of succeeding on the merits. The harm to Defendant Raoul and the public is minimal—again because the showing of alleged harm prevented by SB 1909 is thread bare and the conduct is already covered by the existing Consumer Fraud Act. In contrast, the harm to Plaintiffs will be great.

Date: August 4, 2023

Honorable Iain D. Johnston
United States District Judge